UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT FRANKFORT
*Electronically filed*

| | |
|---|---|
| **COMMONWEALTH OF KENTUCKY,** | |
| *Plaintiff,* | |
| v. | Civil Action No._____ |
| **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**; | |
| **MICHAEL S. REGAN,** in his official capacity as Administrator of the United States Environmental Protection Agency; | |
| **UNITED STATES ARMY CORPS OF ENGINEERS**; | |
| **LIEUTENANT GENERAL SCOTT A. SPELLMON**, in his official capacity as Chief of Engineers and Commanding General, U.S. Army Corps of Engineers; and | |
| **MICHAEL L. CONNOR**, in his official capacity as Assistant Secretary of the Army (Civil Works) | |
| *Defendants.* | |

## COMPLAINT

The Commonwealth of Kentucky files this Complaint against the United States Environmental Protection Agency; its Administrator Michael S. Regan, in his official capacity; the United States Army Corps of Engineers; its Chief of Engineers and Commanding General Lieutenant General Scott A. Spellmon, in his official

capacity; and Assistant Secretary of the Army for Civil Works, Michael L. Connor, in his official capacity (collectively, "Defendants"). Plaintiff alleges as follows.

## **INTRODUCTION**

1.      This case involves the latest unlawful attempt by the United States Environmental Protection Agency ("EPA") and the United States Army Corps of Engineers (the "Corps") (collectively, the "Agencies") to grant themselves regulatory authority over broad swaths of the country's land and water by redefining the term "waters of the United States." That expanded jurisdiction usurps Kentucky's role in managing, protecting, and caring for intrastate waters and lands, while creating significant regulatory burdens for the Commonwealth and its citizens—particularly Kentucky farmers. The *Revised Definition of "Waters of the United States*," 88 Fed. Reg. 3004 (Jan. 18, 2023) ("Final Rule"), promulgated by the Agencies should be vacated and enjoined because it violates the Federal Water Pollution Control Act ("Clean Water Act," "CWA," or "Act"), 33 U.S.C. §§ 1251–1387, the Administrative Procedure Act ("APA"), and the U.S. Constitution.

2.      Under the CWA, Congress granted the EPA and the Corps regulatory authority over "navigable waters," which the statute defines as "waters of the United States." *See* 33 U.S.C. §§ 1342, 1344, 1362(7). Both the statutory language and Supreme Court precedent make clear that this term does not extend to every body of water in the United States. States retain their sovereign responsibility and authority to regulate lands and waters within their borders. Thus, the Agencies must

"recognize, preserve, and protect the primary responsibilities and rights of States . . . to plan the development and use . . . of land and water resources." 33 U.S.C. § 1251(b).

3.      But the Agencies recently promulgated the Final Rule re-defining "waters of the United States" to expand their jurisdiction at the expense of the Commonwealth's primary responsibilities and rights. Administrator Regan and Assistant Secretary Connor signed the Final Rule on December 29, 2022 and December 28, 2022, respectively. The rule was published in the Federal Register at 88 Fed. Reg. 3004, on January 18, 2023.[1]

4.      The Final Rule's expansive definition of "waters of the United States" is contrary to the plain language of the CWA and the Supreme Court's decisions interpreting it.

5.      The Final Rule's expansion of federal authority over the Commonwealth's sovereign decisions regarding intrastate water and land management also unconstitutionally exceeds Congress's Commerce Clause authority and violates the Commonwealth's sovereign authority under the Tenth Amendment.

6.      Because of the Final Rule, the Commonwealth and its citizens will also suffer real and immediate economic harm. They will be compelled to undergo expensive and time-consuming permitting procedures that they otherwise would not need to, and the Final Rule makes those procedures even more costly and difficult because it lacks clarity about what waters (and dry land) qualify as jurisdictional.

---

[1]      A true and correct copy of the Final Rule is attached as Exhibit 1. Prior to adopting the Final Rule, the Federal Agencies published a Proposed Rule. *See* Revised Definition of "Waters of the United States," 86 Fed. Reg. 69,372 (Dec. 7, 2021). A true and correct copy of the Proposed Rule is attached as Exhibit 2.

The Agencies' expanded jurisdiction under the Final Rule also disrupts the established cooperative federalism scheme whereby States play a significant role in ensuring water quality and will force the Commonwealth to expend significant resources to fulfill its obligations under the Act.

7.    The Commonwealth therefore respectfully requests that this Court enter a declaratory judgment pronouncing the Final Rule invalid and an order vacating and setting aside the Final Rule in its entirety, pursuant to 5 U.S.C. § 706, as well as a preliminary and permanent injunction prohibiting the Agencies from enforcing the Final Rule, pursuant to 28 U.S.C. § 2202.

## **THE PARTIES**

8.    Plaintiff Commonwealth of Kentucky is a sovereign state of the United States of America. Daniel Cameron is the duly elected Attorney General of the Commonwealth of Kentucky with the constitutional, statutory, and common-law authority to bring suit on behalf of the Commonwealth and its citizens. *See* Ky. Rev. Stat. §§ 15.020, 15.255(a), 15.260; *see also Commonwealth ex rel. Beshear v. Commonwealth ex rel. Bevin*, 498 S.W.3d 355, 362 (Ky. 2016).

9.    Defendant United States Environmental Protection Agency is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1), tasked with implementing sections of the CWA.

10.    Defendant Michael S. Regan is the Administrator of the EPA. Acting in his official capacity, Administrator Regan signed the Final Rule on December 29, 2022.

11. Defendant United States Army Corps of Engineers is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1), tasked with implementing sections of the CWA.

12. Defendant Lieutenant General Scott A. Spellmon is the Chief of Engineers and Commanding General for the Corps.

13. Defendant Michael L. Connor is the Assistant Secretary of the Army for Civil Works. Acting in his official capacity, Assistant Secretary Connor signed the Final Rule on December 28, 2022.

## JURISDICTION AND VENUE

14. This case arises under the APA, 5 U.S.C. §§ 701–706, and under the Constitution and laws of the United States.

15. This Court has federal question jurisdiction under 28 U.S.C. § 1331.

16. The Court may award declaratory and injunctive relief under the APA, 5 U.S.C. §§ 705–706, as well as 28 U.S.C. §§ 2201–2202 and Federal Rules of Civil Procedure 57 and 65.

17. Venue is proper under 28 U.S.C. § 1391(e)(1)(C). The Commonwealth of Kentucky is located in this judicial district, Defendants are officers or agencies of the United States, and "waters of the United States" jurisdictional determinations will be made under the Final Rule in the district.

18. Under Local Rules 3.2(a)(3) and 8.1, the Central Division of the Eastern District of Kentucky at Frankfort is the proper division for this action because substantial property that is the subject of the action is situated in Franklin County,

Kentucky, where Kentucky's seat of government is located, and where Attorney General Cameron holds office.

## FACTUAL ALLEGATIONS

### I.    The Clean Water Act

19.    Congress passed the CWA in 1972 "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters" through a cooperative federalism scheme. 33 U.S.C. § 1251(a).

