UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT FRANKFORT
*Electronically filed*

| | |
|---|---|
| **COMMONWEALTH OF KENTUCKY** <br><br> *Plaintiff,* <br><br> v. <br><br> **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,** *et al.* <br><br> *Defendants.* | Civil Action No. 3:23-cv-00007 |

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Plaintiff the Commonwealth of Kentucky, by and through Attorney General Daniel Cameron, moves for a preliminary injunction under Fed. R. Civ. P. 65(a) to enjoin implementation and enforcement of the final rule promulgated by the U.S. Environmental Protection Agency ("EPA") and the U.S. Army Corps of Engineers ("Corps") (collectively, the "Agencies") titled *Revised Definition of "Waters of the United States*," 88 Fed. Reg. 3004 (Jan. 18, 2023) ("Final Rule"), which purports to interpret the term "waters of the United States" in the Federal Water Pollution Control Act ("Clean Water Act," "Act," or "CWA"), 33 U.S.C. §§ 1251 *et seq.*

## INTRODUCTION

As a sovereign, Kentucky regulates its land and water to preserve its natural beauty, protect its citizens from harmful pollutants, and ensure the efficient and effective use of the Commonwealth's resources. The Clean Water Act was enacted to preserve States' primacy in promoting these interests while improving the health and

safety of the nation's "navigable waters." But the Final Rule disrupts the federal-state balance protected by the U.S. Constitution and the Act.

The Final Rule represents the Agencies' latest unlawful attempt to grant themselves regulatory authority over broad swaths of the nation's land and water by redefining the term "waters of the United States." As with their past attempts to expand jurisdiction under the Act, the Final Rule is unmoored from the text of the statute and its Commerce Clause origins. Indeed, the Agencies' broad jurisdictional claim over many important aspects of the American economy is devoid of any plausible—let alone clear—congressional authorization. And all of this is at the expense of the Commonwealth of Kentucky. The Final Rule unlawfully infringes on Kentucky's sovereign interest in regulating its lands and water without federal interference. Implementing the Final Rule's expanded definition of jurisdictional waters will also put a strain on Kentucky's resources as it works to fulfill its obligations under the Act. And the Final Rule subjects Kentucky and its citizens—like Kentucky farmers—to potentially enormous civil and criminal penalties without adequately delineating what conduct is forbidden or required.

The Supreme Court struck down the Agencies' last two attempts to appoint themselves as, what amounts to, a national zoning board. This Court should do the same here. And because Kentucky would face irreparable harm if the Final Rule were to go into effect, a preliminary injunction enjoining the Agencies from taking that action is appropriate. That is particularly so because the Agencies are not harmed by

2

continuing to regulate using the current definition of "waters of the United States," while the public interest weighs heavily in favor of enjoining the rule.

## BACKGROUND

### I.    The Clean Water Act

Congress passed the Clean Water Act in 1972 "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." *Rapanos v. United States*, 547 U.S. 715, 722 (2006) (quoting 33 U.S.C. § 1251(a)). The Act struck a balance between States' traditional jurisdiction over lands and waters, and Congress's ability to regulate interstate commerce. *See Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 165–66, 172–73 (2001) ("*SWANCC*"). The EPA and the Corps therefore have jurisdiction to regulate discharges into "navigable waters," defined as "the waters of the United States." *See* 33 U.S.C. §§ 1341–1346, 1362(7). But the Agencies must otherwise "recognize, preserve, and protect the primary responsibilities and rights of States . . . to plan the development and use . . . of land and water resources . . . ." *Id.* § 1251(b).

So the Act establishes a cooperative federalism framework, where federal water standards serve as a regulatory floor for "the waters of the United States," while states retain jurisdiction over their own lands and waters. Indeed, Kentucky has its own water regulatory scheme. *See* Ky. Rev. Stat. §§ 224.70-100 to -150, 224.16-040 to -090; *see also, e.g.*, 401 KAR 10:026; 10:031. And States have an important role

in implementing federal programs under the Act. *See, e.g.*, 33 U.S.C. §§ 1341(a), 1342(b), 1344(g).[1]

For example, Kentucky helps with Clean Water Act permitting.[2] Anyone who wants to discharge "pollutants"—broadly defined, *see* 33 U.S.C. § 1362(6)—into "the waters of the United States" in Kentucky needs at least two things. First, the applicant needs a statement from the Commonwealth certifying that the discharge will comply with its Water Quality Standards ("WQS"), which the Act requires States to establish for each water body within the definition of "waters of the United States." 33 U.S.C. §§ 1311(b)(1)(C), 1313(e)(3)(A), 1341(a)(1). Then, depending on the type of pollutant in question, the applicant needs a permit under either 33 U.S.C. §§ 1342 or 1344. *See* Ky. Rev. Stat. § 224.16-050. Kentucky, like most States, has assumed primary administrative authority for the National Pollution Discharge Elimination System ("NPDES") permitting program under Section 1342(b).[3] So each time a project involves discharge other than dredge or fill material into a "water[] of the United States," the Commonwealth must undertake an extensive administrative review and approval process. *See* Ky. Rev. Stat. § 224.16-050.

---

[1]    *See* CLAUDIA COPELAND, CONGR. RESEARCH SERV., RL30030, CLEAN WATER ACT: A SUMMARY OF THE LAW (2016), https://crsreports.congress.gov/product/pdf/RL/RL30030 (explaining the CWA "embodies a philosophy of federal-state partnership in which the federal government sets the agenda and standards for pollution abatement, which states carry out day-today activities of implementation and enforcement").

[2]    *See §401 Water Quality Certification*, KENTUCKY ENERGY AND ENVIRONMENT CABINET, https://perma.cc/ELS3-4DKQ.

[3]    *See Kentucky NPDES Permits*, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, https://perma.cc/E3LN-R5XG (directing anyone needing NPDES permits to the Kentucky Energy and Environment Cabinet).

