# EXHIBIT 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT FRANKFORT
*Electronically filed*

**COMMONWEALTH OF KENTUCKY**

*Plaintiff,*

v.                                                              Civil Action No. 3:23-cv-00007-GFVT

**UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,** *et al.*

*Defendants.*

## DECLARATION OF JOHN G. HORNE, II

I, John G. Horne, II hereby declare as follows:

1. I am the Executive Director of the Office of Rate Intervention within the Office of the Kentucky Attorney General. I have served in that role since December 17, 2019. The Office of Rate Intervention is responsible for representing the interests of Kentucky consumers before governmental rate-making agencies, including in utility cases (electric, water, telecommunications, and natural gas) before the Public Service Commission.

2. Before serving as Executive Director of the Office of Rate Intervention I served as General Counsel for the Kentucky Energy and Environment Cabinet ("Cabinet"). I was General Counsel for the Cabinet from January 2016 to December 2019. The Cabinet is charged with supervising the administration and enforcement of Kentucky's environmental statutes and regulations. *See* Ky. Rev. Stat. 224.10-100, *et seq.*

3. As General Counsel, I assisted the Division of Water in ensuring that the Cabinet lawfully implemented the Clean Water Act in Kentucky, including developing Kentucky's Water Quality Standards (WQS), monitoring and assessing Kentucky's water resources, developing Total Maximum Daily Loads (TMDL), and incorporating federal requirements so that the Commonwealth's Kentucky Pollutant Discharge Elimination System permitting program complied with the Act. I also assisted the Division of Water with ensuring Kentucky's compliance with the Water Quality Certification (WQC) program pursuant to 33 U.S.C. § 1341(a).

4. The Attorney General is authorized to assist the Cabinet in bringing civil and criminal actions to enforce Kentucky's environmental laws and regulations, including those protecting the Commonwealth's waters. *See, e.g.*, Ky. Rev. Stat. § 224.99-020.

5. Based on my current position in the Attorney General's office and my past experience as General Counsel for the Cabinet, I have personal knowledge and experience to understand the steps the Commonwealth will need to undertake because of the *Revised Definition of "Waters of the United States,"* 88 Fed. Reg. 3004 (Jan. 18, 2023) ("Final Rule"), recently promulgated by the U.S. Environmental Protection Agency and the U.S. Army Corps of Engineers (collectively, the "Agencies").

6. The Final Rule significantly expands the jurisdictional waters under the Clean Water Act, impeding the Commonwealth's sovereignty over, and primary

2

responsibility for, regulating lands and waters. All waters in Kentucky are recognized as Waters of the Commonwealth and all surface waters receive protection of their water quality by Kentucky WQS in 401 KAR Chapter 10. But under the Final Rule, Kentucky will now have secondary authority over lands and waters it previously regulated exclusively.

7. The Agencies' expanded definition of jurisdictional waters will also cost Kentucky financially. To ensure compliance with the Clean Water Act, the Cabinet must immediately assess which waters (and lands) not currently considered "waters of the United States" will become jurisdictional waters under the Final Rule. Because Kentucky has a diverse topography, ecology, and climate, the Final Rule will sweep up a wide array of waters and lands not currently considered jurisdictional, and it will require significant time and resources to identify these new jurisdictional waters. Separating jurisdictional waters from non-jurisdictional waters will require careful legal and technical analysis of the Final Rule as well as field and survey work across the Commonwealth.

8. This task is made more difficult—and costly—because the Final Rule's significant nexus test leaves substantial room for arbitrary enforcement by the Agencies. When any nook or cranny that occasionally becomes moist might qualify as "water of the United States," it will take time and manpower for Kentucky to determine fully and accurately the many additional miles of jurisdictional streams and acres of jurisdictional wetland under the Final Rule.

3

9. But those are only some of the start-up costs. The Cabinet will need to develop a plan to address the implications of the Final Rule on a number of programs administered by the Commonwealth, including (1) the WQS program conducted under 33 U.S.C. § 1313(c); (2) Monitoring and Assessment of waters undertaken pursuant to 33 U.S.C. § 1315(b); (3) the TMDL program pursuant to 33 U.S.C. § 1313(d); and (4) the WQC program pursuant to 33 U.S.C. § 1341(a).

10. Then there will be implementation costs. More jurisdictional waters necessarily mean the Cabinet will have more water quality and environmental assessments to conduct and more permit applications to process under Section 1342. Thus, the Commonwealth will likely need to hire additional manpower or divert already-limited time and resources away from other important agency functions to maintain its current level of regulatory oversight.

11. In sum, Kentucky will need to expend resources to analyze and implement the Final Rule—which infringes the Commonwealth's sovereignty—and absent relief from this Court, the Commonwealth will need to expend additional resources going forward because of the Final Rule to make sure it complies with its obligations under the Clean Water Act.

I declare under penalty of perjury that the foregoing is correct. Executed on this 22nd day of February, 2023 at Frankfort, Kentucky

John G. Horne, II

4