**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**
**FRANKFORT DIVISION**

| | | |
|---|---|---|
| COMMONWEALTH OF KENTUCKY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 3:23-cv-00007-GFVT |
| UNITED STATES ENVIRONMENTAL | ) | (consolidated with No. |
| PROTECTION AGENCY, *et al.*, | ) | 3:23-cv-00008-GFVT) |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| KENTUCKY RESOURCES COUNCIL, | ) | |
| INC., *et al.*, | ) | |
| | ) | |
| Applicant-Intervenor-Defendants. | ) | |
| | ) | |

<u>**MOTION OF KENTUCKY RESOURCES COUNCIL, INC., NATIONAL WILDLIFE FEDERATION, FLORIDA WILDLIFE FEDERATION, NORTH CAROLINA WILDLIFE FEDERATION, SOUTH CAROLINA WILDLIFE FEDERATION, TENNESSEE WILDLIFE FEDERATION, IZAAK WALTON LEAGUE OF AMERICA, AND MINNESOTA DIVISION OF THE IZAAK WALTON LEAGUE OF AMERICA TO INTERVENE AS DEFENDANTS**</u>

Pursuant to Fed. R. Civ. P. 24, the Kentucky Resources Council, Inc., National Wildlife Federation, Florida Wildlife Federation, North Carolina Wildlife Federation, South Carolina Wildlife Federation, Tennessee Wildlife Federation, Izaak Walton League of America, and Minnesota Division of the Izaak Walton League of America (collectively, the "Conservation Groups") respectfully move to intervene as Defendants in this case. As demonstrated below, the Conservation Groups meet the standards both for intervention of right under Fed. R. Civ. P. 24(a) and permissive intervention under Fed. R. Civ. P. 24(b).

The Conservation Groups are authorized to represent that Defendants do not oppose permissive intervention under Rule 24(b) but do oppose intervention of right under Rule 24(a). Plaintiffs do not consent to the Conservation Groups' motion and reserve their right to respond. Given the ongoing briefing on Plaintiffs' motions for a preliminary injunction and the upcoming hearing on Plaintiffs' motions, the Conservation Groups seek expedited review of this Motion.

## INTRODUCTION

This action involves a challenge by Plaintiffs to the "Revised Definition of 'Waters of the United States,'" 88 Fed. Reg. 3004 (Jan. 18, 2023) ("Rule"), promulgated by the U.S. Environmental Protection Agency ("EPA") and U.S. Army Corps of Engineers ("Corps") (collectively, the "Agencies"). The Rule protects critical streams, wetlands, and other waters crucial for fish, wildlife, and outdoor recreation by restoring the longstanding regulatory definition of "waters of the United States" under the Clean Water Act ("Act"), with updates to reflect Supreme Court case law and the Agencies' decades of implementation experience. Because the term "waters of the United States" is the jurisdictional linchpin for the Clean Water Act's key safeguards, a scientifically and legally sound definition of the term is essential to achieving the Act's objective as stated by Congress: restoring and maintaining the chemical, physical, and biological integrity of the nation's waters. *See* 33 U.S.C. § 1251(a).

The Conservation Groups are non-profit outdoor recreation and conservation organizations committed to the preservation and protection of the nation's water resources, including those waters affected by the Rule. The relief sought by Plaintiffs in this case, as articulated in their Complaints, would make it more difficult for EPA and the Corps to consistently protect the integrity of streams, wetlands, and other waterways that the Conservation Groups' members rely on for fishing, hunting, boating, and other outdoor recreation activities.

The Conservation Groups thus have direct, substantial, and legally protectable interests in the subject matter of this litigation that may be impaired by a ruling in Plaintiffs' favor. Further, because the existing Defendants—federal agencies and their officials—answer to a broad spectrum of interests, including interests that may be adverse to those of the Conservation Groups, Defendants do not and will not adequately represent the Conservation Groups' interests in this case.

