**Exhibit G**

**Declaration of Scott Kovarovics**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
FRANKFORT DIVISION

| | |
|---|---|
| COMMONWEALTH OF KENTUCKY, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> UNITED STATES ENVIRONMENTAL ) <br> PROTECTION AGENCY, *et al.*, ) <br> ) <br> Defendants, ) <br> ) <br> and ) <br> ) <br> KENTUCKY RESOURCES COUNCIL, ) <br> INC., *et al.*, ) <br> ) <br> Applicant-Intervenor-Defendants. ) <br> ) | No. 3:23-cv-00007-GFVT <br> (consolidated with No. <br> 3:23-cv-00008-GFVT) |

**DECLARATION OF SCOTT KOVAROVICS**

I, Scott Kovarovics, make the following declaration:

1. This declaration is based on my personal knowledge, information, and belief.

2. I am a resident of Virginia. I am over the age of eighteen and suffer from no legal incapacity.

3. I am the Executive Director of the Izaak Walton League of America, Inc. (the "League") and have served in this role since 2013. I am familiar with the League's mission, purpose, and activities.

4. Founded in 1922, the League is a national nonprofit organization with more than 40,000 members and 206 community-based chapters nationwide. The League's mission is to conserve, restore, and promote the sustainable use and enjoyment of our natural resources, including soil, air, woods, waters, and wildlife. The League's national office is

1

located in Gaithersburg, Maryland.

5. The League was founded by hunters, anglers, conservationists, and others who were concerned about water pollution, wetland drainage, the steep decline of fish and wildlife populations, and who wanted to promote the sustainable management of the nation's public lands. The League and its members nationwide have been advocating to conserve and protect water, land, other natural resources, and wilderness values since 1922.

6. The League works in the core areas of clean water, farm policy, outdoor recreation, and community-based conservation. Some of the threats to water quality we work to address include runoff from and destruction of streams and wetlands by urban and suburban development and agricultural production and pollution from heavy industry.

7. The League's members and volunteers regularly participate in monitoring and other activities to assess and protect stream and wetland health. For example, through the League's Save Our Streams program, its members and volunteers protect waterways from pollution and bring information about water quality to their communities. The program began in 1969, when water pollution problems were easy to see—like massive oil spills and burning rivers. Early Save Our Streams volunteers cleaned up trash from their local waterways and reported problems like streams becoming clogged with silt.

8. In the 1980s, the League recognized that with the right training, volunteers could collect scientifically valid data to assess water quality in local streams—a conviction that has proven true. Ever since, the League has been teaching volunteers to study stream health and report their findings to decision-makers.

9. Today, trained volunteer stream monitors across the country are uncovering pollution problems and urging their local leaders to take action on water quality. The work of these volunteers also creates a critical record of water quality over time, making it possible to

quickly identify pollution problems that develop in the future.

10. For example, the League's Virginia Save Our Streams program is focused on training stream monitors to monitor the water quality of Virginia's streams and educates the public about the importance of clean water. Hundreds of Virginia Save Our Streams volunteers collect water quality data from over 200 stream sites across the state, including streams within the Chesapeake Bay watershed.

11. In 2022, Virginia Save Our Streams volunteers and League members expanded stream monitoring across seven new Virginia counties and 125 new stream sites. Through this work, our volunteers found that only 54% of the streams monitored had water quality rated as "acceptable." The League uses the Save Our Streams program to monitor local waterways, plan restoration projects, and report water quality problems to the state and federal agencies.

12. The League has a long history of working to obtain clean water protections. It has pushed for federal water pollution control for decades, beginning in the 1930s; worked to achieve passage of the Clean Water Act in 1972; and helped conceive the Wild and Scenic Rivers Act of 1968.

13. The League reexamines its public policy priorities every two years and has identified defending a strong Clean Water Act as a policy priority for 2023–2024. The League recognizes the Clean Water Act's 50-year track record as a bedrock environmental law, reducing industrial pollution in waterways and slowing the rate of wetlands loss. We know our most important waterways are only as healthy as the streams and tributaries that flow into them, and that wetlands help protect our waterways from pollution and flooding. Due to these and other critical functions, the League has made it a priority to defend the Clean Water Act and oppose actions that seek to weaken the Act's protections for streams and wetlands by taking actions that

include but are not limited to submitting comments on various "waters of the United States" rulemakings, submitting amicus curiae briefs in cases pending in federal district courts and the United States Supreme Court, and advocating to local, state, and federal legislators.

