**Exhibit H**

**Declaration of Matt Norton**

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF KENTUCKY
# FRANKFORT DIVISION

| | |
|---|---|
| COMMONWEALTH OF KENTUCKY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | No. 3:23-cv-00007-GFVT |
| UNITED STATES ENVIRONMENTAL ) | (consolidated with No. |
| PROTECTION AGENCY, *et al.*, ) | 3:23-cv-00008-GFVT) |
| ) | |
| Defendants, ) | |
| ) | |
| and ) | |
| ) | |
| KENTUCKY RESOURCES COUNCIL, ) | |
| INC., *et al*., ) | |
| ) | |
| Applicant-Intervenor-Defendants. ) | |
| ) | |

## DECLARATION OF MATT NORTON

I, Matt Norton, make the following declaration.

1. This declaration is based on my personal knowledge, information, and belief.

2. I am a resident of Minneapolis, Minnesota. I am over the age of eighteen years and competent to make this declaration.

3. I am a hunter, fisherman, and outdoorsman. I spend as much of my time as I can in Minnesota's natural spaces. I have been fishing and hunting in Minnesota for 20 years.

4. I have been a member of the Minnesota Division of the Izaak Walton League of America ("Minnesota Division") since 2002, and the Secretary of the organization since April 2019.

1

5. The Izaak Walton League of America ("League") is organized into state level divisions and chapters within each state division. The Minnesota Division was founded in 1923 as a state level division of the League, which itself was founded in 1922. The Mission of the Minnesota Division is summarized in the Izaak Walton League Pledge: "To strive for the purity of water, the clarity of air, and the wise stewardship of the land and its resources; to know the beauty and understanding of nature, and the value of wildlife, woodlands and open space; to the preservation of this heritage and to our sharing of it, I pledge myself as a member of the Izaak Walton League of America." The Motto of the League is: Defenders of Soil, Air, Woods, Waters, and Wildlife.

6. As noted in both the League Pledge and the League Motto, water is and always has been of great concern to the League and its members. This concern for water is exemplified by naming the league after Sir Izaak Walton (1593-1683), author of the noted book, *The Compleat Angler*.

7. The Minnesota Division of the League consists of 16 chapters and approximately 1,000 members. These chapters are located in all areas of Minnesota. Some chapters are based in the rich agricultural areas of southern and western Minnesota. Other chapters are based in the Minneapolis/St. Paul metropolitan and suburban areas, and others along the Mississippi River. Still other chapters are based in the Minnesota north woods and in the Great Lakes port city of Duluth.

8. Like the League, the Minnesota Division was founded by hunters and anglers, many of them Minnesotans, seeking to improve the care and quality of Minnesota waters and soils, and protect hunting and fishing habitat, especially wetlands. One of the League's and the Minnesota Division's first initiatives and successes was winning, in 1924, establishment of the

Upper Mississippi River National Wildlife and Fish Refuge, a 240,000-acre, 261-mile long National Wildlife Refuge located in and along the Upper Mississippi River, extending from Wabasha, Minnesota downstream to Rock Island, Illinois. The Minnesota Division has been a key advocate for environmental and habitat conservation legislation since its inception and has been involved in numerous successful efforts to establish national parks in Minnesota, the Boundary Waters Canoe Area Wilderness, and national wildlife refuges in Minnesota.

9. Since 1923, the Minnesota Division has worked to build public support and supportive government and industry to safeguard Minnesota's natural resources, the prairies, woods, wetlands, lakes, streams, and rivers that make our state unique. We advocate for the protection and promotion of natural areas throughout the state—not only as habitat for native wildlife, but also as recreational, hunting, fishing, and wildlife observation areas for the enjoyment of everyone, including our dedicated and passionate members.

10. Several Minnesota Division League chapters participate in the League's national Save Our Streams (SOS) program, which involves members conducting water quality monitoring on rivers and streams. For example, the Austin, Minnesota Chapter monitors the water on the Cedar River which flows into Iowa. This effort is unique in that, in addition to more typical "Citizen Science" water quality monitoring, water samples are placed in a special incubator to test for the presence of *E. coli*. With data in hand, the Austin Chapter has approached the local governmental unit seeking to reach agreement on the need, and a schedule, for steps to be taken to address pollution sources and clean up the water.

11. One of the major initiatives of the Minnesota Division is called the Upper Minnesota River Initiative (UMRI). The UMRI program has been in operation for six years and has been funded by the Minnesota Division with its own funds, as well as through grants from

3

the McKnight Foundation, the U.S. Fish and Wildlife Service, the Sustainable Agriculture Research and Education program of the USDA, and from private and family foundation donations. The focus of UMRI is surface water, in particular, reducing and avoiding harm to headwater streams, wetlands, and rivers that feed the Mississippi River Basin and thereby helping to clean the water of the Mississippi River. If headwater streams or wetlands in the top of the hydrologic system are degraded, the degradation shows up downstream in the rivers. The Upper Mississippi states of Minnesota, Wisconsin, Iowa, and Illinois contribute substantial shares of the excessive nutrient loading and sedimentation in the Mississippi River itself, as well in the Gulf of Mexico. The various projects of the UMRI program focus on: 1) reducing erosion on the lands and both sedimentation and erosion in the tributary streams, which in turn reduces the sediment and contaminants delivered to the Mississippi River itself; 2) preventing chemical runoff into the rivers, streams, lakes that contribute to the hypoxia zone in the Gulf of Mexico; and 3) fighting the improper draining of wetlands, the destruction of headwater streams, and degradation of other wildlife habitat. Each of these issues contribute to the excessive nutrient and sedimentation problem we are seeing in our rivers into the Gulf of Mexico.