20.    Congress granted the Agencies limited authority to regulate the discharge of certain materials into "navigable waters" through permitting programs. *See generally* 33 U.S.C. §§ 1341–1346. The Clean Water Act defines "navigable waters" as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7).

21.    At the same time, Congress preserved States' "primary responsibilities and rights . . . to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator in the exercise of his authority." *Id.* § 1251(b). And Congress allowed States to assist in implementing federal programs under the Act. *Id.* §§ 1342(b), 1344(g).

22.    As primary protector of its natural resources, Kentucky has exercised its authority to regulate its own waters, including imposing its own water-purity and pollution standards. *See* Ky. Rev. Stat. §§ 224.70-100 to -150 and 224.16-040 to -090; *see also* 401 KAR 10:031. The Attorney General is authorized to enforce Kentucky's

environmental protections. *See* Ky. Rev. Stat. §§ 15.020, 15.255(a), 224.99-010(9), 224.99-020(1).

23.     Under the CWA, "the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a). "The discharge of a pollutant" is defined broadly to include "any addition of any pollutant to navigable waters from any point source," *id.* § 1362(12), and "pollutant" is defined broadly to include more benign solids such as "dredged spoil, . . . rock, sand, [and] cellar dirt," *id.* § 1362(6).

24.     There are some exceptions to the CWA's prohibition against discharging pollutants. Section 1342 authorizes the EPA or the State to "issue a permit for the discharge of any pollutant, . . . notwithstanding section 1311(a) of this title." *See also id.* § 1344(a), (b). And Section 1344 authorizes the Corps or the State to "issue permits . . . for the discharge of dredged or fill material into the navigable waters at specified disposal sites." *Id.* § 1344(a), (g).

25.     Kentucky plays a role in implementing these permitting programs. All permit applicants under the CWA—whether for pollutants or dredge and fill material—must obtain a statement from the Commonwealth, certifying that the discharge will comply with Kentucky's Water Quality Standards (WQS). *Id.* § 1341(a)(1). The CWA requires States to establish these WQS or goals for each water body within the definition of "waters of the United States." *See Id.* §§ 1311(b)(1)(C), 1313(e)(3)(A); 40 C.F.R. §§ 130.3, 131.3(i), 131.4(a). Kentucky must revise its WQS periodically based on relevant changes, and the EPA will create WQS for the Commonwealth, if its WQS do not comply with the CWA. 33 U.S.C. § 1313(c)(3).

7

26.     If a water body fails to meet WQS, Kentucky must set Total Maximum Daily Loads limiting the amount of a pollutant that can be discharged into the water while achieving the WQS. *See* 40 C.F.R. § 130.7. Kentucky must then apply the limit to its water quality management plan and permitting programs. *Id.*

27.     And Kentucky helps implement the National Pollution Discharge Elimination System permitting program. *See* Ky. Rev. Stat. § 224.16-050. So the Commonwealth is responsible for processing applications for permits under Section 1342. *Id.*; 33 U.S.C. § 1342(b).

28.     Obtaining a discharge permit is an expensive and time-consuming process. It can cost hundreds of thousands of dollars and take years. *See Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 594–95 (2016).

29.     Discharging materials into the "waters of the United States" without a permit is also costly. Doing so can subject a person to civil penalties of up to $64,618 per violation, per day, as well as criminal penalties. *See generally Hanousek v. United States*, 528 U.S. 1102 (2000) (Thomas, J., dissenting from the denial of certiorari); *see also* 33 U.S.C. §§ 1311, 1319, 1365; 40 C.F.R. § 19.4. The Act also allows for "citizen suits." Any "person or persons having an interest which is or may be adversely affected" may bring suit against "any person," including "any . . . governmental instrumentality or agency to the extent permitted by the eleventh amendment to the [U.S.] Constitution[] who is alleged to be in violation of . . . an effluent standard or limitation under this chapter or . . . an order issued by the Administrator or a State with respect to such a standard or limitation." 33 U.S.C. § 1365(a), (g).

30.     The CWA also requires Kentucky to submit a water quality report to the EPA biennially describing "the water quality of all navigable waters" in the Commonwealth and analyzing the extent to which these waters provide for "the protection and propagation of a balanced population of shellfish, fish, and wildlife, and allow recreational activities in and on the water." 33 U.S.C. § 1315(b)(1)(A)–(B).

## II.     Defining "Waters of the United States"

### A. The Supreme Court has repeatedly considered what waters qualify as "waters of the United States."

31.     The Supreme Court interpreted the phrase "navigable waters of the United States" in the CWA's predecessor statute to refer to "navigable in fact" interstate waters. *The Daniel Ball,* 77 U.S. 557, 563 (1870).

32.     After the CWA was enacted, the Corps issued a rule in 1974 defining "waters of the United States" as those waters that have been, are, or may be, used for interstate or foreign commerce. Permits for Activities in Navigable Waters or Ocean Waters, 39 Fed. Reg. 12,115, 12,119 (Apr. 3, 1974).

33.     A federal district court enjoined that rule as too narrow. *Nat. Res. Def. Council, Inc. v. Callaway*, 392 F. Supp. 685, 686 (D.D.C. 1975). On remand, the Agencies sought to expand their regulatory jurisdiction to include new areas not previously subject to federal permitting requirements. *See generally* Permits for Activities in Navigable Waters or Ocean Waters, 40 Fed. Reg. 31,320 (July 25, 1975). Those 1975 regulations defined "the waters of the United States" to include navigable waters and their tributaries, as well as non-navigable intrastate waters that could affect interstate commerce. *Id.* at 31,324–25.

9

34.     The Supreme Court upheld that definition insofar as it interpreted "waters of the United States" to include wetlands that "actually abut[] . . . a navigable waterway." *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 135 (1985). The Supreme Court recognized that "the Corps must necessarily choose some point at which water ends and land begins." *Id.* at 132.

35.     In 1986, the Corps sought to expand its jurisdiction under the CWA even further, to include traditional navigable waters, tributaries of those waters, wetlands adjacent to these waters and tributaries, and waters used as habitat by migratory birds that either are protected by treaty or cross state lines. *See* Final Rule for Regulatory Programs of the Corps of Engineers, 51 Fed. Reg. 41,206–60 (Nov. 13, 1986). The EPA promulgated materially identical regulations in 1988. Clean Water Act Section 404 Program Definitions and Permit Exceptions; Section 404 State Program Regulations, 53 Fed. Reg. 20,764 (June 6, 1988).

36.     In *Solid Waste Agency of Northern Cook County v. Army Corps of Engineers* ("*SWANCC*"), the Supreme Court rejected the Corp's assertion of jurisdiction over any waters "[w]hich are or would be used as habitat" by migratory birds. 531 U.S. 159, 164 (2001) (quoting Final Rule for Regulatory Programs of the Corps of Engineers, 51 Fed. Reg. at 41,217). The Court explained that Congress did not authorize the Agencies to regulate "nonnavigable, isolated, intrastate waters," like seasonal ponds. *See id.* at 171. "The term 'navigable' has at least the import of showing us what Congress had in mind as its authority for enacting the CWA; its

10

traditional jurisdiction over waters that were or had been navigable in fact or which could reasonably be so made." *Id.* at 172.