If a State's WQS fall below the federal standards (Kentucky's do not), the EPA can create new standards for the State. 33 U.S.C. § 1313(c)(3). And if it is determined that a water body falls below a State's WQS, the State must take corrective action. *See* 40 C.F.R. § 130.7. The CWA also requires Kentucky to submit biennially a water quality report to the EPA describing "the water quality of all navigable waters in" the Commonwealth and analyzing how well these waters provide for "the protection and propagation of a balanced population of shellfish, fish, and wildlife, and allow recreational activities in and on the water." 33 U.S.C. § 1315(b)(1)(A)–(B). In all, Kentucky is deeply entwined with regulating and protecting "the waters of the United States," however defined.

## II.   Defining "Navigable Waters" as "Waters of the United States"

### A. The Supreme Court's definition

Under the predecessor to the Clean Water Act, "navigable waters of the United States" referred to "navigable in fact" interstate waters. *The Daniel Ball*, 77 U.S. 557, 563 (1870). Now "navigable waters" is defined within the Act as "the waters of the United States." 33 U.S.C. § 1362(7). The Supreme Court has recognized that this term encompasses more than just traditional navigable waters—wetlands which "actually abut[] . . . a navigable waterway" count, for example. *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 135 (1985). But "waters of the United States" is not broad enough to include every piece of land that might be damp from time to time. The statute's use of the term "navigable waters," its Commerce Clause underpinnings, and its explicit recognition of States' traditional domain over lands

5

and waters are lodestars for assessing the Agencies' jurisdiction to regulate "the waters of the United States." *SWANCC,* 531 U.S. at 172–73.

The Supreme Court most recently weighed in on the limits of "the waters of the United States" in *Rapanos*, 547 U.S. at 715. More guidance might come any day. *See Sackett v. EPA*, No. 21-454 (argued Oct. 3, 2022) (asking whether the Ninth Circuit applied the proper test for determining "waters of the United States"). But, for now, *Rapanos* remains the best guide.

Emphasizing that the traditional concept of "navigable waters" must inform and limit the construction of the phrase "the waters of the United States," Justice Scalia's plurality opinion limited that term to only "relatively permanent, standing or continuously flowing bodies of water." *See Rapanos*, 547 U.S. at 739–42 (Scalia, J., plurality). The Agencies' jurisdiction also extends to secondary waters with a "continuous surface connection" to such relatively permanent waters. *Id.* at 742. "Wetlands with only an intermittent, physically remote hydrologic connection," the plurality explained, do not fall within the Agencies' jurisdiction. *Id.*

Writing separately for himself, Justice Kennedy explained that the Agencies' jurisdiction extends only to "waters that are or were navigable in fact or that could reasonably be so made" and to secondary waters with a "significant nexus" to these waters. *Id.* at 759 (Kennedy, J., concurring in the judgment). To satisfy that nexus, secondary waters must "significantly affect the chemical, physical, and biological integrity of" navigable-in-fact waters. *Id.* at 780. But when a wetland's "effects on

water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the term 'navigable waters.'" *Id.*

### B. The Agencies' *Revised Definition of "Waters of the United States"*

Since *Rapanos*, the Agencies have issued a series of rules defining "waters of the United States." Each has been challenged as unlawful before being ultimately withdrawn. *See, e.g.*, *Georgia v. Wheeler*, 418 F. Supp. 3d 1336, 1381–83 (S.D. Ga. 2019) (invalidating the 2015 rule defining "waters of the United States"); *Pascua Yaqui Tribe v. EPA*, 557 F. Supp. 3d 949, 956–57 (D. Ariz. 2021) (remanding the 2020 rule defining "waters of the United States" at the Agencies' request, without addressing the merits). In December 2021, the Agencies went back to the well and published in the Federal Register a proposed rule titled "Revised Definition of 'Waters of the United States.'" 86 Fed. Reg. 69,372 (Dec. 7, 2021) ("Proposed Rule").

Kentucky and other States commented to explain the problems with the Proposed Rule—including that it would exceed the Agencies' statutory authority at the expense of the States' sovereignty.[4] Kentucky farmers explained that the Proposed Rule's vague significant nexus standard left them wondering what ordinary activities would require a permit—one that might take years and cost hundreds of thousands of dollars to obtain.[5] *See Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 594–95 (2016). But the Agencies pushed ahead and finalized their rulemaking.

---

[4]   *See* DN 1-3 at 6–7.
[5]   *See* DN 1-4 at 3–4.

The Final Rule includes five categories of "jurisdictional" waters: Traditional Waters,[6] Jurisdictional Impoundments,[7] Jurisdictional Tributaries,[8] Jurisdictional Adjacent Wetlands,[9] Other Intrastate Jurisdictional Waters.[10] For the last three categories, the Final Rule purports to allow for jurisdiction to be established under either the *Rapanos* plurality's relatively permanent standard or Justice Kennedy's significant nexus standard. 88 Fed. Reg. at 3143. So, for example, "relatively permanent, standing or continuously flowing" tributaries to navigable waters are considered jurisdictional under the Final Rule. *Id.* But according to the Final Rule, so are any tributaries which "either alone or in combination with similarly situated waters in the region, significantly affect the chemical, physical, or biological integrity" of Traditional Waters. *Id.* The revised definition's relatively permanent standard and significant nexus standard "replaces the interstate commerce test," which considered jurisdiction over non-navigable, intrastate waters "based solely on whether the use, degradation, or destruction of the water could affect interstate or foreign commerce." *Id.* at 3029. Because of that switch, more waters traditionally regulated only by the Commonwealth will now be considered "waters of the United States."

---

[6]   These are traditional navigable waters, territorial seas, and interstate waters and wetlands. Final Rule, 88 Fed. Reg. at 3143.

[7]   These are impoundments of "waters of the United States," except for Impoundments of intrastate lakes and ponds. *Id.*

[8]   These are tributaries to either Traditional Waters or Jurisdictional Impoundments. *Id.*

[9]   These are wetlands adjacent to either a qualifying Traditional Water, Jurisdictional Impoundments, or Jurisdictional Tributary. *Id.*

[10]   These are intrastate lakes and ponds, streams, or wetlands not identified in the previous categories that meet either the relatively permanent standard or the significant nexus standard. *Id.* at 3143–44.