Organizations like the Conservation Groups have previously been granted intervention in similar litigation under nearly identical circumstances—including challenges to both this Rule and a prior rule issued by EPA and the Corps to define "waters of the United States." *See, e.g.*, *In re: Envtl. Prot. Agency and Dept. of Defense, Final Rule: Clean Water Rule: Definition of "Waters of the United States*," No. 15-3799, ECF No. 25 (6th Cir. Sept. 16, 2015) (granting motion to intervene by National Wildlife Federation and fourteen other conservation organizations); *Texas v. U.S. Envtl. Prot. Agency,* No. 3:23-cv-00017, ECF No. 20 (S.D. Tex. Feb. 14, 2023) (granting motion to intervene by conservation group); *Georgia v. McCarthy*, No. 2:15-cv-79-LGW-RSB, ECF No. 182 (S.D. Ga. July 3, 2018) (granting motion to intervene by National Wildlife Federation and three other organizations); *North Dakota v. U.S. Envtl. Prot.* Agency, No. 3:15-cv-59-PDW-ARS, ECF No. 198 (D.N.D. Apr. 19, 2018) (granting motion to intervene by conservation group). Here, too, the Conservation Groups are entitled to intervene.

For the reasons set forth below, the Conservation Groups respectfully request that the Court grant this Motion and permit the Conservation Groups to intervene as Defendants. Declarations showing the Conservation Groups' interests in this action are attached as Exhibits 1 through 15 to this Motion. In addition, the Conservation Groups have attached proposed answers pursuant to Rule 24(c) and a proposed order pursuant to Local Rule 7.1(e).

ARGUMENT

**I.      The Conservation Groups Are Entitled to Intervene as of Right Under Rule 24(a).**

Under Fed. R. Civ. P. 24(a), a court must permit an applicant to intervene if a proposed intervenor demonstrates that (1) the motion to intervene is timely; (2) the applicant has a substantial legal interest in the subject matter of the case; (3) the applicant's ability to protect that interest may be impaired absent intervention; and (4) the existing parties may not adequately represent the applicant's interest. Fed. R. Civ. P. 24(a); *see also Wineries of the Old Mission Peninsula Ass'n v. Twp. of Peninsula, Michigan*, 41 F.4th 767, 771 (6th Cir. 2022); *Grutter v. Bollinger*, 188 F.3d 394, 397–98 (6th Cir. 1999). Each of these elements should be "broadly construed in favor of potential intervenors." *Coal. to Defend Affirmative Action v. Granholm*, 501 F.3d 775, 779 (6th Cir. 2007) (quoting *Purnell v. City of Akron*, 925 F.2d 941, 950 (6th Cir. 1991)). Because the Conservation Groups readily satisfy each requirement, they are entitled to intervene as of right.

**A.      The motion to intervene is timely.**

In determining whether an application to intervene is timely, a court considers "all relevant circumstances," but gives particular consideration to "(1) the point to which the suit has progressed; (2) the purpose for which intervention is sought; (3) the length of time preceding the application during which the proposed intervenors knew or should have known of their interest in the case; (4) the prejudice to the original parties due to the proposed intervenors' failure to promptly intervene after they knew or reasonably should have known of their interest in the case; and (5) the existence of unusual circumstances militating against or in favor of intervention." *Stupak-Thrall v. Glickman*, 226 F.3d 467, 472–73 (6th Cir. 2000).

4

Under this standard, the Conservation Groups' Motion to Intervene is timely. There has been no delay in filing this motion. The Conservation Groups have moved to intervene just eight days after Plaintiffs filed their complaints and motions for preliminary injunction. Defendants have not yet filed an answer, a dispositive motion, or the administrative record. The deadline for Defendants to respond to Plaintiffs' motions for a preliminary injunction has not yet passed, and the Conservation Groups are prepared to meet that deadline without seeking additional time. As a result, the Conservation Groups' intervention would not delay the disposition of the case or otherwise prejudice any party.

**B.     The Conservation Groups have significant interests in the scope of the Clean Water Act and the integrity of waters affected by the Rule.**

To intervene as a matter of right, an applicant must show that it has a "substantial interest in the subject matter of [the] litigation." *Grutter*, 188 F.3d at 398. In assessing this element, the Court of Appeals for the Sixth Circuit "subscribe[s] to a 'rather expansive notion of the interest sufficient to invoke intervention of right.'" *Id.* (quoting *Michigan State AFL–CIO v. Miller*, 103 F.3d 1240, 1245 (6th Cir. 1997)). For example, intervenors need not show any specific legal or equitable interest and need not establish standing so long as they are not seeking different or additional relief. *Id.* Further, under Sixth Circuit precedent, "close cases should be resolved in favor of recognizing an interest under Rule 24(a)." *Id*. at 399.