14. The League supported the U.S. EPA's and U.S. Army Corps of Engineers' ("Agencies") issuance of the "Revised Definition of 'Waters of the United States'" ("2023 Rule") as a return to the longstanding protections for streams, wetlands, and other critical waterways based on the scientific reality that waters are connected in various ways. The League strongly believes, as informed by its monitoring and conservation efforts, that scientific evidence establishing the connectivity of small streams and wetlands to downstream waters must inform Clean Water Act protections, and that pollution in tributary streams and wetlands must be controlled to protect the chemical, physical, and biological integrity of downstream waters.

15. Because protecting water resources is fundamental to the League's mission, we worked on behalf of our members and chapters to urge the Agencies to restore longstanding federal Clean Water Act protections for waters such as headwater and tributary streams, adjacent wetlands, and other wetlands such as prairie potholes. These wetlands cut through the Dakotas, western Minnesota, and northern Iowa. These wetlands are magnets for waterfowl, so much so that the Prairie Pothole Region has earned the title of "North America's Duck Factory."

16. They also provide many of the functions the current administration's rule recognizes should be considered in identifying what waters are "waters of the United States" ("2023 Rule"): For example, they filter out pollutants such as nutrients before they run into streams; and they store water after heavy rain or snowmelt, slowing the flow of water into streams and rivers and protecting communities from flooding. They also contribute to local economies and job creation. The prairie pothole region of South Dakota alone attracted 80,000 out-of-state pheasant hunters in 2010. Hunters, anglers, and wildlife viewers spend money on

4

lodging, restaurants, and gear. These and other critical wetlands across the country should be protected, but they may not be protected if the Court accepts the Plaintiffs' arguments in this case.

17. The 2023 Rule restores the longstanding definition of "waters of the United States" that predated the 2015 Clean Water Rule, with additional clarity and limitations to reflect the Agencies' interpretation of Supreme Court precedent, agency experience and expertise, and the best available science. The 2023 Rule also provides clearer protections for these critical waters by providing more guidance to the agencies and the regulated community.

18. League members nationwide have a strong interest in protecting water quality and water resources, including streams and wetlands, and aquatic life, fish, and wildlife. League members also value protecting these resources because they provide the foundation for quality outdoor recreation activities in which many members participate, including fishing, hunting, canoeing, hiking, and camping.

19. I understand that the parties challenging the 2023 Rule are asking this Court to vacate the rule and to limit the protections for clean water that the rule provides. I also understand that the parties in the case argue that the 2023 Rule is inconsistent with Supreme Court precedent and exceeds the federal agencies' authority. If Plaintiffs were to prevail on some of these arguments, I understand that it could make it very difficult, if not impossible, for the agencies to protect headwater streams, tributaries, many wetlands, and other waterways that are so important for fish, wildlife, drinking water, recreation, and other natural resource values, in addition to being critical to the League's ability to achieve its mission and carry out its programs.

20. As a national organization, the League and its members would be adversely affected by restricted Clean Water Act protections for small streams and wetlands because this would impair and potentially irreparably damage natural resources, water quality, and

conservation values throughout the country. These resources, including clean water, healthy wetlands, and abundant fish and wildlife, are directly threatened and could be damaged by the relief the Plaintiffs seek. The League has numerous active members who have taken action to support a strong Clean Water Act and strong federal protections for our nation's waters. These members use and enjoy streams, wetlands, and other water bodies that will be at risk of pollution, degradation, or destruction if this Court issues an order limiting the clean water protections provided by the 2023 Rule.

21. If the parties challenging the 2023 Rule prevail on their arguments, the destruction of the waters that would be permitted to occur would force the League to increase its advocacy and restoration efforts, including advocating before Congress and state legislatures, and state and federal agencies, and engaging in administrative actions and potentially litigation to challenge permits and potentially damaging projects. These necessary efforts would divert resources from the League's other important projects, such as addressing the threats posed by invasive species, fostering youth engagement with nature and the outdoors, promoting sustainable agricultural practices, and promoting the pursuit of sustainable outdoor recreation such as fishing, hunting, and shooting sports.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on March 1, 2023

Scott Kovarovics