12.     Much of the rich agricultural portion of Minnesota was once known as the Prairie Pothole Region. It is regularly reported by various governmental agencies that over 90%, some say over 95%, of the prairie potholes in Minnesota have been drained. Though much of that destruction occurred in the last decades of the 1800s to the mid-1900s, drainage continued long after we came to understand its harmful consequences for fish and wildlife, and for water quality and flooding in downstream communities. Improper draining continues. The same dynamic has happened to one degree or another in neighboring states, a trend that would very likely resume if the plaintiffs in this case succeed in blocking and having the new "waters of the U.S." rule set

aside. The historic loss of wetlands in the Prairie Pothole region, once a veritable "duck factory," has resulted in a significant reduction in waterfowl habitat and terrible declines in migrating duck numbers. If the new "waters of the U.S." rule were to be set aside and prevented from going into effect, then the loss of wetlands would likely continue across the Prairie Pothole region. Even if that loss resumed only in states other than Minnesota, the result would nonetheless affect the numbers of ducks and other waterfowl migrating through Minnesota, harming the state's ecology, wildlife viewing, and hunting opportunities of our members, not to mention the economics of reduced tourism.

13.     Wetland drainage projects tend to happen to wetlands left unprotected in law. An unnaturally limited definition of "waters of the U.S." leaves so-called geographically "isolated" wetlands vulnerable to drainage projects that harm the receiving rivers and other waterways because the drainage creates an artificially increased connection to those very same wetlands, which in turn causes increased erosion and damage to stream health, higher phosphorus loading, eutrophication, algae blooms, and increased incidence of fish kills in the downstream waters. Groundwater connection of navigable waters to even very distant wetlands is still an important connection. Pretending otherwise leaves wetlands unprotected, which exposes wetlands, fish and wildlife, water quality, and our largest rivers and other waterways open to unnecessary harm.

14.     Improper wetland drainage upstream also often harms downstream landowners. Drainage upstream causes erosion, causing instability and clumping of streambanks. This steadily steals acres from the fields of downstream landowners.

15.     Draining wetlands also contributes to the loss of calcareous fens by reducing groundwater flows necessary to maintain calcareous fens. Calcareous fens are rare and distinctive peat-accumulating wetlands. They depend on a constant supply of upwelling

groundwater rich in calcium and other minerals. They typically occur on slopes where groundwater rises to the surface and saturates the peat before draining away, causing the area to be spongy and wet. The upwelling groundwater can either create a "peat dome," rising a few feet above the ground or an "apron" where the peat spreads out along a hillside. You might also notice shallow pools of water that can be surrounded by sedges growing in small, raised clumps, called hummocks. The shallow pools contain white calcium carbonate deposits that look like snow or salt. Water levels in calcareous fens remain at or very near the soil surface, even during summer because groundwater input balances evaporation and the use of water by plants (transpiration). They are rarely, if ever, flooded by surface water because of their position on the landscape. Draining a nearby wetland, despite it not being connected by surface water, can rob a fen of its springwater sources and destroy the fen.

16. The UMRI Project of the Minnesota Division is currently intervening to modify a large agricultural drainage project that threatens a calcareous fen in southern Minnesota. Prior to intervention by the UMRI project team, the local government unit with authority to approve the project had already received a final engineering report that failed to even acknowledge the existence of the fen or consider the effect of the drainage project on the fen. Following the UMRI intervention, the local government unit stopped its approval process and has contracted with a hydrological consulting firm to examine the fen and the impact of the drainage project on that fen.

17. The prior administration's constricted definition of "waters of the United States" under the Clean Water Act—the "Navigable Waters Protection Rule"—harmed the Minnesota Division and its local chapters and members because it removed federal clean water protections

from wetlands across the Upper Midwest, including some in the states with which we cooperate on the UMRI.

18. I understand that the parties challenging the "Revised Definition of 'Waters of the United States'" ("2023 Rule") are asking this court to vacate the rule and to limit the protections for wetlands and clean water that the rule provides. A decision in favor of Plaintiffs would make it more difficult for the federal agencies to recognize as "waters of the United States" headwater streams and wetlands across the country, including wetlands and headwater streams critical for the Upper Mississippi River's steady flows, its fisheries, wildlife habitat, and hard-won gains in pollution control. The 2023 Rule provides for clarity and guidance on the jurisdictional analysis that is lacking in the pre-2015 regime.

19. We are deeply invested in maintaining the water quality and presence of wetlands, headwater streams, and other tributaries of navigable waters in the United State, for the existence and use and enjoyment of fish and wildlife, as well as for people, including our members. We cannot protect fish and wildlife if we cannot protect their habitat—the existence of wetlands, headwater and small streams, and other important waterways, and we cannot protect wetlands, headwater and small streams, and other waterways if federal clean water protections are weakened. Additionally, the more Clean Water Act protections are weakened, the less migrating waterfowl we will have. All of these harms will demand that the Minnesota Division spend more of our scarce funds and resources advocating for local water quality protections and programs, which would strain our capacity to maintain the Minnesota Division's other critical programs.

20. Upholding the 2023 Rule and the federal agencies' authority to protect critical headwater streams, other tributaries, and wetlands that sustain our fisheries and wildlife habitat will address the Minnesota Division's concerns.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on March 2, 2023

*Matthew Norton*

Matt Norton