37.     According to the Court, the Agencies' assertion of broader jurisdiction tested "the outer limits of Congress's power," had the effect of "alter[ing] the federal-state framework by permitting federal encroachment upon a traditional state power," and raised "significant constitutional questions." *Id.* at 172–74. The Court concluded that Congress did not intend for the Agencies to assert authority to the outer bounds of its constitutional authority or cause significant constitutional difficulty. *Id.* at 172–73 (explaining that courts assume "Congress does not casually authorize administrative agencies to interpret a statute to push the limit of congressional authority").

38.     In *Rapanos v. United States*, 547 U.S. 715 (2006), the Supreme Court again rejected the Agencies' assertion of authority over non-navigable, intrastate waters not meaningfully connected to navigable waters. Specifically, the Court considered which, if any, non-navigable tributaries of traditional navigable waters are jurisdictional under the Act and what is required for a wetland to be consider "adjacent" to navigable waters. *Id.* at 731–42. The a majority of the Court rejected the Agencies' expansive jurisdictional claim across two opinions.

39.     Justice Scalia's plurality opinion emphasized that the traditional concept of "navigable waters" must inform and limit the construction of the phrase "the waters of the United States." *See id.* at 732–33. With that in mind, the plurality held that only "relatively permanent, standing or continuously flowing bodies of

11

water," as well as other waters with a "continuous surface connection" to such relatively permanent waters, qualify as "waters of the United States." *Id.* at 739–42. "Wetlands with only an intermittent, physically remote hydrologic connection," the plurality explained, do not fall within the Agencies' jurisdiction. *Id.* at 742.

40.     Writing separately for himself, Justice Kennedy explained that the Agencies' jurisdiction extends only to primary "waters that are navigable in fact or that could reasonably be so made" and to other waters with a "significant nexus" to traditionally navigable waters. *Id.* at 759, 779 (Kennedy, J., concurring in the judgment). To satisfy that nexus, the other waters must "significantly affect the chemical, physical, and biological integrity of" other covered waters more readily understood as 'navigable'." *Id.* at 780.

41.     According to Justice Kennedy, the Agencies' position would impermissibly "permit federal regulation whenever wetlands lie alongside a ditch or drain, however remote and insubstantial, that eventually may flow into traditional navigable waters." *Id.* at 778. The CWA does not allow the Agencies to assert jurisdiction over all "wetlands (however remote)" or "a continuously flowing stream (however small)." *Id.* at 776–77.

42.     On October 3, 2022, the Supreme Court heard oral argument in *Sackett v. EPA*, which asks the Court to address the proper test for determining "waters of the United States." No. 21-454 (argued Oct. 3, 2022). The Agencies elected to promulgate the Final Rule before the Court decided *Sackett*.

**B. The Agencies have wrestled with defining "waters of the United States," particularly after *Rapanos*.**

43.     The Corps originally issued a rule defining "waters of the United States" in 1974, limiting that term to waters that have been, are, or may be, used for interstate or foreign commerce. Permits for Activities in Navigable Waters or Ocean Waters, 39 Fed. Reg. at 12,119. The Corps expanded that definition in 1975 to include navigable waters and their tributaries, as well as non-navigable intrastate waters that could affect interstate commerce. Permits for Activities in Navigable Waters or Ocean Waters, 40 Fed. Reg. at 31,324–25. That was followed by the 1986 redefinition to include migratory bird habitats invalidated in *SWANCC*. *See* 531 U.S. at 164.

44.     After *Rapanos*, the Agencies issued a guidance document explaining the approach they would use to determine whether waters were subject to the CWA. The plan was to identify jurisdictional waters using reasoning drawn from the *Rapanos* dissenters' view of the operative test.[2] Specifically, the Agencies concluded that CWA jurisdiction "exists over a water body if either the plurality's [relatively permanent standard] or Justice Kennedy's [significant nexus] standards is satisfied."[3] The Agencies notably explained that they would assert jurisdiction "over a water body if either the plurality's [relatively permanent] or Justice Kennedy's [significant nexus] standard [was] satisfied."[4] This approach was borrowed from the *Rapanos* dissenters.

---

[2]     EPA & Army Corps of Eng'rs, Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in *Rapanos v. United States & Carabell v. United States*, at 3 (Dec. 2, 2008) ("Post-*Rapanos* Guidance"), https://perma.cc/KJD4-L33Y.

[3]     *Id.* at 3 & n.15 (citing *Rapanos*, 547 U.S. at 810 (Stevens, J., dissenting) ("judgments should be reinstated if either of those tests is met" (emphasis omitted)); *contra Marks v. United States*, 430 U.S. 188, 193 (1977) (the holding of a divided court "may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds" (emphasis added) (citation omitted)).

[4]     *Id.* at 3.

*See Rapanos*, 547 U.S. at 810 (Stevens, J., dissenting) ("[J]udgments should be reinstated if either of those tests is met." (emphasis omitted)).

45.     Then, in 2015, the Agencies promulgated a new definition of "waters of the United States." Clean Water Rule: Definition of "Waters of the United States", 80 Fed. Reg. 37,054 (June 29, 2015) ("2015 Rule"). The rule incorporated an expansive reading of the Agencies' jurisdiction. *See id.* at 37,057.

46.     The 2015 Rule was immediately challenged. It was stayed nationwide while litigation was pending. *See In re EPA*, 803 F.3d 804, 808–09 (6th Cir. 2015). Multiple district courts also preliminarily enjoined the rule. *See, e.g.*, *North Dakota v. EPA*, 127 F. Supp. 3d 1047, 1051 (D.N.D. 2015); *Georgia v. Pruitt*, 326 F. Supp. 3d 1356, 1370 (S.D. Ga. 2018).

47.     Two federal courts considered the merits of the 2015 Rule. Both found the rule unlawful and remanded for agency reconsideration. *Texas v. EPA*, 389 F. Supp. 3d 497, 501–06 (S.D. Tex. 2019); *Georgia v. Wheeler*, 418 F. Supp. 3d 1336, 1355–81 (S.D. Ga. 2019). The Commonwealth was a plaintiff in the *Georgia* litigation, where the court held that the 2015 Rule was unlawful, in part, because it "read[] the term navigability out of the" statute. 418 F. Supp. 3d at 1358.

48.     In 2019, the Agencies rescinded the 2015 Rule and reinstated the pre-*Rapanos* regulations as informed by the 2008 guidance.[5]

49.     In 2020, the Agencies adopted the Navigable Waters Protection Rule. 85 Fed. Reg. 22,250 (Apr. 21, 2020) ("2020 Rule"). The 2020 Rule granted the Agencies'

---

[5]    Definition of "Waters of the United States"—Recodification of Pre-Existing Rules, 84 Fed. Reg. 56,626 (Oct. 22, 2019).

narrower jurisdiction than the 2015 Rule by, for example, expressly excluding features like "ephemeral streams" and "ditches." *See id.* at 22,251. The 2020 Rule provided predictability and hued closer to the Agencies' statutory authority.[6] The 2020 Rule did not incorporate a significant nexus standard.