### III. This action

After the Agencies published the Final Rule in the Federal Register, the Commonwealth immediately assessed the implications of the Final Rule—for Kentucky's sovereign interests, for its citizens, and for its duties and responsibilities under the CWA. To protect those interests, the Commonwealth sued, alleging that the Final Rule is unlawful and should be set aside. Kentucky now moves for a preliminary injunction to avoid irreparable harm from the Final Rule and to protect the public interest while this Court considers the full merits of this case.

## ARGUMENT

Preliminary injunctive relief turns on a four-part test: "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S.7, 20 (2008). "These factors are not prerequisites, but are factors to be balanced against each other." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). Here, the balance is clear: All four factors favor granting a preliminary injunction to preserve the status quo.

### I. The Commonwealth is likely to succeed on the merits.

As explained below, Kentucky is likely to succeed on the merits of its challenge to the Final Rule. Such a showing "is often dispositive." *Wilson v. Williams*, 961 F.3d 829, 839 (6th Cir. 2020).

**A. Kentucky has standing to sue.**

Article III standing is a prerequisite to suing in federal court. To establish standing, the plaintiff must show an injury which is "concrete and particularized," "actual or imminent," "fairly traceable" to the Final Rule, and "likely" to be "redressed by a favorable decision" from this Court. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up). Kentucky satisfies each of these elements here.

**1.** Kentucky's many injuries are real, concrete, and particularized. Like all States, the Commonwealth has a sovereign interest in managing and protecting its natural resources, including its land and water. *See Kansas v. Nebraska*, 574 U.S. 445, 480 (2015) (Thomas, J., concurring in part and dissenting in part) ("Authority over water is a core attribute of state sovereignty."). Indeed, Kentucky has established a sophisticated regulatory scheme to ensure the health of its lands, waters, and habitats. *See* Ky. Rev. Stat. §§ 224.70-100 to -150, 224.16-040 to -090. And Congress explicitly recognized in the CWA that States retain "*primary*" authority in land regulation. 33 U.S.C. § 1251(b) (emphasis added).

Thus, the Final Rule's expanded definition of "waters of the United States" will hurt Kentucky in its sovereign capacity, in its capacity as a landowner, and in its capacity as a regulator of waters and lands within its borders. By federalizing regulation of lands and waters that were historically the exclusive jurisdiction of the Commonwealth, the Final Rule infringes on "an essential attribute of [Kentucky's] sovereignty": the "power to control navigation, fishing, and other public uses of water." *Tarrant Reg'l Water Dist. v. Herrmann*, 569 U.S. 614, 631 (2013) (cleaned up).

10

And because the Final Rule's rubric for jurisdictional waters is malleable and ill-defined, that intrusion is restrained only by the discretion of the Agencies, which they have exercised like "despot[s]." *Rapanos*, 547 U.S. at 721.

Beyond harming its sovereign interests, expanding the jurisdictional "waters of the United States" will cost the Commonwealth time, money, and resources. *See generally* Ex. 1, Decl. of John Horne, II ("Horne Decl."). Kentucky plays a key role in the cooperative federalism scheme established by the Act. For example, the Act requires the Commonwealth to enact WQS for jurisdictional waters and to revise WQS as necessary. 33 U.S.C. §§ 1311(b)(1)(C), 1313(e)(3)(A); 40 C.F.R. §§ 130.3, 131.3(i), .4(a). The Act also requires Kentucky to prepare and submit to the EPA a biennial water quality report describing "the water quality of all navigable waters in" the Commonwealth and analyzing how well these waters provide for "the protection and propagation of a balanced population of shellfish, fish, and wildlife, and allow recreational activities in and on the water." 33 U.S.C. § 1315(b)(1)(A)–(B). And Kentucky must take corrective action when it determines a jurisdictional water does not meet applicable WQS. *See, e.g.*, 40 C.F.R. § 130.7.

On top of that, Kentucky plays an important role in the permitting process under the Act. Every CWA permit applicant must obtain a statement from the Commonwealth certifying that the discharge will comply with its WQS. 33 U.S.C. § 1341(a)(1). Kentucky also assists with the NPDES permitting program under

section 1342(b).[11] So each time a project involves discharge other than dredge or fill material into a "water[] of the United States," the Commonwealth must undertake an extensive administrative review and approval process. *See, e.g.*, Ky. Rev. Stat. § 224.16-050.

Given these obligations under the Act, the Final Rule's impact on Commonwealth resources is clear: more jurisdictional "waters" subject to the CWA means Kentucky will have to expend more time, money, and manpower. First, Kentucky will need to conduct careful legal and technical analysis of the Final Rule, as well as field and survey work across the Commonwealth to determine what additional waters are now regulated under the Act. Horne Decl. ¶¶ 8–9. Once those new jurisdictional waters are identified, Kentucky will need to determine whether they meet WQS. *Id.* ¶¶ 9–10. Then, it will need to act if they do not. *See* 40 C.F.R. § 130.7 Kentucky's biennial report to the EPA will require more time and state resources to compile, as there will be more waters to assess. And since there are more jurisdictional waters, more projects are likely to trigger the Act's permitting requirements, which Kentucky will have to process under Section 1341(a)(1) and likely under 1342(b), too. Indeed, the Agencies recognized that the Final Rule could increase States' costs for implementing the permitting program under the Act.[12]

---

[11]   *See Kentucky NPDES Permits*, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, https://perma.cc/8RND-EX79 (directing anyone needing NPDES permits to the Kentucky Energy and Environment Cabinet).

[12]   EPA & Dep't of the Army, *Economic Analysis for the Final "Revised Definition of 'Waters of the United States,'"* 66–67, 95 (2022), https://perma.cc/2TZS-ZDNA (recognizing, for example, that some States "could incur additional costs (*e.g.*, staffing costs) from conducting more Clean Water Act section 401 water quality certification reviews of EPA-issued section 402 permits" and that "an increase in [the number of] section 404 permits could result in increased costs to States").