As outdoor recreation and conservation organizations representing hunters, anglers, conservationists, and outdoor enthusiasts who use and enjoy water resources, the Conservation Groups have a significant, protectable interest in the scope of the Clean Water Act and the ecological integrity of waters affected by the Rule. Healthy waters support healthy fish and wildlife and sustain hunting, fishing, water activities, and other outdoor recreation, as well as the nearly $788 billion domestic industry those activities support. Dirk van Duym, *Outdoor*

*Recreation Satellite Account: National and State Statistics 2012-2019*, BUREAU ECON. ANALYSIS, at 3 (2020), https://perma.cc/8DLC-RKX8. The Conservation Groups, as non-profit member organizations, have an indisputable interest in protecting those interests: for example, when headwaters and small streams are polluted, it directly impacts their members' opportunity to fish; when wetlands are degraded, it directly diminishes their members' opportunity to hunt; when the nation's waters are not adequately protected, it directly affects the organizations' ability to fulfill their missions.

Because of their strong interest in the ecological health of streams, wetlands, and other critical waterways, the Conservation Groups have expended substantial time and resources protecting those waters—and protecting the scope of the Clean Water Act, including in connection with the rulemaking process at issue in this litigation.

The Kentucky Resources Council, Inc., for example, is a statewide non-profit organization dedicated to the conservation and prudent use of the Commonwealth of Kentucky's natural resources. Since 1984, the organization has dedicated itself to protecting Kentucky's land, air, water, and communities, and providing legal and technical assistance involving protection of headwater streams from resource extraction and other pollution sources. Decl. of Ashley Wilmes ¶ 6 (attached as Ex. A). The Council actively works on behalf of its members and the surrounding community to ensure the protection of wetlands, streams, and other critical water resources across the Commonwealth, including those affected by the Rule. *Id.* ¶ 7. Among other things, the Council has worked to strengthen Kentucky's water quality standards and successfully challenged regulatory changes that would have weakened Kentucky's state water quality standards. *Id.*

The National Wildlife Federation is a non-profit organization representing more than six million conservation-minded hunters, anglers, and outdoor enthusiasts nationwide. Decl. of James Murphy ¶ 4 (attached as Ex. B). Since the Clean Water Act's passage in 1972, the organization has consistently advocated for broad protections to conserve the nation's wetlands, streams, and rivers. *Id.* ¶ 12. The organization has co-produced and publicly distributed three major reports focusing on the heightened risk to wetlands and water resources following the Supreme Court decisions in *Solid Waste Agency of Northern Cook County (SWANCC) v. United States*, 531 U.S. 159 (2001) and *Rapanos v. United States*, 547 U.S. 715 (2006), and the 2003 and 2008 guidance documents that the Agencies adopted in the wake of those decisions. *Id.* It has conducted scores of presentations and roundtables around the country to inform the public of the need to restore Clean Water Act protections to vulnerable wetlands and streams. *Id.* The National Wildlife Federation also participated in, and contributed scientific input to, the EPA Office of Research and Development's science report, *Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence*, and the formal EPA Science Advisory Board's review of the report, which provides a portion of the scientific support for the 2023 Rule. *Id.* In addition, the organization submitted extensive written comments to EPA and the Corps supporting reforms to the 2003 and 2008 guidance documents; supported a strong 2015 Clean Water Rule during the rulemaking process; opposed actions to delay the effective date of the 2015 Clean Water Rule; submitted organizational comments and encouraged our members, supporters, and state affiliates to submit more than 96,500 total individual and organizational comments supporting the 2015 Clean Water Rule and opposing the 2019 repeal of the Clean Water Rule and the 2020 adoption of the "Navigable Waters Protection Rule;" advocated for the restoration of longstanding federal clean water protections during the 2023