50.    Even so, the 2020 Rule was also challenged in multiple federal district courts. *See, e.g.*, *Pascua v. Yaqui Tribe v. EPA*, 557 F. Supp. 3d 949, 953–57 (D. Ariz. 2021); *Colorado v. EPA*, 445 F. Supp. 3d 1295 (D. Colo. 2020), *rev'd*, 989 F.3d 874, 890 (10th Cir. 2021).

51.    After President Biden took office, he issued Executive Order 13990, which directed federal agencies to "immediately review, and . . . take action to address the promulgation of Federal regulations and other actions during the last 4 years that conflict with . . . work to confront the climate crisis." 86 Fed. Reg. 7037 (Jan. 20, 2021). In response, the Agencies decided to initiate new rulemaking to revise the definition of "waters of the United States" and therefore filed motions seeking voluntary remands. Ultimately, the rule was vacated and remanded to the Agencies. *Pascua Yaqui Tribe*, 557 F. Supp. 3d at 953–57; *Navajo Nation v. Regan*, 563 F. Supp. 3d 1164, 1167–70 (D.N.M. 2021).

---

[6]    *See* Comments of the States of West Virginia, Alabama, Arkansas, Georgia, Idaho, Indiana, Kansas, Louisiana, Missouri, Montana, Nebraska, Ohio, Oklahoma, South Carolina, Tennessee, Texas, and Utah, on the proposed rule titled Revised Definition of "Waters of the United States," 84 Fed. Reg. 4154 (Feb. 14, 2019); *See* Comments of the Kentucky Energy and Environment Cabinet on the proposed rule titled Revised Definition of "Waters of the United States," 84 Fed. Reg. 4154 (Feb. 14, 2019).

52.     The Agencies stopped implementation of the 2020 Rule, returning again to the pre-*Rapanos* regulations as informed by the 2008 post-*Rapanos* Guidance.[7] Then the Agencies began drafting a new rule.

### C. The Agencies re-define "waters of the United States" yet again in the Final Rule.

53.     On December 7, 2021, the Agencies published in the Federal Register a proposed rule titled Revised Definition of "Waters of the United States." 86 Fed. Reg. 69,372–69,450 (Dec. 7, 2021) ("Proposed Rule"). The Proposed Rule claimed to "restore the longstanding, familiar 1986 regulations, with amendments to reflect the agencies' determination of the statutory limits on the scope of the 'waters of the United States' informed by Supreme Court case law." *Id.* at 69,416.

54.     But, in fact, the Proposed Rule was a significant expansion of the Agencies' jurisdiction under the Act. It was unlawful for a myriad of reason, as Kentucky—along with 23 other States—commented to the Agencies.[8] Among other things, the States explained that the Proposed Rule exceeds the Agencies' statutory authority, and its proposed "significant nexus" standard was inconsistent with even Justice Kennedy's *Rapanos* concurrence.[9] According to Justice Kennedy, non-navigable jurisdictional water must "significantly affect the chemical, physical, *and* biological" integrity of navigable waters." *Rapanos*, 547 U.S. at 780 (emphasis added).

---

[7]   *See* EPA, *Current Implementation of "Waters of the United States*," https://perma.cc/JH87-9MR3.
[8]   Comments of the States of West Virginia, Alabama, Arizona, Arkansas, Georgia, Idaho, Indiana, Kansas, Louisiana, Mississippi, Missouri, Montana, Nebraska, New Hampshire, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, and Wyoming, the Commonwealth of Kentucky, and the Commonwealth of Virginia, on the Proposed Rule Entitled Revised Definition of "Waters of the United States," 86 Fed. Reg. 69,372 (Dec. 7, 2021), Dkt. No. EPA-HQ-OW-2021-0602 (Feb. 7, 2022). A true and correct copy of the States' Comment Letter is attached as Exhibit 3.
[9]   *Id.* at 6.

But the Proposed Rule—and the Final Rule—seek to regulate non-navigable waters so long as they "significantly affect[] the chemical, physical, *or* biological" integrity of the navigable waters. 86 Fed. Reg. at 69373 (emphasis added); 88 Fed. Reg. at 3142–44. "This swap might triple the Agencies' jurisdiction over water and land with an already tenuous connection to anything commonly viewed as 'navigable.'"[10] The States also noted that the viability of Justice Kennedy's significant nexus standard was currently pending before the Court, counseling against its incorporation in the final rule.[11]

55.    On October 3, 2022, the Supreme Court heard oral arguments in *Sackett v. EPA*. A decision is expected by June of this year at the latest.

56.    Rather than wait for the Supreme Court's guidance in *Sackett*, the Agencies issued the Final Rule on December 30, 2022. The Final Rule was published in the Federal Register on January 18, 2023. 88 Fed. Reg. at 3004. According to the Agencies, the regulations in the Final Rule are "founded on the familiar framework of the 1986 regulation and are generally consistent with the pre-2015 regulatory regime." *Id.* at 3007.

57.    The definition of "waters of the United States" under the Final Rule is overbroad. The Final Rule interprets "waters of the United States" to include five categories of waters:

a. traditional navigable waters, territorial seas, and interstate waters, including interstate wetlands ("Traditional Waters");

---

[10]    *Id.* at 7.
[11]    *See id.* at 4–5.

b. impoundments of "waters of the United States" ("Jurisdictional Impoundments");

c. tributaries to traditional navigable waters, the territorial seas, interstate waters, or Jurisdictional Impoundments when the tributaries meet either the relatively permanent standard or the significant nexus standard ("Jurisdictional Tributaries");

d. wetlands adjacent to Traditional Waters, wetlands adjacent to and with a continuous surface connection to relatively permanent Jurisdictional Impoundments, wetlands adjacent to tributaries and impoundments that meet the relatively permanent standard, and wetlands adjacent to Jurisdictional Impoundments or Jurisdictional Tributaries when the wetlands meet the significant nexus standard ("Jurisdictional Adjacent Wetlands"); and

e. intrastate lakes and ponds, streams, or wetlands not identified in the previous categories that meet either the relatively permanent standard or the significant nexus standard ("Other Intrastate Jurisdictional Waters"). *Id.* at 3142–44.

58. Notwithstanding the Final Rule's claims to the contrary, this definition is a significant expansion of the pre-2015 regulatory scheme. The Final Rule returns to the erroneous approach adopted by the *Rapanos* dissent, allowing for jurisdiction where a water meets either the relatively permanent standard or the significant

nexus standard. And because the rule relies on subjective, multi-factored tests, it fails to provide certainty and predictability to States or individuals.

59.     Under the Final Rule, Traditional Waters include waters that are "currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide," "the territorial seas," and "interstate waters, including interstate wetlands." *Id.* at 3143.

60.     The Final Rule thus grants the Agencies jurisdiction over *all* interstate waters "regardless of their navigability." *Id.* at 3072. Thus, navigability also is irrelevant in assessing whether tributaries to such interstate waters, wetlands adjacent to them, and other water bodies are jurisdictional. *See id.* at 3142–44 (defining certain tributaries, impoundments, and other waters as jurisdictional based on their relationship to Traditional Waters). The Final Rule therefore grants the Agencies broad jurisdiction over waters and lands without any regard for navigability.