The Final Rule costs Kentucky in more than its role as regulator. The Commonwealth engages in infrastructure and public-works projects that sometimes require CWA permits. Kentucky's projects are more likely to require permitting under the Final Rule's expanded definition of "waters of the United States." And obtaining a discharge permit from the Agencies is an expensive and time-consuming process. It can cost hundreds of thousands of dollars and take years. *See Hawkes Co.*, 578 U.S. at 594–95. Proceeding without the necessary permit would risk Agency enforcement actions and costly "citizen suits." *See Hanousek v. United States*, 528 U.S. 1102, 1103 (2000) (Thomas, J., concurring in part and dissenting in part); *see also* 33 U.S.C. §§ 1311, 1319, 1365(a) (g); 40 C.F.R. § 19.4. Thus, Kentucky faces an imminent threat not only to its sovereignty, but also to its coffers.

**2.** And these injuries are traceable to the Final Rule. Without it, the status quo would continue, and Kentucky would retain its current position as primary regulator of intrastate waters without any of the added implementation costs discussed above. For those same reasons, a ruling from this Court declaring the Final Rule unlawful and setting it aside would redress the havoc to be wrought by the Final Rule. *See Lujan*, 504 U.S. 560–61. That means Kentucky has standing. *Id.*

**B. The Final Rule exceeds the Agencies' authority.**

The Agencies' "power to act and how they are to act is authoritatively prescribed by Congress," *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013), and Congress's power to authorize agency action flows from the Constitution, *New York v. United States*, 505 U.S. 144, 157 (1992). Therefore, courts routinely set aside

agency action as unlawful when it exceeds the agency's authority under the statute, *see, e.g.*, *Util. Air Regul. Grp. v. EPA*, 573 U.S. at 302 325–26 (2014), or the Constitution, *see FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). And the Supreme Court is particularly skeptical when an agency claims jurisdiction over broad and important swaths of the American economy, requiring explicit congressional authorization. *See West Virginia v. EPA*, 142 S. Ct. 2587, 2608–09 (2022).

Here the Final Rule has no basis in the Clean Water Act. It ignores the Act's Commerce Clause underpinnings. And it appoints the Agencies as a national zoning board with oversight powers affecting major state and national industries—like farming, energy and mining projects, infrastructure, construction, and homebuilding—without clear congressional authorization. The Final Rule should be set aside as unlawful. 5 U.S.C. § 706(2)(A), (B), (C).

### i. The Final Rule conflicts with the Act's plain jurisdictional language and its Commerce Clause underpinnings.

Congress passed the CWA under its Commerce Clause authority. *Riverside Bayview Homes*, 474 U.S. at 133. It accordingly granted the Agencies jurisdiction only to regulate discharges and dredging in "navigable waters," later defined in the Act as "the waters of the United States." *See* 33 U.S.C. §§ 1251(a), 1342(a), 1344(a), 1362(7); *see also SWANCC*, 531 U.S. at 172 (Congress's use of the word "navigable" reveals "what Congress had in mind as its authority for enacting the CWA: Its traditional jurisdiction over waters that were or had been navigable in fact or which could reasonably be so made."). But you would not know that reading the Final Rule. The

14

Agencies have defined "waters of the United States" without regard for whether they are "navigable" or affect interstate commerce. The Final Rule therefore exceeds the Agencies' authority and should be set aside. *See* 5 U.S.C. § 706(2)(A), (C).

**1.** The Final Rule reads "navigable" out of the Act, unlawfully granting the Agencies jurisdiction over lands and waters that have no meaningful connection to "navigable waters." While "the Act's term 'navigable waters' includes something more than traditional navigable waters," the Supreme Court has instructed that "the qualifier 'navigable' is not devoid of significance." *Rapanos*, 547 U.S. at 731; *see also SWANCC*, 531 U.S. at 172–73. But the Final Rule renders the term optional.

The Final Rule purports to incorporate both the plurality's test and Justice Kennedy's significant nexus test for determining jurisdictional waters. *See* 88 Fed. Reg. at 3101, 3029. But, in fact, the Final Rule grants the Agencies jurisdiction over waters unconnected to "navigable waters," which neither the *Rapanos* plurality nor Justice Kennedy would approve. The *Rapanos* plurality explained that "the Act's use of the traditional phrase 'navigable waters' . . . confirms that it confers jurisdiction only over relatively *permanent* bodies of water." 547 U.S. at 734. Justice Kennedy believed that "to constitute 'navigable waters' under the Act, a water or wetland must possess a 'significant nexus' to waters that are or were navigable in fact or that could reasonably be so made." *Id.* at 759. But to "permit federal regulation whenever wetlands lie alongside a ditch or drain, however remote and insubstantial, that eventually may flow into traditional navigable waters"—as the Final Rule does—strips "navigable" of any import. *Id.* at 778; *see also id.* at 733–34 (plurality).

Start with the Final Rule's definition of Traditional Waters. Traditional waters are said to include "all rivers, lakes, and other waters that flow across, or from a part of, State boundaries" "regardless of their navigability." 88 Fed. Reg. at 3072. But it is not enough that the waters cross state borders. *See Wheeler*, 418 F. Supp. 3d at 1358–59 (striking down the 2015 rule, in part, because its assertion of jurisdiction over *all* interstate waters read navigability out of the Act). And "interstate wetlands" are Traditional Waters under the Final Rule whether they actually abut a navigable waterway or not. 88 Fed. Reg. at 3072; *see Riverside Bayview Homes*, 474 U.S. at 135. Contrary to the Supreme Court's instructions, navigability has no place in assessing whether a Traditional Water is jurisdictional under the Final Rule. *See Rapanos*, 547 U.S. at 731; *see also SWANCC*, 531 U.S. at 172–73. The Final Rule also grants the Agencies jurisdiction over impoundments "with no outlet or hydrologic connection the tributary network," as well as over waters separated by dams. 88 Fed. Reg. at 3077–78. So navigability also is inconsequential for Jurisdictional Impoundments under the Final Rule.