Rule rulemaking process, including submitting comments to EPA and the Corps on their proposed rule; and regularly reported to its members on the organization's efforts to ensure that Clean Water Act protections are asserted and maintained for water resources to the full extent required by law. *Id.*

In addition to its direct work on the legal scope of the Clean Water Act, the National Wildlife Federation regularly works on projects to restore and protect rivers, bays, wetlands, and watersheds across the country, including those affected by the Rule. *Id.* ¶ 13. For example, in 2010, the National Wildlife Federation helped launch the Choose Clean Water Coalition to advocate for restoring thousands of streams and rivers flowing to the Chesapeake Bay. *Id.* It has done similar advocacy work and on-the-ground restoration in the upper Great Lakes, especially Michigan's Upper Peninsula, northern Wisconsin, and the Arrowhead region of northern Minnesota; the Everglades; the Mississippi River Delta; and the Gulf of Mexico. *Id.*

The National Wildlife Federation also supports affiliate organizations in fifty-two states and territories, *id.* ¶ 4, including the Florida Wildlife Federation, North Carolina Wildlife Federation, South Carolina Wildlife Federation, and Tennessee Wildlife Federation. Like the National Wildlife Federation, each of these affiliates plays a significant role in advocating for the prevention of wetland and stream destruction and pollution through the Clean Water Act.

Founded in 1936, the Florida Wildlife Federation is a statewide non-profit citizens' conservation education organization with more than 9,000 members and approximately 60,000 supporters throughout Florida. Decl. of Sarah Gledhill ¶ 6 (attached as Ex. C). A majority of the Florida Wildlife Federation's core advocacy work is dedicated to wildlife protection and land conservation. *Id.* ¶ 10. This work is especially focused on the protection of wetlands and other aquatic habitats, which both provide habitat for vulnerable species and perform vital pollution

filtering and flood protection services for communities across the state. *Id.* Over the years, the

Florida Wildlife Federation has advocated for strong federal clean water protections that protect

wetlands from pollution or wholesale destruction. *Id.* ¶ 12. In 2021, for instance, the organization

joined other conservation groups to challenge EPA's decision to authorize Florida's assumption

of the Section 404 permitting program. *Id.*

Since 1945, the North Carolina Wildlife Federation has worked with outdoor enthusiasts,

hunters and anglers, government, and industry to safeguard North Carolina's natural resources—

not only as habitats for native wildlife but also as recreational, hunting, fishing, and wildlife

observation areas. Decl. of Tim Gestwicki ¶ 6 (attached as Ex. D). As North Carolina's oldest

and largest statewide non-profit conservation organization, the organization has more than ten

thousand members and supporters, four dozen affiliates, and sixteen community chapters. *Id.*

Through policy and protection work, research and education, and direct hands-on conservation

projects, the North Carolina Wildlife Federation works to protect water quality and to conserve

clean water throughout North Carolina. *Id.* ¶ 7.

The South Carolina Wildlife Federation is a non-profit organization officially organized

in 1946, with operations dating back to 1931. Decl. of Sara Green ¶ 6 (attached as Ex. E). On

behalf of its more 10,000 members and supporters, the organization works to conserve and

restore South Carolina's wildlife and wildlife habitat through education and advocacy. *Id.* ¶ 5.

The organization represents hunters, birdwatchers, teachers, backpackers, boaters, farmers,

gardeners, and anglers, all of whom rely on clean water, and works to ensure that South

Carolina's outdoors and recreation opportunities are preserved for future generations. *Id.* ¶ 6. As

South Carolina's oldest non-profit conservation organization, the South Carolina Wildlife

Federation has helped lead some of the most important conservation efforts across South Carolina. *Id.* ¶ 8.