61.     The second category of jurisdictional waters is Jurisdictional Impoundments. While granting the Agencies jurisdiction over all impoundments of Traditional Waters, Jurisdictional Tributaries, or Jurisdictional Wetlands, the Final Rule fails to define "impoundments" with adequate specificity, leaving significant play in the joints.[12]

---

[12]   "[I]mpoundments are distinguishable from natural lakes and ponds because they are created by discrete structures (often human-built) like dams or levees that typically have the effect of raising the water surface elevation, creating or expanding the area of open water, or both." 88 Fed. Reg. at 3075.

62.     The Final Rule qualifies impoundments as jurisdictional whether or not the impoundment is hydrologically connected to the impounded Traditional Water, Jurisdictional Tributary, or Jurisdictional Wetland. The Final Rule would include off-channel impoundments ("an impoundment with no outlet or hydrologic connection to the tributary network"), *id.* at 3077–78, and waters wholly separated by dams because dams "generally do not prevent all water flow, but rather allow seepage under the foundation of the dam and through the dam itself," *Id.* at 3076. Thus, whether an impoundment is jurisdictional is divorced from whether it bears a significant nexus or relatively permanent connection to jurisdictional water under the rule.

63.     Impoundments are also jurisdictional under the Final Rule whether the water body they impound is currently a "water[] of the United States" or if it would have qualified at the time of impoundment. *Id.* at 3078. So the Agencies may now assert jurisdiction over waters that only met the Final Rule's jurisdictional definition years ago but would not otherwise qualify as "waters of the United States." *Id.*

64.     For the final three categories—Jurisdictional Tributaries, Jurisdictional Adjacent Wetlands, and Other Jurisdictional Intrastate Waters—the Final Rule purports to allow for jurisdiction under either the *Rapanos* plurality's relatively permanent standard or a version of Justice Kennedy's significant nexus standard.

65.     According to the Final Rule, waters meet the relatively permanent test if they are "relatively permanent, standing or continuously flowing waters connected to a [Traditional Water]," or have a continuous surface connection to such a water.

*Id.* at 3066. But unlike in the past, the Final Rule does not require water to flow through a tributary "at least seasonally (*e.g.*, typically three months)" before it is considered jurisdictional. *Id.* at 3085. Instead, a tributary is jurisdictional so long as it contains "flowing or standing water year-round or continuously during certain times of the year," but the Final Rule does not have a "specific flow duration" requirement and tributaries that "may run dry [for] years" may still qualify. *See id.* at 3084–85.

66.     According to the Final Rule, waters meet the Agencies' version of the significant nexus standard where they "either alone or in combination with similarly situated waters in the region significantly affect the chemical, physical, or biological integrity of" another water. *See id.* at 3066–67. The Final Rule, unlike the Proposed Rule, further defines "significantly affect" to mean "material influence." *Id.* at 3067. But the Final Rule fails to meaningfully clarify terms like "in the region" and "similarly situated," leaving regulated entities to guess the contours of those terms.

67.     Assessing whether a water body has a "material influence" requires engaging in multiple multi-factored tests. Five functions must be assessed.[13] And five factors must be considered.[14]

---

[13]   (1) contribution of flow; (2) trapping, transformation, filtering and transport of material (including nutrients, sediment, and other pollutants); (3) retention and attenuation of floodwaters and runoff; (4) modulation of temperature in paragraph (a)(1) waters; or (5) provision of habitat and food resources for aquatic species located in Traditional Waters. 88 Fed. Reg. at 3144.

[14]   (1) the distance from Traditional Waters; (2) hydrologic factors, such as the frequency, duration, magnitude, timing, and rate of hydrologic connections, including shallow subsurface flow; (3) the size, density, or number of waters that have been determined to be similarly situated; (4) landscape position and geomorphology; and (5) climatological variables such as temperature, rainfall, and snowpack. 88 Fed. Reg. at 3144.

68.    The Agencies dismissed concerns from commenters that this aggregation approach is subjective, unclear, or difficult to implement. According to the Agencies, because they "have extensive experience aggregating waters under prior regulatory regimes," regulated entities and individuals should trust the Agencies' ability to divine what waters are "similarly situated" even if the entities and individuals themselves struggled to do so. *See id.* at 3126–27.

69.    The ultimate effect of incorporating the significant nexus standard is to greatly expand the Agencies' jurisdiction beyond what was contemplated by the CWA and to do so without a clear statement from Congress authorizing it. *Contra SWANCC*, 531 U.S. at 172–74; *West Virginia v. EPA*, 142 S. Ct. 2587, 2608–09 (2022). The Final Rule's inclusion of the significant nexus standard has no basis in the text of the CWA. What is more, the rule's articulation of that standard is inconsistent with Justice Kennedy's opinion in *Rapanos*.

70.    Under the Final Rule, Jurisdictional Tributaries include "rivers, streams, lakes, ponds, and impoundments, regardless of their flow regime, that flow directly or indirectly through another water or waters to" Traditional Waters. *Id.* at 3080. According to the Final Rule, "indirect" flow could be through "a number" of downstream waters—including non-jurisdictional features like a ditch—so long as it is "part of a tributary system that *eventually* flows to" a Traditional Water. *Id.* (emphasis added).

71.    The Agencies also assert broad authority over "perennial, intermittent, and ephemeral streams," reasoning that those features are part of tributary streams

that "are chemically, physically, and biologically connected to larger downstream waters via channels and associated alluvial deposits where water and other materials are concentrated, mixed, transformed, and transported." *Id.* at 3030. Thus, the Agencies' rejected the *Rapanos* plurality's contrary conclusion. *See id.* at 3040.

72.    According to the Final Rule, manmade features may also be tributaries "so long as they contribute flow to" a Traditional Water. *Id.* at 3080. Such tributaries are jurisdictional if they meet either the relatively permanent water test or the rule's significant nexus test. *Id.*

73.    Jurisdictional Wetlands include any wetland "adjacent" to Traditional Waters (whether or not it meets the relatively permanent or significant nexus standard) and any wetland "adjacent" to a Jurisdictional Impoundment or Jurisdictional Tributary if it meets either the permanent or significant nexus standard. *See id.* at 3143. Before the Final Rule, the Agencies asserted jurisdiction over only "adjacent wetlands . . . hav[ing] a continuous surface connection with a relatively permanent, non-navigable tributary"—i.e., "where the wetland directly abuts the tributary (e.g., they are not separated by uplands, a berm, dike, or similar feature)." Post-*Rapanos* Guidance at 7.

74.    But the Final Rule is more expansive. "Adjacent" for purposes of determining "adjacent wetlands" under the Final Rule means "bordering, contiguous, or neighboring" and includes as adjacent per se "wetlands separated from other waters of the United States by man-made dikes or barriers, natural river berms,

beach dunes, and the like." 88 Fed. Reg. at 3144. The Final Rule emphasizes that "direct abutment" is not required. *Id.* at 3028.