The same is true for Jurisdictional Tributaries. That category includes "rivers, streams, lakes, ponds, and impoundments, regardless of their flow regime, that flow directly or indirectly through another water or waters to" Traditional Waters. Final Rule, 88 Fed. Reg. at 3080. When the Final Rule says indirect, it means it. A water body is jurisdictional under the Final Rule if it is "part of a tributary system that *eventually* flows to a traditional navigable water," even if the water's only path is

through non-navigable, non-jurisdictional lands and waters like non-jurisdictional tributaries, ephemeral streams, or ditches. *Id.* (emphasis added).

And the category with the most obvious—and troubling—blind spot for navigability is the catch-all Other Jurisdictional Intrastate Waters. That term explicitly does not include traditional navigable waterways, their impoundments, their tributaries, or their adjacent wetlands. *See* 88 Fed. Reg. at 3143. Instead, it captures any other waters that pass either the Final Rule's relatively permanent standard or its significant nexus standard. *See id.* But, as explained below, while those standards as stated in *Rapanos* sought to account for navigability, the Final Rule's versions are different in kind and unmoored from "navigable waters." And because the Final Rule ignores this key jurisdictional limitation in the Act, it exceeds the Agencies' authority and should be set aside as unlawful. 5 U.S.C. § 706(2)(A), (C).

**2.** In construing "waters of the United States" without regard for navigability, the Final Rule also violates the U.S. Constitution. Congress passed the CWA pursuant to its Commerce Clause authority to regulate interstate channels of commerce. *Riverside Bayview Homes*, 474 U.S. at 133. The Act does not, however, extend to the full powers of Congress to regulate interstate commerce. *SWANCC*, 531 U.S. at 172–73.

The Agencies rely on *United States v. Lopez*, 514 U.S. 549, 558–59 (1995), as authorizing federal authority over channels of interstate commerce. But the link between a water body and interstate commerce is an afterthought under the Final Rule. For example, the Final Rule regulates *intrastate* bodies like rivers, lakes, ponds,

ditches, and ephemeral streams with no meaningful connection to interstate commerce. *See* 88 Fed. Reg. at 3143–44. It is improbable that regulating, for example, a small farm pond furthers the Agencies' stated interests in keeping the channels of interstate commerce free from injurious uses, and the Agencies have not explained otherwise. *Id.* at 3045. Such an expansive definition of jurisdictional waters would exceed Congress's powers under the Commerce Clause. *See Rapanos*, 547 U.S. at 738; *SWANCC*, 531 U.S. at 173. The Final Rule should therefore be set aside as unlawful. 5 U.S.C. § 706(2)(C).

**3.** The Supreme Court has admonished the Agencies for errors like these in the past. *See, e.g.*, *Rapanos*, 547 U.S. at 730–31, 738 (explaining that the Agencies' expansive definition of "waters of the United States" read "navigable" out of the statute and "stretche[d] the limits of Congress's commerce power"); *see also SWANCC*, 531 U.S. at 172–73. But the Agencies haven't taken the hint. Instead, while claiming to incorporate both the relatively permanent standard and Justice Kennedy's significant nexus standard from *Rapanos*, *see* Final Rule, 88 Fed. Reg. at 3101, the Final Rule warps those standards beyond recognition.

The *Rapanos* plurality cabined jurisdiction under the Act to "relatively permanent, standing or flowing bodies of water," like streams, oceans, rivers, lakes, and bodies water forming geographical features. 547 U.S. at 732–33. The Final Rule goes much further. For example, a tributary will be considered "relatively permanent" if it contains "flowing or standing water year-round or continuously during *certain times of the year*." Final Rule, 88 Fed. Reg. at 3084 (emphasis added). But that doesn't

18

mean *every* year.[13] And the water need only stand or flow "more than a short duration" to convert dry land to a "water[] of the United States." *Id.* at 3088. Indeed, because the Final Rule "does not require surface water to be continuously present between the wetland and the tributary," even streambeds that remain dry most of the year may be covered. *See id.* at 3096. And the Final Rule's relatively permanent standard encompasses "tributaries in which extended periods of standing or continuously flowing water are not linked to naturally recurring annual or seasonal cycles," like diversions. *Id.* at 3085. The *Rapanos* plurality would not have considered such water bodies "relatively permanent." *See* 547 U.S. at 732–34.

Nor is the Final Rule's significant nexus standard consistent with Justice Kennedy's concurrence in *Rapanos*. For example, the Final Rule would allow the Agencies to regulate wetlands that "significantly affect the chemical, physical, *or* biological integrity" of Traditional Waters. 88 Fed. Reg. at 3006. (emphasis added). That triples the grounds for authority Justice Kennedy envisioned for the Agencies when he said: "Wetlands possess the requisite nexus . . . if the wetlands . . . significantly affect the chemical, physical, *and* biological integrity" of Traditional Waters. *Rapanos*, 547 U.S. at 780 (emphasis added). And the Final Rule waters down Justice Kennedy's standard by defining "significantly affect" as only "material influence." 88 Fed. Reg. at 3119. Thus, the Final Rule's significant nexus standard goes beyond what Justice Kennedy described in *Rapanos*. Because the Final Rule's

---

[13] Even tributaries that "may run dry [for] years" may be jurisdictional. Final Rule, 88 Fed Reg. at 3055. The Agencies declined to use the "seasonal" flow approach consistent with *Rapanos* that required flow for three months out of the year, and instead "decided not to establish a minimum duration." *Id.* at 3085.

standards stray significantly from those described in *Rapanos*—which sought to account for the Act's language and constitutional underpinnings—it is unlawful and should be set aside. *See* 5 U.S.C. § 706(2)(A).

### ii.  The Final Rule violates the major questions doctrine.

When an agency claims "regulatory power over a 'significant portion of the American economy,'" courts should "hesitate before concluding that Congress meant to confer such authority." *West Virginia v. EPA*, 142 S. Ct. at 2608 (cleaned up). In those situations, "something more than a merely plausible textual basis for the agency action is necessary." *Id.* at 2609. The agency "must point to 'clear congressional authorization' for the power it claims." *Id.* The Final Rule fails under that rubric.