Founded in 1946, the Tennessee Wildlife Federation represents the various interests of hunters and anglers, other outdoor enthusiasts, and affiliate organizations committed to conserving Tennessee's wildlife and natural resources. Decl. of Michael Butler ¶ 6 (attached as Ex. F). On behalf of its more than 20,000 members and supporters, the Tennessee Wildlife Federation engages with local, state, and federal agencies and decision-makers from both political parties to promote conservation policy in Washington, D.C. and in Tennessee. *Id.* ¶¶ 9, 11. As part of its water and wildlife protection work, employees of the Tennessee Wildlife Federation continuously monitor permit applications submitted to the Tennessee Department of Environment and Conservation and relevant federal agencies, including the U.S. Army Corps of Engineers, for projects that would affect aquatic habitats and water quality in the state. *Id.* ¶ 13. The Tennessee Wildlife Federation frequently submits comments during the permitting processes for such projects. *Id.* In addition to this work, the organization manages numerous aquatic habitat restoration projects, *id.* ¶ 15; works to protect the health and biodiversity of rivers across Tennessee, *id.* ¶ 16; and establishes and maintains wetland mitigation and in-lieu fee programs within Tennessee to preserve and protect the health of the State's waters, *id.* ¶ 14.

Founded in 1922, the Izaak Walton League of America is a national non-profit with more than 40,000 members and 206 community-based chapters nationwide. Decl. of Scott Kovarovics ¶ 4 (attached as Ex. G). The League was founded by hunters, anglers, conservationists, and others who were concerned about water pollution, wetland drainage, and the steep decline of fish and wildlife populations, and who wanted to promote the sustainable management of the nation's public lands. *Id.* ¶ 5. From its inception, the League has fought to

protect the nation's waterways from pollution. In 1927, President Coolidge commissioned the League to conduct the first national water pollution survey. Ever since, the League has advocated for strong federal water pollution controls, including working to achieve passage of the Clean Water Act in 1972 and helping conceive the Wild and Scenic Rivers Act of 1968. *Id*. ¶ 12.

The League and its state affiliates have made it a priority to defend the Clean Water Act and oppose actions that seek to weaken its protections for streams and wetlands. *Id*. ¶ 13. Among other things, the League has submitted comments on numerous "waters of the United States" rulemakings, including this one; submitted *amicus curiae* briefs in cases pending in federal district courts and the United States Supreme Court; and advocated in support of broad clean water protections to local, state, and federal legislators. *Id*.

The Minnesota Division of the Izaak Walton League of America is a state-based arm of the national League. Composed of sixteen chapters and approximately 1,000 members throughout the state, the Minnesota Division, like the Izaak Walton League of America, seeks to conserve, restore, and promote the sustainable use and enjoyment of the state's natural resources, including soil, air, woods, water, and wildlife. Decl. of Matt Norton ¶¶ 5, 7 (attached as Ex. H).

In addition to these organizational interests, the Conservation Groups' members have significant recreational, aesthetic, conservation, and professional interests in waters affected by the Rule. *See, e.g.*, Decl. of Gates Roll (attached as Ex. I); Decl. of Manley Fuller (attached as Ex. J); Decl. of Robert Dale Brown (attached as Ex. K); Decl. of Tony Bebber (attached as Ex. L); Decl. of Richard Staffon (attached as Ex. M); Decl. of Andrew Berry (attached as Ex. N); Decl. of David Wicks (attached as Ex. O).

Gates Roll, for example, is a member of the South Carolina Wildlife Federation who

owns a water-based recreation company called Tall Tide Fishing Adventures in the South Carolina Lowcountry. Roll Decl. ¶¶ 3, 6. He leads nature and birding trips and conventional fishing and fly-fishing trips for clients from all over the world who travel to Charleston because of its unique waters and landscapes, including the wetlands, marshes, bays, and headwater streams protected by the Rule challenged in this litigation. *Id.* ¶ 6. His business and livelihood depend on clean water: clean, remote waterways are critical to sustaining his ecotourism business. *Id.* ¶ 11. In addition to his professional interest in clean water, Mr. Roll has personal interests in preserving the wetlands and streams of the Lowcountry for himself and his family. *Id.* ¶ 14. As the father of two young sons, he hopes the Lowcountry's headwater streams, blackwater rivers, marshes, and other wetlands to continue to exhibit the same pristine wilderness qualities that they do today so that his children can enjoy the same natural environment he has. *Id.*

Manley Fuller has a similar desire to see rivers and wetlands preserved for future generations. Mr. Fuller is the Vice President of Conservation Policy for the North Carolina Wildlife Federation, the former President of the Florida Wildlife Federation, and a current member of the National Wildlife Federation and the South Carolina Wildlife Federation. Fuller Decl. ¶¶ 2–3. He has devoted much of his career to protecting and restoring wetlands, streams, rivers, and bays, including those in the Wakulla and St. Marks River watersheds in Florida and the Catawba River Basin in North Carolina. *Id.* ¶ 5.