75.     Instead of clarifying the meaning of "adjacent", the Final Rule only confuses the term. *See id.* at 3089, 3093–94. The Final Rule does not define "neighboring" as a concept distinct from "contiguous" or "bordering." But adjacency "does not require flow from the wetland to the jurisdictional water or from the jurisdictional water to the wetland." *Id.* at 3093.

76.     Rather, the Final Rule considers a wetland "adjacent" if there is an "unbroken surface or shallow subsurface connection to [a] jurisdictional water[]," "where the wetland directly abuts the jurisdictional water or by a non-jurisdictional physical feature that provides the direct connection between the wetland and a jurisdictional water such as a pipe, culvert, non-jurisdictional ditch, or flood gate, that has at least periodic flow." *Id.* This test extends the Final Rule's jurisdiction, allowing for a non-jurisdictional physical feature between a jurisdictional water and a wetland as the conduit. *See id.* at 3093, 3095. And this non-jurisdictional physical feature does not need to be flowing with water between the wetland and jurisdictional water. *Id.* at 3093. Indeed, "[a] continuous surface connection does not require a constant hydrologic connection" under the Final Rule. *Id.* at 3095.

77.     Even water that is "physically separated" from a jurisdictional wetland, without any hydrologic connection, may be "adjacent" under the Final Rule. *See id.* at 3092, 3094. And a wetland that is divided by artificial structures is still considered "one wetland." *Id.* at 3094.

24

78.     Wetlands must only be "reasonably close" to be considered adjacent, which can "depend[] on regional variations in climate, landscape, and geomorphology." *Id.* at 3089; *see also id.* at 3094. Pairing the Agencies' "adjacency" analysis with the overly broad and vague language in the relatively permanent standard or significant nexus standard gives the Agencies almost unfettered discretion in determining if "adjacent wetlands" are "waters of the United States." *Id.* at 3095-97.

79.     The Final Rule includes a final catch-all category of jurisdictional waters—"Other Jurisdictional Intrastate Waters." *See id.* at 3143. This category includes "intrastate lakes and ponds, streams, or wetlands" not already identified in the other four categories, but that satisfy either the relatively permanent standard (to Traditional Waters or Jurisdictional Tributaries) or significant nexus standard (to Traditional Waters). *Id.* at 3143, 3097-98, 3101-03. The effect is to expand the Agencies' jurisdiction over all remaining waters not already captured by the first four broad categories.

80.     What is more, to rationalize these expansive categories, the Agencies relied on the same flawed "Science Report" they relied on to issue their failed 2015 Rule. *See id.* at 3035; *see also id.* at 3006, 3029, 3030, 3033.

**III.    The Final Rule Harms the Commonwealth.**

81.     The Final Rule harms the Commonwealth of Kentucky and its citizens— particularly Kentucky farmers.

82.     By expanding what is considered jurisdictional waters beyond what the CWA authorizes, the Final Rule impedes the Commonwealth's authority over its own

waters and increases regulatory burdens and costs on the Commonwealth, its agencies, and citizens. All the while, the Final Rule fails to provide clear and predictable standards for distinguishing jurisdictional from non-jurisdictional waters.

83.   Kentucky has primary authority "to control navigation, fishing, and other public uses of water," which "is an essential attribute of [its] sovereignty." *Tarrant Reg'l Water Dist. v. Herrmann*, 569 U.S. 614, 631 (2013) (citation omitted); *Kansas v. Nebraska*, 574 U.S. 445, 479–80 (2015) (Thomas, J., concurring and dissenting in part); *see also Hudson Cnty. Water Co. v. McCarter*, 209 U.S. 349, 356 (1908); *see also* Ky. Rev. Stat. §§ 151.110(1)(a), 151.120(1). States retain this traditional authority over their own lands and waters under the Tenth Amendment to the U.S. Constitution. *See, e.g.*, *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 44 (1994). And the Act recognizes this sovereign interest. *See* 33 U.S.C. § 1251(b).

84.   The Final Rule interferes with States' sovereign authority over land and water. In doing so, it disrupts the cooperative federalism scheme established by the Act, and "significantly change[s] the federal-state balance" that has always existed regarding land and water regulation. *See SWANCC*, 531 U.S. at 172–74.

85.   Beyond interfering with Kentucky's sovereign powers, the Final Rule also imposes significant burdens on the Commonwealth in its capacity as a landowner and developer.

86.   Expanding the Agencies' jurisdiction under the Act means that Kentucky's use of its own lands and waters will be subject to greater federal oversight

26

under the Final Rule. This will increase planning and permitting costs for state infrastructure projects and other public works projects. The Commonwealth will need to expend more state resources to obtain the necessary permits because it will require additional staff, time, and expert resources to navigate the uncertain, multi-factor analysis imposed by the Final Rule to determine which waters are jurisdictional.

87.     More jurisdictional waters under the Final Rule will also mean that Kentucky citizens will see an uptick in projects requiring federal permitting. The rule's expansive, amorphous, and extra-textual definition of "waters of the United States" "could lead to tremendous barriers to produce livestock and crops in the Commonwealth by adding additional burdensome regulations to farm" land.[15]

88.     As Kentucky farmers explained to the Agencies, "farmers need water. For this reason, farming tends to occur on lands where there is either plentiful rainfall or adequate water available for irrigation. There are many features on those lands that are wet only when it rains and that may be miles from the nearest 'navigable' water."[16] But under the Final Rule, those features may qualify as jurisdictional, meaning that everyday farming activities—plowing, planting, or fence building—could be subject to regulation backed by the threat of significant civil or criminal penalties.[17]

---

[15]   Comments of the Kentucky Farm Bureau Federation regarding the Proposed Rule Entitled Revised Definition of "Waters of the United States," 86 Fed. Reg. 69,372 (Dec. 7, 2021), Dkt. No. EPA-HQ-OW-2021-0602 (Feb. 4, 2022) ("KFB Comment Letter"). A true and correct true and correct copy of the KFB Comment Letter is attached as Exhibit 4
[16]   *Id.* at 1.
[17]   *Id.* at 2.

89.     The costs for permit applicants are likely to be especially high under the Final Rule because it does not provide a clear or predictable rubric for what is and is not a jurisdictional water. For example, farmers and fertilizer companies already "must plan years in advance to obtain all necessary permits in accordance with the Clean Water Act. [They] need regulatory certainty and predictability"[18] so they can plan appropriately to be able to produce their crops. But under the Final Rule, farmers and ranchers will need "a team of attorneys and consultants to identify 'navigable waters' on their land" and to navigate the "quagmire of regulatory uncertainty on large areas of private farmland miles from the nearest navigable water."[19]

90.     Indeed, Kentucky farmers explained to the Agencies that the Final Rule, instead of certainty and fair notice, "set[s] up a system that is based in arbitrary decision-making" that "threatens to impede farmers' ability to provide safe, affordable, and abundant food, fuel, and fiber to the citizens of this nation and the world." KFB Comment Letter at 3.