**1.** The Final Rule grants the Agencies oversight authority over broad swaths of the American economy. Farmers are impacted because under the Final Rule everyday activities like "fence building in or near ephemeral drainages, ditches, or low spots could trigger" harsh penalties, or such activities will need to be delayed while farmers navigate the confusing scheme established by the Final Rule.[14] Homebuilders are also impacted. *See Sackett v. EPA*, 566 U.S. 120, 124 (2012) (explaining that the EPA brought enforcement proceedings against the Sacketts after they had "filled in part of their lot with dirt and rock" "[i]n preparation for constructing a house"). Construction companies and their suppliers will be regulated

---

[14]   *See generally* DN 1-4 at 2.

by the Final Rule.[15] Energy projects and mining operations will feel impacts from the Final Rule, too.[16] As discussed above, States and their agencies are also impacted. In sum, if allowed to take effect, the Final Rule will govern activities in "a significant portion of the American economy." *West Virginia v. EPA*, 142 S. Ct. at 2608.

**2.** And this jurisdictional claim by the Agencies' is "unheralded." *See id.* As already explained, the CWA does not support the Agencies' broad claim of regulatory power. Even if there were some plausibility to the Agencies' reading of the statute (there is not), that is not enough. To assert the kind of regulatory power allowed by the Final Rule, the Agencies must point to "clear congressional authorization." *Id.* at 2609. But the Act explicitly limits the Agencies' jurisdiction to "navigable waters"— i.e., "the waters of the United States." *See* 33 U.S.C. §§ 1341–1346, 1362(7). Nothing about those terms clearly authorizes the Agencies' claim to jurisdiction over bodies of water like intrastate lakes, farm ponds, and streams. Even less do they authorize jurisdiction over dry land that sometimes gets moist, like ditches that sporadically see flowing water that eventually drains to a Traditional Water. *See* Final Rule, 88 Fed. Reg. at 3143–44, 3080. And all of this is at the expense of States' sovereignty, even though Congress must use "exceedingly clear language" to "alter the balance between federal and state power and the power of the Government over private

---

[15]   *See, e.g.*, *Comments of National Ready Mixed Concrete Association regarding the Proposed Rule Titled Revised Definition of "Waters of the United States," 86 Fed. Reg. 69,372 (Dec. 7, 2021)*, Dkt. No. EPA–HQ–OW–2021–0602, at 1–2, 4–5 (Feb. 7, 2022), https://perma.cc/X8C7-YAWF.

[16]   *See, e.g.*, *Comments of the National Mining Association regarding the Proposed Rule Titled Revised Definition of "Waters of the United States," 86 Fed. Reg. 69,372 (Dec. 7, 2021)*, Dkt. No. EPA–HQ–OW–2021–0602, at 2, 9 (Feb. 7, 2022), https://perma.cc/9T3A-37NF; *Comments of the American Public Power Association on the Environmental Protection Agency and U.S. Army Corps of Engineers' Proposed Rule: Revised Definition of "Waters of the United States," 86 Fed. Reg. 69,372 (Dec. 7, 2021)*, Dkt. No. EPA–HQ–OW–2021–0602, at 2–3, 9 (Feb. 7, 2022), https://perma.cc/36B2-N7AT.

property." *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021). Because the Final Rule grants the Agencies broad regulatory authority over many important state and national industries without clear congressional authority, it should be set aside as unlawful under the Major Questions Doctrine. *Id.*; 5 U.S.C. § 706(2)(A), (C).

### C. The Final Rule infringes Kentucky's sovereignty in violation of the Tenth Amendment.

"The powers not delegated to the United States by the Constitution . . . are reserved to the States respectively, or the people." U.S. CONST., amend. X. Land and water regulation is a traditional state power. *Kansas v. Nebraska*, 574 U.S. at 480 (Thomas, dissenting in part and concurring in part). Thus, the Commonwealth of Kentucky has a sovereign interest in managing and protecting its land and water resources without federal interference. *Id.*; 33 U.S.C. § 1251(b). To that end, Kentucky has created a robust and effective environmental regulatory scheme, which includes regulations for intrastate waters. *See, e.g.*, Ky. Rev. Stat. §§ 224.70-100 to -150, 224.16-040 to -090. The Final Rule impermissibly "alters the federal-state framework by permitting federal encroachment upon a traditional state power." *SWANCC*, 531 U.S. at 173. If allowed to take effect, the Final Rule will relegate Kentucky to second place when regulating and protecting lands and waters that previously were under the Commonwealth's exclusive jurisdiction.

Exactly this type of incursion harms States' sovereign interests. *See, e.g.*, *Georgia v. Pruitt*, 326 F. Supp. 3d 1356, 1367 (S.D. Ga. 2018); *North Dakota v. EPA*, 127 F. Supp. 3d 1047, 1058–59 (D.N.D. 2015). The Supreme Court has said so. *See SWANCC*, 531 U.S. at 174 ("Permitting [a] claim [to] federal jurisdiction over ponds

22

and mudflats . . . would result in a significant impingement of the States' traditional and primary power over land and water use," which is a "function traditionally performed by local governments." (citation omitted)). And so has Congress. *See* 33 U.S.C. § 1251(b) (recognizing States' primacy over land and water regulation). Because this injury to Kentucky's sovereignty is "contrary to [a] constitutional right," the Final Rule should be set aside as unlawful. 5 U.S.C. § 706(2)(C).

### D. The Final Rule violates Due Process.

"[L]aws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *Fox Television Stations*, 567 U.S. at 253. But the Final Rule leaves Kentucky and its citizens uncertain whether projects or developments—or even ordinary land-use activities—require federal approval. The Final Rule's malleable, ill-defined standards essentially let the Agencies pick and choose which waters (and dry lands) are jurisdictional. This leaves Kentucky and its citizens in an impossible spot. They cannot know for sure whether their conduct is forbidden even if they expend significant resources on consultants and experts, and if they get it wrong (at least according to the Agencies' application of the Final Rule to that particular conduct), they risk enormous civil and criminal penalties. That violates Administrative Law 101. *Id.*[17]

---

[17]   That landowners can request a jurisdictional determination from the Corps, Final Rule, 88 Fed. Reg at 3048, is proof that the rule—which spans 141 pages of the Federal Register—is indecipherable even to citizens of "ordinary intelligence," not a reason to save it. *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). That is especially so because preparing a jurisdictional determination request is itself expensive and time consuming.