In addition to his professional and volunteer work to protect the rivers and wetlands of Florida and North Carolina, Mr. Fuller also personally uses and enjoys these waters. *Id.* ¶ 13. He spends considerable time exploring Florida and North Carolina's riverine and floodplain ecosystems. *Id.* In and around his property, he observes birds, alligators, and other wildlife. *Id.*

At least twice a year, he traverses the Wakulla River and associated wetlands by canoe, launching from his dock. *Id.* He takes field trips to Wakulla Springs and the associated river run about ten times each year to observe manatees and other fish and wildlife. *Id.* He frequently enjoys hiking, observing nature, fishing, and hunting in the wetlands, sinkholes, lakes, and streams in and around the Apalachicola Forest in the Wakulla River watershed, and he fishes in the brackish waters of the lower St. Marks River a couple of times each year. *Id.* He also hikes along tributary streams to the Catawba near the Linville Gorge most weekends when in North Carolina. *Id.*

The Clean Water Act's safeguards provide an essential foundation to protect the health of North Florida's river systems and the Catawba River Basin in North Carolina, including the waters Mr. Fuller visits and uses for recreational and professional purposes. *Id.* ¶ 14. Mr. Fuller is concerned about pollution in the St. Marks and Wakulla River watersheds, especially pollution of the wetlands, springs, sinkholes, sinking streams, distributaries, and seasonally flowing streams there. *Id.* ¶ 15. Pollution or destruction of these waters will have negative impacts not only there but also downstream, in the St. Marks River, the Wakulla River, and Apalachee Bay. *Id.* The loss and degradation of these waters would also adversely affect the fish and wildlife habitat they provide and have negative effects on wildlife downstream. *Id.* If the wetlands and other waters of the Wakulla, St. Marks, and Catawba River watersheds are polluted or degraded, Mr. Fuller will enjoy them less when he visits, and he will be less likely to want to hike, canoe, fish, and observe nature in and around the Wakulla and Catawba basins. *Id.* ¶ 16.

These interests plainly meet the Rule 24 "interest" requirement. Indeed, in the more stringent context of standing, the Supreme Court has made clear that the desire to use an affected area for recreational and aesthetic purposes is a legally protectable interest for purposes of

standing. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) ("Environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity."); *see also Chiles v. Thornburgh*, 865 F.2d 1197, 1213 (11th Cir. 1989) (noting that while a "party seeking to intervene need not demonstrate that he has standing in addition to meeting the requirements of Rule 24," standing principles are "relevant to help define the type of interest that the intervenor must assert").

Because the Conservation Groups' interests include, among other things, their members' recreational and aesthetic enjoyment of waters affected by the Rule, they have a valid standing interest and thus a legally protectable interest sufficient to satisfy Rule 24(a). Indeed, several federal circuits have deemed it "indisputable that a prospective intervenor's environmental concern is a legally protectable interest." *WildEarth Guardians v. Nat'l Park Serv.*, 604 F.3d 1192, 1198 (10th Cir. 2010) (quotation marks and citation omitted); *see also Mausolf v. Babbitt*, 85 F.3d 1295, 1302 (8th Cir. 1996); *Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525, 527–28 (9th Cir. 1983). Under these principles, the Conservation Groups' interests in the integrity of waters affected by the Rule plainly qualify as legally protected interests sufficient for intervention.

### C.    The disposition of this action may impair or impede the Conservation Groups' ability to protect their interests and the interests of their members.

To satisfy the third element of the intervention test, an applicant "must show only that impairment of its substantial legal interest is possible if intervention is denied." *Grutter*, 188 F.3d at 399. "This burden is minimal." *Id.* "The rule is satisfied whenever disposition of the present action would put the movant at a practical disadvantage in protecting its interest."