91.     The Final Rule also harms Kentucky in its role as a regulator within the cooperative federal scheme established by the Act, notwithstanding the Agencies' claim that States would face only a "de minimis" cost difference relative to the regime before 2015. Because the rule increases the number of waters subject to permitting under the CWA, the Commonwealth must immediately determine which waters were

---

[18]   *WOTUS rule reinstatement receives backlash from agriculture*, AGDAILY (Feb. 3, 2023), https://perma.cc/W8LV-G4CB.
[19]   *New Water Rule Will Create More Confusion for Farmers*, FARM BUREAU, https://perma.cc/XTT9-5N89.

added to the Agencies' jurisdiction and if current WQS apply to these additional waters. 33 U.S.C. § 1313(c)(4)(B). This evaluation will require the Commonwealth to expend significant resources.

92.     And once identified, Kentucky will need to monitor these additional jurisdictional waters to ensure compliance with applicable standards and act if the water body fails to meet those standards. *See* 40 C.F.R. § 130.7. This will impose additional monitoring and enforcement costs.

93.     More jurisdictional waters also means that Kentucky will need to spend more time and resources preparing the biennial water quality report it must submit to the EPA describing "the water quality of all navigable waters in" the Commonwealth and analyzing how well individual waters support wildlife populations and recreational activities. 33 U.S.C. § 1315(b)(1)(A).

94.     The Commonwealth will also need to process more discharge permits. Because more projects will implicate "waters of the United States" under the Final Rule, the Commonwealth will have to provide more certifications under Section 1341(a) of Title 33. Kentucky will also have to process additional permit applications under Section 1342(b). Processing these additional applications will come at a significant cost to Kentucky.

95.     In sum, the Final Rule will impede Kentucky's sovereign interest in land and water regulation. It increases the Commonwealth's costs and burdens for using its own lands and waters for the benefit of its citizens. The Final Rule imposes significant initial implementation costs on the Commonwealth. And then Kentucky

will need to expend additional resources on an on-going basis to comply with its duties under the Act.

## CLAIMS FOR RELIEF

**I.    Claim One: The Final Rule is Arbitrary and Capricious.**

96.    Plaintiff incorporates by reference the preceding allegations of this Complaint as if fully set forth herein.

97.    Under the APA, an agency action is unlawful and may be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm. Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (explaining an agency rule is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise").

98.    The Final Rule is arbitrary and capricious because, among other things, it:

   a.   is inconsistent with the text of the CWA

   b.   is inconsistent with Supreme Court precedent interpreting the Act;

   c.   creates a scheme based on subjective, case-by-case tests that leave regulated entities and individuals uncertain how it will be applied and which create the potential for similar waters being treated differently;

    d.   is not adequately justified by the Agencies' reliance on the 2015 Science Report. *See* 88 Fed. Reg. at 3035; *see also id.* at 3006, 3029, 3030, 3033

    e.   concludes that expanding the Agencies' jurisdiction will result in only "*de minimus* costs" generally, *id.* at 3007, and will not produce "new costs or requirements [for] states," *id.* at 3141;

    f.   wrongly concludes that maximum federal jurisdiction is optimal without adequately or accurately considering the value of state regulation;

    g.   suggests that it is merely a return to the enforcement regime before the 2015 Rule despite its expansion of jurisdiction;

    h.   simultaneously expands the Agencies' jurisdiction in the name of "environmental justice" while explaining that "impacts on communities with environmental justice concerns are not a basis for determining the scope of the definition of 'waters of the United States.'" *Id.* at 3018, 3142.

99.    The Final Rule should be set aside accordingly. 5 U.S.C. § 706(2)(A).

## II.   Claim Two: The Final Rule Exceeds Congress's Authority under the Commerce Clause.

100.    Plaintiff incorporates by reference the preceding allegations of this Complaint as if fully set forth herein.

101.    Under the APA, an agency action is unlawful and may be set aside if it is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

102.    The Final Rule is such an abuse because it exceeds Congress's authority under the Commerce Clause in Article I, Section 8 of the Constitution.

103.   Because the CWA was enacted pursuant to Congress's authority to regulate interstate commerce, federal agencies violate the Constitution when their enforcement of the CWA extends beyond the regulation of interstate commerce. *See SWANCC*, 531 U.S. at 173.

104.   Under the Commerce Clause, Congress is empowered only to "regulate Commerce . . . among the several states." U.S. Const. art. I, § 8, cl. 3. As a result, Congress may regulate the "use of the channels of interstate commerce" and "activities that substantially affect interstate commerce." *United States v. Lopez*, 514 U.S. 549, 558–59 (1995). The Final Rule ignores these limitations. Among other things, it reads the word "navigable" out of the statute by basing jurisdiction on a connection to non-navigable interstate waters. *See* 88 Fed. Reg at 3072. The Final Rule also gives the Agencies jurisdiction over isolated features, much like what the Court disapproved of in *SWANCC*. *See id.* at 3143, 3097-98, 3101-03.

105.   Therefore, the Final Rule is "contrary to a constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B), as well as "arbitrary, capricious, an abuse of discretion, or otherwise not accordance with law," 5 U.S.C. § 706(2)(A). It should be set aside accordingly. *Id.* at §§ 706(2)(A)–(B).

## III.   Claim Three: The Final Rule Infringes the Commonwealth's Sovereignty, in Violation of the Tenth Amendment.

106.   Plaintiff incorporates by reference the preceding allegations of this Complaint as if fully set forth herein.

107. Under the APA, an agency action is unlawful and may be set aside if it is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

108. The Final Rule is such an abuse because it infringes on Kentucky's sovereignty, in violation of the Tenth Amendment.

109. Under the Tenth Amendment, "[t]he powers not delegated to the United States by the Constitution . . . are reserved to the States respectively, or the people." U.S. CONST. amend. X. Nothing in the Constitution delegates to the federal government general powers over land-use planning, regulation, and zoning. Indeed, these are traditionally areas of state authority. *See SWANCC*, 531 U.S. at 174; *see also Hess*, 513 U.S. at 44. Typically, Congress must give a "clear and manifest" statement before a federal agency may intrude into areas of traditional state authority. *Rapanos*, 547 U.S. at 738 (citation omitted). And the phrase "the waters of the United States" is not such a "clear and manifest" statement. *See id.*

110. The Final Rule is therefore "contrary to a constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B), as well as "arbitrary, capricious, an abuse of discretion, or otherwise not accordance with law," 5 U.S.C. § 706(2)(A). It should be set aside accordingly. *Id.* at §§ 706(2)(A)–(B).

## IV. Claim Four: The Final Rule Violates Due Process

111. Plaintiff incorporates by reference the preceding allegations of this Complaint as if fully set forth herein.

112.    Under the APA, an agency action is unlawful and may be set aside if it is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

113.    The Final Rule is such an abuse because it imposes civil and criminal penalties on regulated entities and individuals without providing adequate notice of what conduct is forbidden, in violation of Due Process.

114.    The Due Process Clause of the Fifth Amendment requires adequate notice of what conduct is forbidden before criminal or civil penalties may attach, and may not be so incomplete, vague, indefinite, or uncertain that persons of common intelligence must necessarily guess at its meaning and as to its application. *See e.g.*, *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *Baggett v. Bullitt*, 377 U.S. 360, 371 (1964).