Distinguishing jurisdictional from non-jurisdictional waters using the Final Rule can prove as difficult as solving the Riemann hypothesis. Consider just a few of the vague and ill-defined terms regulated entities must decipher to determine whether their conduct risks serious sanction. For example, the Final Rule purports to exclude "ditches." 88 Fed. Reg. at 3103. But it limits that exclusion to ditches "excavated wholly in and draining only dry land and that do not carry a relatively permanent flow of water." *Id.* Kentucky farmers are left wondering whether a ditch excavated generations ago was located "wholly in . . . dry land" and whether it drains "only dry land" now. *Id.* And because of the uncertainties built into the relatively permanent standard, farmers cannot be sure whether a particular ditch "carr[ies] a relatively permanent flow of water." 88 Fed. Reg. at 3103.

Or consider the Final Rule's explanation for determining whether a wetland is "adjacent" to other jurisdictional features. *See* 88 Fed. Reg. at 3143–44. According to the Final Rule, "adjacent" in those circumstances means "bordering, contiguous, or neighboring." *Id.* "Bordering" and "contiguous" match the plain meaning of "adjacent." *Adjacent*, Merriam-Webster (2023), https://perma.cc/GYQ5-L6F4 ("not distant"; "having a common endpoint or border"; "immediately preceding or following"). But the Final Rule does not explain or distinguish "neighboring." So that term has broad reach given that "adjacent" under the Final Rule "does not require flow from the wetland to the jurisdictional water or from the jurisdictional water to the wetland." 88 Fed. Reg. at 3093. The Final Rule also considers wetlands "separated from a jurisdictional water by man-made dikes or barriers, natural river berms, beach

24

dunes, and the like" *per se* adjacent because its claims "no additional identification of a hydrologic connection between the wetland and the jurisdictional water is required . . . ." *Id.* at 3094.

Also consider the Final Rule's significant nexus standard. The Agencies claim jurisdiction over tributaries, wetlands, and other intrastate waters that "either alone or in combination with similarly situated waters in the region, significantly affect the chemical, physical, or biological integrity of" Traditional Waters. *See id.* at 3143–44. But the Final Rule does not define "similarly situated" or "in the region," leaving regulated entities to wonder what types of waters they must consider and how broad their search must be. Even if they can figure that out, they must determine whether there is a "significant" effect, which the Final Rule later defines as "a material influence"—another nebulous term. *Id.* at 3143. And where the Final Rule tries to put meat on these standardless bones, it adds only confusing and malleable multifactor tests. *See id.* at 3144. For example, to determine whether there is a material influence, entities must consider five functions. *Id.* [18] They must also consider five other factors. [19] Given that significant nexus determinations must be made case-by-case, the Agencies may exercise their near boundless discretion in a

---

[18]   (1) Contribution of flow; (2) Trapping, transformation, filtering, and transport of materials (including nutrients, sediment, and other pollutants); (3) Retention and attenuation of floodwaters and runoff; (4) Modulation of temperature in Traditional Waters; and (5) Provision of habitat and food resources for aquatic species located in Traditional Waters.

[19]   (1) Distance from a Traditional Water; (2) Hydrologic factors, such as frequency, duration, magnitude, timing, and rate of hydrologic connections, including shallow subsurface flow; (3) Size, density, or number of waters that have been determined to be similarly situated; (4) Landscape position and geomorphology; and (5) Climatological variables such as temperature, rainfall, and snowpack.

way regulated entities could not anticipate. Due process requires more, so the Final Rule should be set aside as unlawful. 5 U.S.C. § 706(C).

### E. The Final Rule is arbitrary and capricious.

Agency actions may not be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm. Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (explaining an agency rule is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise"). But the Final Rule is all those things for the reasons already identified: it exceeds the Agencies' authority under the statute, violates the Commerce Clause and the major questions doctrine, infringes state sovereignty, and violates due process, allowing arbitrary enforcement by the Agencies. It should be set aside accordingly. 5 U.S.C. § 706(2)(A).

## II.   The Commonwealth and its citizens will be irreparably harmed absent injunctive relief.

The second factor to consider on a motion seeking a preliminary injunction is whether the moving party "is likely to suffer irreparable harm in the absence of preliminary relief." *Platt v. Bd. of Com'rs on Grievances & Discipline of the Ohio Supreme Court*, 769 F.3d 447, 453 (6th Cir. 2014). An injury is irreparable if it is not "fully compensable by monetary damages." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012). The injury "must be both certain and immediate, not speculative

26

or theoretical." *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 391 (6th Cir. 2020) (citation omitted). The Final Rule will result in several certain and immediate injuries to Kentucky, including infringement on state sovereignty and unrecoverable compliance costs.

### A. The Final Rule causes irreparable harm by infringing on Kentucky's sovereignty.

Like all states, Kentucky has sovereignty over its natural resources, including land and water. *See Kansas v. Nebraska*, 574 U.S. at 480 (Thomas, J., concurring in part and dissenting in part). Congress recognized this in the Clean Water Act by providing that the states will maintain primary responsibility for developing land and water resources. 33 U.S.C. §1251(b). And the Supreme Court has interpreted this provision to mean Congress intentionally sought "to avoid the significant constitutional and federalism questions" that would be raised if the division of responsibility were handled differently. *SWANCC*, 531 U.S. at 174. Contrary agency interpretations are not owed deference. *Id*.

The Final Rule will trample on state sovereignty by reaching into state borders to regulate entirely intrastate land and water. The Final Rule diverges from previous federal jurisdiction over non-navigable, intrastate waters only if "the use, degradation, or destruction of the water could affect interstate or foreign commerce." *See* 88 Fed. Reg. at 3029 (concluding it is "not appropriate" to utilize the standard used for "more than 45 years"). Purportedly, the Final Rule "replaces the interstate commerce test with the relatively permanent standard and the significant nexus standard." *Id*. What results is a standard that grants the Agencies almost unlimited

jurisdiction. This expansion of federal regulation deprives Kentucky of its sovereign powers to manage its land and waters—and that is an irreparable harm.