*Wineries of the Old Mission Peninsula Ass'n*, 41 F.4th at 774 (quoting 7C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1908.2 (3d ed. April 2022 Update)).

The interests of the Conservation Groups and their members may be directly affected by the outcome of this litigation. If Plaintiffs prevail in their challenge, water bodies considered to be "waters of the United States" under the Rule—including certain streams, wetlands, and other waters used and enjoyed by the Conservation Groups' members—may be more easily excluded from the Clean Water Act's protections. The ecological significance of such waters is extensive, and their fate could be left uncertain if the Court were to adopt some of the arguments put forth by Plaintiffs and vacate the Rule.

As discussed above, the Conservation Groups' members use and enjoy many waters protected under the Rule for fishing, hunting, water activities, and other outdoor recreational and aesthetic interests. A ruling adopting the arguments made by Plaintiffs in this action could remove the clearer, science-based protections afforded by the Rule, allowing such waters to be more easily contaminated or destroyed. The outcome of this litigation could thus impair or impede the Conservation Groups' ability to protect their recreational, aesthetic, and conservation interests, and the interests of their members, in these waters.

> **D.    The Conservation Groups' interests are not adequately represented by the existing parties.**

The final prong of the standard for intervention of right—inadequate representation—is satisfied if the applicant shows that existing parties "may not adequately represent [its] interests." *Grutter*, 188 F.3d at 400; *see also Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n. 10 (1972). Unlike some other circuits, "this circuit has declined to endorse a higher standard for inadequacy when a governmental entity in involved." *Grutter*, 188 F.3d at 400. "Indeed, '[i]t may be enough to show that the existing party who purports to seek the same outcome will not

make all of the prospective intervenor's arguments.'" *Id.* (quoting *Michigan State AFL-CIO*, 103 F.3d at 1247).

While the Conservation Groups' interests here are partially aligned with those of the Agencies, their respective interests are sufficiently distinct to make the Agencies inadequate representatives of the interests of the Conservation Groups. Indeed, numerous courts have recognized that the interests of a government agency are rarely identical to those of aspiring intervenors and found intervention to be warranted. *See, e.g., Kane Cnty. v. United States*, 928 F.3d 877, 894 (10th Cir. 2019) (recognizing that the government's objectives "involve a much broader range of interests, including competing policy, economic, political, legal, and environmental factors"); *Fund For Animals, Inc. v. Norton*, 322 F.3d 728, 736 (D.C. Cir. 2003) ("[W]e have often concluded that governmental entities do not adequately represent the interests of aspiring intervenors."); *Heaton v. Monogram Credit Card Bank of Ga.*, 297 F.3d 416, 425 (5th Cir. 2002) (holding that federal agency representing public interest does not adequately represent interests of private applicant where their "interests may diverge in the future, even though, at this moment, they appear to share common ground"); *In re Sierra Club*, 945 F.2d 776, 779–80 (4th Cir. 1991) (holding that a state agency did not adequately represent the interests of a conservation organization because the conservation organization "represent[ed] only a subset of citizens" and therefore did "not need to consider the interests of all South Carolinians" like the state agency did).

Here, the Conservation Groups are non-profit organizations committed to the protection of natural resources, including waters affected by the Rule. Defendants, as federal agencies, answer to a far broader constituency, including entities with interests that may differ from, or even be adverse to, those of the Conservation Groups. In the very rulemaking at issue, the

Agencies solicited input from a variety of stakeholders, including conservation organizations, but also industry groups, environmental organizations, agricultural organizations, state and local governments, and Tribal nations, and indicated that the final Rule "seeks to balance the considerations and concerns" of those stakeholders. Revised Definition of "Waters of the United States," 86 Fed. Reg. 69,372-01, 69,385 (Dec. 7, 2021) ("Proposed Rule").