115.    The Final Rule fails to give adequate notice of what is, and what is not, "waters of the United States." By employing vague, undefined terms, and unweighted arbitrary factors that may or may not be employed by the Agencies, the Final Rule does not give adequate notice of what the terms "interstate waters," "impoundments," "tributaries," "adjacent wetlands," "relatively permanent," "seasonally," "significant nexus," "similarly situated," and "significantly affect" mean. Accordingly, the Final Rule fails to give fair notice of what conduct is forbidden under the CWA and grants impermissible *ad hoc* discretion to the Agencies, *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) ("A fundamental principle in our legal system is that laws which regulate persons         or entities must         give fair notice of conduct that

34

is forbidden or required."); *see also Morton v. Ruiz*, 415 U.S. 199, 232 (1974) (admonishing agencies "to avoid the inherently arbitrary nature of unpublished ad hoc determinations").

116.   The Final Rule is therefore "contrary to a constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B), as well as "arbitrary, capricious, an abuse of discretion, or otherwise not accordance with law," 5 U.S.C. § 706(2)(A). Accordingly, it should be set aside. *Id.* at §§ 706(2)(A)–(B).

## V.   Claim Five: The Final Rule Exceeds the Agencies' Authority Under the CWA.

117.   Plaintiff incorporates by reference the preceding allegations of this Complaint as if fully set forth herein.

118.   Under the APA, an agency action is unlawful and may be set aside if it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

119.   The Final Rule is such an abuse because its redefinition of "waters of the United States" exceeds the authority that the CWA granted to the Agencies.

120.   Among other excesses, the Final Rule's position that waters can be jurisdictional based on a significant nexus without a continuous surface connection to a navigable water has no basis in the text of the CWA, and it conflicts with the plurality opinion in *Rapanos*.

121.   And to the extent there is statutory support for the significant nexus standard articulated by Justice Kennedy in *Rapanos*, the Final Rule conflicts with that standard.

122.    The Final Rule also exceeds the Agencies' statutory authority because it misconstrues 33 U.S.C. § 1251(a) and (b), and conflicts with the Supreme Court's decision in *SWANCC*.

123.    For these and other reasons outlined above, the Final Rule is therefore "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), as well as "arbitrary, capricious, an abuse of discretion, or otherwise not accordance with law," 5 U.S.C. § 706(2)(A). It should be set aside accordingly. *Id.* at §§ 706(2)(A), (C).

## VI.    Claim Six: The Final Rule Violates the Major Questions Doctrine and the Non-Delegation Doctrine.

124.    Plaintiff incorporates by reference the preceding allegations of this Complaint as if fully set forth herein.

125.    Under the major questions doctrine, an agency's claim of authority must be clearly supported by statute before an agency can assert "'unheralded' regulatory power over a 'significant portion of the American economy.'" *West Virginia v. EPA*, 142 S. Ct. at 2608 (citation omitted). The Supreme Court has accordingly rejected agencies' claims of regulatory authority when the underlying claim of authority concerns an issue of "vast 'economic and political significance,'" unless Congress has clearly empowered the agency. *See, e.g., Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014) (citation omitted).

126.    Whether a body of water qualifies as one of the "waters of the United States" is an issue of "vast 'economic and political significance.'" The broader the Agencies' jurisdiction under the CWA, the more individuals will be forced to

36

undertake costly and time-consuming permitting procedures before they can use their land for agricultural development, constructing infrastructure, energy development, and other ordinary uses. Non-compliance results in civil and/or criminal penalties.

127.   The CWA does not clearly authorize the expansive jurisdiction the Agencies claim in the Final Rule. Indeed, particularly given that the CWA specifically recognizes, preserves, and protects the primary responsibilities of States to plan the development and use of their land and water resources, "waters of the United States" cannot be read as expansively as the Agencies have done here.

128.   For similar reasons, the Final Rule would violate the non-delegation doctrine even if its overbroad definition of "waters of the United States" was correct. *See Mistretta v. United States*, 488 U.S. 361, 372 (1989) (explaining that Congress must provide an "intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform"); *see also Sackett v. EPA*, 566 U.S. 120, 133 (2012) (Alito, J., concurring) (explaining that "waters of the United States" "was not a term of art with a known meaning; and the words themselves are hopelessly indeterminate").

129.   The Final Rule is therefore "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), as well as "arbitrary, capricious, an abuse of discretion, or otherwise not accordance with law," 5 U.S.C. § 706(2)(A). It should be set aside accordingly. *Id.* at §§ 706(2)(A), (C).

## VII.   Claim Seven: The Final Rule Violates the APA's Procedural Requirements.

130.   Plaintiff incorporates by reference the preceding allegations of this Complaint as if fully set forth herein.

131.   Before issuing a rulemaking, federal agencies must provide a "[g]eneral notice of proposed rule making" and give "interested persons an opportunity to participate in the rule making through submission of written data, view, or arguments." 5 U.S.C. § 553(b)-(c). The Final Rule must be a "logical outgrowth" of the proposed rule to ensure that interested parties have adequate notice and opportunity to comment. *See Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007).

132.   The Final Rule is not a logical outgrowth of the Proposed Rule. Among other things, the Proposed Rule did not signal that the Final Rule would water down "significantly affect" to require only a "material influence."

133.   The Final Rule also creates a standard for reconsideration of jurisdictional determinations issued under the 2020 Rule, which was not signaled in the Proposed Rule.

134.   The Agencies also failed to meet their obligations under the Regulatory Flexibility Act, claiming they were excused because the Final Rule "will not have a significant economic impact on a substantial number of small entities." 88 Fed. Reg. at 3139–40.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully asks this Court to:

A.      Declare the Final Rule is unlawful because it: (1) is arbitrary and capricious; (2) is contrary to constitutional rights and powers; and (3) was promulgated in excess of the Agencies' statutory authority;

B.      Vacate and set aside the Final Rule in its entirety;

C.      Issue preliminary and permanent injunctive relief prohibiting the Agencies from implementing, applying, enforcing, or otherwise proceeding on the basis of the Final Rule;

D.      Award Plaintiff reasonable costs and fees, including attorney's fees, pursuant to any applicable statute or authority

E.      Grant Plaintiff such additional relief that the Court deems appropriate.

Dated: February 22, 2023

Respectfully Submitted,


**Daniel Cameron**
**ATTORNEY GENERAL**


*/s/ Christopher L. Thacker*
Victor B. Maddox (KBA No. 43095)
Christopher L. Thacker (KBA No. 91424)
Lindsey R. Keiser (KBA No. 99557)
Harrison Gray Kilgore (KBA No. 99829)
Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
Phone: (502) 696-5300
Victor.Maddox@ky.gov
Christopher.Thacker@ky.gov
Lindsey.Keiser@ky.gov
Harrison.Kilgore@ky.gov


*Counsel for the Commonwealth of Kentucky*
*ex rel. Daniel Cameron in his official capacity*
*as Attorney General of Kentucky*