State sovereignty is not some vague idea that the federal government can ignore when it wants to accomplish its goals; it is an integral and protected aspect of American government. The sovereignty of the states is memorialized in the Tenth Amendment to the U.S. Constitution and its presence there demands that the federal government not intrude on the powers left to the states. The right to exercise the powers not given to the federal government or prohibited by it belongs *solely* to the states. *See* U.S. CONST. amend. X. Accordingly, when a state's sovereignty is being infringed, "a finding of irreparable injury is mandated." *See ACLU of Ky. v. McCreary Cnty.*, 354 F.3d 438, 445 (6th Cir. 2003). Indeed, courts across the country have recognized that a regulatory scheme that deprives a state of its sovereignty causes irreparable harm. *See, e.g.*, *Texas v. EPA*, 829 F.3d 405, 433–34 (5th Cir. 2016). The infringement on state sovereignty that will result from the Final Rule weighs heavily in favor of granting preliminary relief to Kentucky.

### B. The unrecoverable costs that will result from the Final Rule constitute irreparable harm.

The Final Rule also causes irreparable harm by imposing unrecoverable costs on the Commonwealth both in its capacity as owner and as regulator. As explained earlier, Kentucky plays a key role in the cooperative federalism scheme established by the CWA, which means it has direct regulatory duties, as well as reporting and enforcement responsibilities. *See* Compl. ¶¶ 25–27, 30; *see also* Horne Decl. ¶¶ 8-10. Additionally, Kentucky will need to seek approval for projects it wants to undertake,

and the expanded jurisdiction under the Final Rule likely means it will have to seek approval for more projects. *See* Compl. ¶¶ 86, 95. Any money Kentucky expends for such compliance constitutes unrecoverable costs. *See Commonwealth v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023) (explaining the federal government's sovereign immunity makes costs from compliance unrecoverable). These compliance costs are irreparable harm. *See id.* (finding that regulatory guidance requiring employers to designate individuals to distribute information and to document compliance constituted unrecoverable costs and thereby, irreparable harm).

The pending decision in *Sackett v. EPA* makes Kentucky's irreparable harm from compliance costs even clearer. "[C]omplying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs." *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring in part) (emphasis omitted). In *Sackett*, the Supreme Court has been asked again to weigh in on what constitutes "waters of the United States." If, for example, the Court rejects Justice Kennedy's position from *Rapanos* in favor of the plurality's, the Final Rule would be in conflict with controlling precedent. *See* 88 Fed. Reg. at 3039 (asserting that "the *Rapanos* plurality relied on a strained reading" of the Act). And it would invalidate the Final Rule's incorporation of the significant nexus standard. Without a preliminary injunction, Kentucky will have to expend significant resources to comply with the Final Rule, which may be invalidated, at least in part, by a decision expected in a few months. That produces an irreparable harm supporting the Commonwealth's request for a preliminary injunction.

29

### III.   The balance of equities favors injunctive relief, and enjoining the Final Rule will promote the public interest.

Enjoining the Final Rule will not mean the waters of the United States are unprotected. Without the Final Rule, the CWA will still be implemented as before. Furthermore, as the Agencies recognize, the states, including Kentucky, have protections that will remain in place. *Id.* at 3050 ("The agencies recognize that waters that are not jurisdictional under the Clean Water Act do not necessarily lack environmental protections under potential Tribal, State, or local laws"). Thus, there will be no harm to the Agencies, the waters of the United States, or the public's interest in those waters if the Final Rule is enjoined.

And ultimately, "the public interest lies in the correct application of the law." *Commonwealth*, 57 F.4th at 556. As already laid out in the discussion of the first factor, the Final Rule exceeds the Agencies' authority under the CWA by ignoring the Act's Commerce Clause underpinnings, impermissibly infringes on state sovereignty protected by the Tenth Amendment, violates due process, and is arbitrary and capricious in contravention of the APA. The best way to serve the public interest is by correctly applying these constitutional and statutory provisions. *See Kentucky v. Biden*, 23 F.4th 585, 612 (6th Cir. 2022). Accordingly, the balance of equities favors granting injunctive relief.

### CONCLUSION

For these reasons, the Commonwealth of Kentucky's motion for injunctive relief should be granted, and the Agencies should be enjoined from implementing, applying, enforcing, or otherwise proceeding based on the Final Rule.

Respectfully submitted,

**Daniel Cameron**
**ATTORNEY GENERAL**

*/s/ Christopher L. Thacker*
Victor B. Maddox
Christopher L. Thacker
Lindsey R. Keiser
Harrison Gray Kilgore (application for admission submitted)
Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
Phone: (502) 696-5300
Victor.Maddox@ky.gov
Christopher.Thacker@ky.gov
Lindsey.Keiser@ky.gov
Harrison.Kilgore@ky.gov

*Counsel for the Commonwealth of Kentucky*
*ex rel. Daniel Cameron in his official capacity*
*as Attorney General of Kentucky*

## CERTIFICATE OF SERVICE

I certify that on February 22, 2023, the above document was filed with the CM/ECF filing system and sent via regular U.S. mail, postage prepaid, to:

**United States Environmental Protection Agency**
1200 Pennsylvania Ave. NW, 1101A
Washington, DC 20460

**Michael S. Regan**
United States Environmental Protection Agency
1200 Pennsylvania Ave. NW, 1101A
Washington, DC 20460

**United States Army Corps of Engineers**
441 G. Street NW
Washington, DC 20314

**Lieutenant General Scott A. Spellmon**
United States Army Corps of Engineers
441 G. Street NW
Washington, DC 20314

**Michael L. Connor**
United States Army Corps of Engineers, Office of Civil Works
441 G. Street NW
Washington, DC 20314

*/s/ Christopher L. Thacker*
*Counsel for the Commonwealth of Kentucky*
*ex rel. Daniel Cameron in his official capacity*
*as Attorney General of Kentucky*