Further, while the Conservation Groups largely support the Rule, many of their comments on the proposed rule urged the Agencies to go even further in protecting the nation's waters—suggestions that the Agencies did not ultimately adopt. *Compare, e.g.*, National Wildlife Federation and North Carolina Wildlife Federation, Comments on Proposed Revised Definition of "Waters of the United States," Docket ID No. EPA-HQ-OW-2021-0602, at 3 (Feb. 7, 2022) (requesting the agencies "to ensure" the protection of so-called "isolated" wetlands), https://perma.cc/KYJ8-9E9P, *with* U.S. EPA, Response to Comments Section 11: Paragraph (a)(5) Waters, Docket ID No. EPA-HQ-OW-2021-06022493, at 12–13, https://perma.cc/6ZEG-36QQ (requiring case-by-case analyses under significant nexus and relatively permanent standards for protection of geographically "isolated" wetlands).

Finally, as the Agencies' formal position on the appropriate scope of "waters of the United States" has shifted over time, several of the Conservation Groups have at times found their interests to be directly opposed to those of the Agencies, including on opposite sides of legal challenges to the Agencies' rules. *See, e.g.*, *S.C. Coastal Conservation League v. Wheeler*, No. 2:20-cv-01687 (D.S.C.) (National Wildlife Federation and North Carolina Wildlife Federation challenging the Navigable Waters Protection Rule); Br. *Amici Curiae* Trout Unlimited, *et al.*, *South Carolina Coastal Conservation League v. Wheeler*, No. 2:20-cv-01687-

DCN (D.S.C. July 17, 2020) (Izaak Walton League of America and other organizations filing an amicus brief in support of the challenge to the Navigable Waters Protection Rule).

In sum, because the interests of the Conservation groups differ demonstrably from those of the Agencies, and because the Conservation Groups would unquestionably add another perspective to the litigation, the Court should grant intervention as a matter of right.

## II. Alternatively, the Conservation Groups Should Be Granted Permissive Intervention Under Fed. R. Civ. P. 24(b).

In the alternative, the Conservation Groups request that the Court grant permissive intervention. On a timely motion, permissive intervention under Rule 24(b) is appropriate where a party's claim or defense and the main action have a question of law or fact in common and the intervention will not unduly prejudice or delay the adjudication of the rights of the original parties. Fed. R. Civ. P. 24(b).

As discussed in above, the Conservation Groups' motion to intervene is timely, as it has been filed just eight days after Plaintiffs filed their complaint and before any briefing or responsive pleading is due. The Conservation Groups' intervention will not unduly delay this action or prejudice the existing parties. And the Conservation Groups' defenses plainly derive from the same issues of fact and law as the underlying claims in Plaintiffs' action. This case challenges a Rule that will directly affect the interests of the Conservation Groups and their members; the Conservation Groups seek to oppose that challenge and uphold the Rule. Therefore, the Court should grant the Conservation Groups leave to intervene under Rule 24(b).

## CONCLUSION

For the foregoing reasons, the Conservation Groups respectfully request that they be granted intervention as Defendants in this action.

Respectfully submitted this 2nd day of March, 2023.

/s/ Mark Sabath
Mark Sabath*
Southern Environmental Law Center
122 C Street NW, Suite 325
Washington, DC 20001
(434) 977-4090
msabath@selcva.org

Kelly F. Moser*
Nicholas S. Torrey*
Southern Environmental Law Center
601 West Rosemary Street, Suite 220
Chapel Hill, NC 27516
(919) 967-1450
kmoser@selcnc.org
ntorrey@selcnc.org

Megan Hinkle Huynh*
Southern Environmental Law Center
Ten 10th Street NW, Suite 1050
Atlanta, GA 30309
(404) 521-9900
mhuynh@selcga.org

*Counsel for the Conservation Groups*
*\*Pro hac vice application filed concurrently*

/s/ Ashley Wilmes
Ashley Wilmes
Tom FitzGerald
Kentucky Resources Council
PO Box 1070
Frankfort, Kentucky 40602
(502) 875-2428
ashley@kyrc.org
fitzkrc@aol.com

*Counsel for Kentucky Resources Council, Inc.*

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 2, 2023, I electronically filed the foregoing Motion to Intervene as Defendants with the Clerk of Court using the CM/ECF system, which will send notification of this filing to all counsel of record.

<u>/s/ Ashley Wilmes</u>
