**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**FRANKFORT DIVISION**


| | | |
|---|---|---|
| COMMONWEALTH OF KENTUCKY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:23-cv-00007-GFVT |
| | ) | (consolidated with No. |
| | ) | 3:23-cv-00008-GVFT) |
| | ) | |
| UNITED STATES ENVIRONMENTAL | ) | |
| PROTECTION AGENCY, *et al*., | ) | |
| | ) | |
| | ) | |
| Defendants. | | |


**FEDERAL DEFENDANTS' COMBINED OPPOSITION TO PLAINTIFFS' MOTIONS**
**FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Table of Contents ................................................................................................... i

Table of Authorities ............................................................................................ iv

Table of Exhibits ............................................................................................... xiii

Glossary ............................................................................................................. xiv

Introduction ......................................................................................................... 1

Background ........................................................................................................... 3

        A.     The CWA and "waters of the United States" .......................................... 3

        B.     Prior "waters of the United States" definitions and litigation .................... 4

               1.     The 1986 Regulations and the pre-2015 regime ............................ 4

               2.     "Waters of the United States" rules between 2015 and 2020 ......... 6

        C.     2023 Rule ................................................................................................ 7

               1.     "Waters of the United States" categories ...................................... 8

               2.     Ditches and other exclusions ......................................................... 9

               3.     Significant nexus standard .............................................................. 9

Nature and Stage of the Proceedings ................................................................. 9

Standard of Decision ......................................................................................... 10

Summary of the Argument ............................................................................... 10

Argument ........................................................................................................... 11

        I.     Plaintiffs have not adequately demonstrated irreparable harm or standing. ......... 11

        A.     Plaintiffs have not shown irreparable harm warranting a preliminary injunction ............................................................................ 12

               1.     Plaintiffs' purported compliance costs are not irreparable harms ........................................................................................... 12

i

2.     The Rule does not harm Kentucky's sovereignty. ........................ 16

3.     The *Sackett* case has no bearing on Plaintiffs' alleged harms. ........................................................................... 18

B.     Plaintiffs fail to demonstrate standing. ...................................... 18

II.     Plaintiffs fail to show that they are likely to succeed on the merits. ................... 21

A.     The Rule is substantially similar to the status quo regime........................ 21

1.     The Rule represents the best (or at least a permissible) interpretation of the Act, "navigable waters," and "waters of the United States." .................................................. 21

a.     The Rule advances the CWA's objective. ........................ 23

b.     The Rule correctly continues to cover interstate waters. ................................................................. 23

c.     The Rule reasonably continues to cover impoundments.................................................... 25

d.     The Rule's coverage of tributaries that meet a *Rapanos* standard is narrower than Plaintiffs portray and is consistent with the status quo regime................... 25

e.     The Rule continues to cover adjacent wetlands consistent with the Act.................................... 26

f.     The Rule's coverage of (a)(5) waters is valid. ................. 26

2.     Case-specific determinations continue the status quo regime and are permissible under the CWA. .............................. 28

3.     The Rule's significant nexus test is sufficiently limited and is founded on the status quo regime.............................................. 29

4.     The Rule provides a reasoned explanation and is consistent with *Rapanos*. ............................................................ 31

a.     The Agencies provide a reasoned explanation for the Rule. ................................................................. 31

b.     The Rule is consistent with *Rapanos*................................ 34

ii

B.   The Rule is constitutional. ....................................................... 35

   1.   The Rule is consistent with the Commerce Clause. ..................... 35

   2.   The Rule comports with Section 101(b) and maintains the
        CWA's state-federal balance. ........................................ 37

   3.   The Rule does not run afoul of the major questions doctrine
        and is a valid exercise of Congress's delegated authority. ........... 39

   4.   The Rule is not impermissibly vague. ........................................... 41

C.   The Rule complied with procedural requirements. ................................... 44

III.   The balance of equities and public interest weigh against an injunction. ............. 46

IV.   Any injunction should be limited to the Rule's application to waters in
      Kentucky. ....................................................................... 48

Conclusion ............................................................................. 50

# TABLE OF AUTHORITIES

## UNITED STATES CONSTITUTION

U.S. Const. art. I, § 8..................................................................................24

## CASES

*Allina Health Servs. v. Sebelius*,
  746 F.3d 1102 (D.C. Cir. 2014) .................................................................46

*Am. Civil Liberties Union of Kentucky v. McCreary Cnty.*
  354 F.3d 438 (6th Cir. 2003) ......................................................................17

*Am. Hosp. Ass'n v. Harris*,
  625 F.2d 1328 (7th Cir. 1980) ....................................................................15

*Am. Trucking Ass'ns, Inc. v. FMCSA*,
  724 F.3d 243 (D.C. Cir. 2013)....................................................................46

*A.O. Smith Corp. v. FTC*,
  530 F.2d 515 (3d Cir. 1976)........................................................................15

*Arizona v. Biden*,
  40 F.4th 375 (6th Cir. 2022) .......................................................................49

*Arkansas v. Oklahoma*,
  503 U.S. 91 (1992)......................................................................................38

*Ass'n of Am. Physicians & Surgeons v. FDA (AAPS)*,
  13 F.4th 531 (6th Cir. 2021) .................................................................18, 50

*Ass'n of Battery Recyclers, Inc. v. EPA*,
  208 F.3d 1047 (D.C. Cir. 2000) .................................................................44

*Benisek v. Lamone*,
  138 S. Ct. 1942 (2018)................................................................................10

*Benjamin v. Douglas Ridge Rifle Club*,
  673 F. Supp. 2d 1210 (D. Or. 2009) ..........................................................33

*Biden v. Missouri*,
  142 S. Ct. 647 (2022)..................................................................................39

*Boylen v. United States*,
  No. 19-3597, 2019 WL 13127547 (6th Cir. Sept. 27, 2019) .....................43

iv

*California v. Texas*,
   141 S. Ct. 2104 (2021) .................................................................................................48

*Cargill v. Garland*,
   57 F.4th 447 (5th Cir. 2023) (en banc) .....................................................................48

*Chevron, U.S.A. Inc., v. NRDC*,
   467 U.S. 837 (1984) ..................................................................................................22

*Chrysler Corp. v. Dep't of Transp.*,
   515 F.2d 1053 (6th Cir. 1975) ..................................................................................44

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) ..................................................................................................21

*City of Arlington, Tex. v. FCC*,
   569 U.S. 290 (2013) ..................................................................................................22

*City of Milwaukee v. Illinois*,
   451 U.S. 304 (1981) ....................................................................................................3

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ..................................................................................................20

*Cnty. of Maui, Haw. v. Haw. Wildlife Fund*,
   140 S. Ct. 1462 (2020) ...........................................................................23, 29, 40, 43

*Commonwealth v. Biden*,
   57 F.4th 545 (6th Cir. 2023) ...........................................................10, 13, 15, 16, 48

*Conn v. Deskins*,
   199 F. Supp. 3d 1172 (E.D. Ky. 2016) ....................................................................17

*Connection Distrib. Co. v. Reno*,
   154 F.3d 281 (6th Cir. 1998) ....................................................................................17

*Crane v. Johnson*,
   783 F.3d 244 (5th Cir. 2015) ....................................................................................20

*DHS v. New York*,
   140 S. Ct. 599 (2020) ................................................................................................48

*Dismas Charities, Inc. v. U.S. Dep't of Justice*,
   401 F.3d 666, 678 (6th Cir. 2005) ...........................................................................44

*D.T. v. Sumner Cnty. Schs.*,
  942 F.3d 324 (6th Cir. 2019) ...................................................................................10, 11, 15

*Elrod v. Burns*,
  427 U.S. 347 (1976)..................................................................................................................17

*F.C.C. v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009).................................................................................................................32

*Freedom Holdings, Inc. v. Spitzer*,
  408 F.3d 112 (2d Cir. 2005)....................................................................................................15

*Gen. Dynamics Land Sys., Inc. v. Cline*,
  540 U.S. 581 (2004).................................................................................................................23

*Gilley v. United States*,
  649 F.2d 449 (6th Cir. 1981) ..................................................................................................16

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972).................................................................................................................42

*Gun Owners of Am., Inc. v. Garland*,
  19 F. 4th 890 (6th Cir. 2021),
  *cert. denied*, 143 S. Ct. 83 (2022) ....................................................................................22, 40

*Hodel v. Va. Surface Min. and Reclamation Ass'n, Inc.*,
  452 U.S. 264 (1981).............................................................................................................16, 20

*Int'l Paper Co. v. Ouellette*,
  479 U.S. 481 (1987).................................................................................................................38

*Kentucky v. Biden*,
  571 F. Supp. 3d 715 (E.D. Ky. 2021) ....................................................................................16

*Kentucky v. U.S. ex rel. Hagel*,
  759 F.3d 588 (6th Cir. 2014) ..................................................................................................10

*Ky. Waterways All. v. Ky. Utils. Co.*,
  905 F.3d 925 (6th Cir. 2018),
  *abrogated on other grounds by Cnty. of Maui, Haw. v. Haw. Wildlife Fund*,
  140 S. Ct. 1462 (2020)........................................................................................................37, 38

*Leary v. Daeschner*,
  228 F.3d 729 (6th Cir. 2000) ..................................................................................................10

*LeBlanc v. EPA,*
  310 F. App'x 770 (6th Cir 2009) ................................................................39

*Leyse v. Clear Channel Broadcasting, Inc.*,
  545 F. App'x 444 (6th Cir. 2013) ........................................................45, 46

*Long Island Care at Home, Ltd. v. Coke*,
  551 U.S. 158 (2007) .............................................................................45

*Lujan v. Defs. Of Wildlife*,
  504 U.S. 555 (1992) .............................................................................18

*Maynard v. Cartwright*,
  486 U.S. 356m (1988) ...........................................................................41

*Mayo Found. for Med. Educ. & Rsch. v. United States,*
  562 U.S. 44 (2011),
  *cert. denied*, 143 S. Ct. 83 (2022) ..........................................................40

*Mich. Coal. Of Radioactive Material Users, Inc. v. Griepentrog*,
  945 F.2d 150 (6th Cir. 1991) ..................................................................16

*Memphis A. Philip Randolph Inst. v. Hargett*,
  978 F.3d 378 (6th Cir. 2020) ..................................................................11

*Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co*.,
  463 U.S. 29 (1983)...............................................................................10

*MX Grp., Inc. v. City of Covington*,
  293 F.3d 326, 332 (6th Cir. 2002) ...........................................................18

*Mylan Pharms. Inc. v. U.S. Food & Drug Admin.*,
  789 F. Supp. 2d 1 (D.D.C. 2011).............................................................20

*Nat'l Ass'n of Home Builders v. EPA*,
  667 F.3d 6 (D.C. Cir. 2011) ...................................................................19

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
  138 S. Ct. 617 (2018) ...........................................................................23

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs*,
  545 U.S. 967 (2005) .............................................................................34

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
   538 U.S. 803 (2003) .................................................................................11

*New England Power Generators Ass'n, Inc. v. FERC*,
   707 F.3d 364 (D.C. Cir. 2013) ..............................................................14

*Nken v. Holder*,
   556 U.S. 418 (2009) ..........................................................................47, 48

*NLRB v. Bell Aerospace Co. Div. of Textron, Inc.*,
   416 U.S. 267 (1974) ................................................................................29

*North Dakota v. EPA*,
   127 F. Supp. 3d 1047 (D.N.D. 2015) .................................................12, 38

*Online Merchants Guild v. Cameron*,
   995 F.3d 540 (6th Cir. 2021) ..................................................................11

*Platte River Whooping Crane Critical Habitat Maint. Tr. v. FERC*,
   962 F.2d 27 (D.C. Cir. 1992) .................................................................18

*Rapanos v. United States*,
   547 U.S. 715 (2006) ..................................5, 6, 22, 23, 24, 25, 28, 29, 32, 35, 36, 38, 41, 42, 43

*S.D. Warren Co. v. Me. Bd. of Env't Prot.*,
   547 U.S. 370 (2006) ................................................................................25

*Saginaw Cnty., Mich. v. STAT Emergency Med. Servs.Inc.*,
   946 F.3d 951 (6th Cir. 2020) ..................................................................20

*Sampson v. Murray*,
   415 U.S. 61 (1974) .................................................................................17

*Sierra Club v. Morton*,
   405 U.S. 727 (1972) ................................................................................19

*Small Refiner Lead Phase-Down Task Force v. EPA*,
   705 F.2d 506 (D.C. Cir. 1983) ..............................................................46

*Solid Waste Agency of N. Cook Cnty. v. USACE* (*SWANCC*),
   531 U.S. 159 (2001) .........................................................................5, 38, 43

*Texas v. EPA*,
   829 F.3d 405 (5th Cir. 2016),
   *aff'd as modified sub nom. Kentucky v. Biden*,
   57 F.4th 545 (6th Cir. 2023) .............................................................16, 17

*Trump v. Hawaii*,
  138 S. Ct. 2392 (2019) ...............................................................................49

*United States v. Ashland Oil & Transp. Co.*,
  504 F.2d 1317 (6th Cir. 1974) ...............................................................22, 24

*United States v. Cundiff*,
  555 F.3d 200 (6th Cir. 2009) ...........................................................22, 33, 43

*United States v. Hubenka*,
  438 F.3d 1026 (10th Cir. 2006) ...............................................................36

*United States v. Long*,
  450 F. App'x 457 (6th Cir. 2011) ...............................................................43

*United States v. Lucas*,
  516 F.3d 316 (5th Cir. 2008) ...............................................................43, 44

*United States v. Lucero*,
  989 F.3d 1088 (9th Cir. 2021) ...............................................................42

*United States v. Martin*,
  438 F.3d 621 (6th Cir. 2006) ...............................................................21

*United States v. Midwest Fireworks Mfg. Co.*
  248 F.3d 563 (6th Cir. 2001) ...............................................................41

*United States v. Nat'l Dairy Prods. Corp.*,
  372 U.S. 29 (1963) ...............................................................42

*United States v. Osborne*,
  No. 1:11 CV 1029, 2011 WL 7640985 (N.D. Ohio Dec. 15, 2011),
  *report and recommendation adopted*,
  No. 1:11CV1029, 2012 WL 1095960 (N.D. Ohio Mar. 30, 2012)...........................................33

*United States v. Riverside Bayview Homes, Inc.*,
  474 U.S. 121 (1985)...............................................................5, 22, 23, 36, 41, 43

*United States v. Utesch*,
  596 F.3d 302 (6th Cir. 2010) ...............................................................46

*Corps v. Hawkes Co.*,
  136 S. Ct. 1807 (2016)...............................................................29

*Waskul v. Washtenaw Cnty. Cmty. Mental Health,*
    900 F.3d 250 (6th Cir. 2018) ...................................................................19

*West Virginia v. EPA,*
    142 S. Ct. 2587 (2022) ...........................................................................39

*White v. United States,*
    601 F.3d 545 (6th Cir. 2010) ...................................................................20

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001) ...............................................................................40

*Winter v. NRDC,*
    555 U.S. 7 (2008) ...................................................................................10

**STATUTES**

5 U.S.C. § 553(b)(3) ...........................................................................................44

5 U.S.C. § 553(c) ...............................................................................................44

5 U.S.C. § 702 ...................................................................................................49

5 U.S.C. § 703 ...................................................................................................49

5 U.S.C. § 705 ..............................................................................................10, 49

5 U.S.C. § 706 ..............................................................................................46, 48

33 U.S.C. § 466a(d)(1) (1952) ............................................................................24

33 U.S.C. § 466g(a) (1964) .................................................................................24

33 U.S.C. § 466i(e) (1952) ..................................................................................24

33 U.S.C. § 1160(c)(1) (1970) ............................................................................24

33 U.S.C. § 1173(e) (1970) .................................................................................24

33 U.S.C. 1251(a) ...........................................................................................2, 34

33 U.S.C. 1251(b) ..............................................................................................37

33 U.S.C. 1251(c) ..............................................................................................38

33 U.S.C. 1251(f) ...............................................................................................38

33 U.S.C. § 1251(g) ................................................................38

33 U.S.C. § 1311(a) ..................................................................3

33 U.S.C. § 1313(a) ..................................................................4

33 U.S.C. § 1313(a)(1) .............................................................24

33 U.S.C. § 1313(a)-(d) ............................................................3

33 U.S.C. § 1313(b) ..................................................................4

33 U.S.C. § 1313(c)(1) ..............................................................4

33 U.S.C. § 1313(d)(1)(A) .........................................................4

33 U.S.C. § 1313(d)(1)(B) .........................................................4

33 U.S.C. § 1319 .....................................................................43

33 U.S.C. § 1321 ......................................................................3

33 U.S.C. § 1341 ......................................................................3

33 U.S.C. § 1342 ...................................................................3, 4

33 U.S.C. § 1344 ......................................................................3

33 U.S.C. § 1344(a) ..................................................................4

33 U.S.C. § 1344(d) ..................................................................4

33 U.S.C. § 1344(g) ..................................................................4

33 U.S.C. § 1344(g)(1) .............................................................26

33 U.S.C. § 1361 .................................................................40, 48

33 U.S.C. § 1362(7) ...............................................................2, 3

33 U.S.C. § 1362(12) ................................................................3

33 U.S.C. § 1370 .....................................................................16

33 U.S.C. § 1377(e) ...............................................................3, 4

## CODE OF FEDERAL REGULATIONS

33 C.F.R. § 328.3 (2014) ....................................................................................4, 7

33 C.F.R. § 328.3(a) (2014) .....................................................................................4

40 C.F.R. § 120.1 ....................................................................................................7

40 C.F.R. § 120.2 ....................................................................................................7

40 C.F.R. § 130.2(j) .................................................................................................4

40 C.F.R. § 130.7(b)(1) ...........................................................................................4

40 C.F.R. § 131.8 ....................................................................................................4

40 C.F.R. § 232.2 (2014) .........................................................................................4

## FEDERAL REGISTER

42 Fed. Reg. 37121 (July 19, 1977) ......................................................................25

51 Fed. Reg. 41206 (Nov. 13, 1986) ......................................................................26

80 Fed. Reg. 37054 (June 29, 2015) ........................................................................6

84 Fed. Reg. 56626 (Oct. 22, 2019) ...............................................................2, 6, 47

85 Fed. Reg. 22250 (Apr. 21, 2020) .....................................................................1, 7

86 Fed. Reg. 69372 (Dec. 7, 2021) ....................................................................7, 45

88 Fed. Reg. 3004 (Jan. 18, 2023) ......................................1, 2, 4, 6, 7, 8, 9, 13, 15, 16, 22, 23, 24,
.................................................................................25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35
.................................................................................36, 37, 38, 39, 40, 42, 43, 45, 47, 50

## LEGISLATIVE HISTORY

S. Rep. No. 92-414, 92 Cong. 1st Sess. 7 (1971) .........................................................2

## DICTIONARY

*Relatively*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/relatively .....35

## TABLE OF EXHIBITS

Exhibit 1:      Text of the 1986 Regulations, 33 C.F.R. § 328.3 (2014)

Exhibit 2:      "*Rapanos* Guidance" EPA & Corps of Engineers, Clean Water Act Jurisdiction
                Following the U.S. Supreme Court's Decision in *Rapanos v. United States &
                Carabell v. United States* (Dec. 2, 2008), EPA-HQ-OW-2021-0602-0096

Exhibit 3:      History of the Effects of Litigation, EPA-HQ-OW-2021-0602-2480

Exhibit 4:      Regulatory text of the 2023 Rule (to be codified at 33 C.F.R. § 328.3)

Exhibit 5:      Excerpts of Economic Analysis for the 2023 Rule, EPA-HQ-OW-2021-0602-
                2489

Exhibit 6:      Excerpts of 2023 Rule Response to Comments Document, EPA-HQ-OW-2021-
                0602-2493

Exhibit 7:      Excerpts of Corps, *Regulatory Guidance Letter: No. 16-01* (Oct. 2016), EPA-HQ-
                OW-2021-0602-2512

Exhibit 8:      Corps, *Regulatory Impact Analysis for 2021 Reissuance and Modification of
                Nationwide Permits* (Jan. 3, 2021), EPA-HQ-OW-2021-0602-2513

Exhibit 9:      Comments on Proposed Rule from U.S. Chamber of Commerce (Feb. 7, 2022),
                EPA-HQ-OW-2021-0602-0437

Exhibit 10:     Comments on Proposed Rule from Nat'l Stone, Sand, & Gravel Ass'n (Feb. 7,
                2022), EPA-HQ-OW-2021-0602-0511

Exhibit 11:     Excerpts of Comment on Proposed Rule from Waters Advocacy Coalition (Feb.
                7, 2022), EPA-HQ-OW-2021-0602-0268

# GLOSSARY

| | |
|---|---|
| 1986 Regulations | 33 C.F.R. § 328.3(a) (2014) (Corps); 40 C.F.R. § 232.2(q) (2014) (EPA) |
| pre-2015 regime or status quo regime | The Agencies' current and pre-2015 application of the 1986 Regulations, implemented consistent with relevant case law (including *Rapanos v. United States*, 547 U.S. 715 (2006)), and longstanding practice, as informed by applicable guidance (including the *Rapanos* Guidance), training, and experience |
| 2015 Rule | *Clean Water Rule: Definition of "Waters of the United States,"* 80 Fed. Reg. 37054 (June 29, 2015) |
| 2019 Rule | *Definition of "Waters of the United States"—Recodification of Pre-Existing Rules*, 84 Fed. Reg. 56626 (Oct. 22, 2019) |
| 2020 Rule | *Navigable Waters Protection Rule: Definition of "Waters of the United States,"* 85 Fed. Reg. 22250 (Apr. 21, 2020) |
| 2023 Rule or Rule | *Revised Definition of "Waters of the United States,"* 88 Fed. Reg. 3004 (Jan. 18, 2023) (filed as Bus. Mot. Ex. B, No. 3:23-cv-8, ECF No. 13-2) |
| Agencies | U.S. Army Corps of Engineers and U.S. Environmental Protection Agency |
| APA | Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* |
| Econ. Analysis | Economic Analysis for the 2023 Rule, EPA-HQ-OW-2021-0602-2489 |
| CWA or Act | Clean Water Act, 33 U.S.C. § 1251 *et seq.* |
| Business Plaintiffs | Plaintiffs in *Kentucky Chamber of Commerce, et al. v. EPA, et al.*, No. 3:23-cv-8-GFVT (E.D. Ky.) |
| Bus. Mot. | *Kentucky Chamber of Commerce, et al. v. EPA, et al.*, No. 3:23-cv-8-GFVT, ECF No. 14 (E.D. Ky. Feb. 22, 2023) |
| Ky. Mot. | *Commonwealth of Kentucky. v. EPA, et al.*, No. 3:23-cv-7-GFVT, ECF No. 10 (E.D. Ky. Feb. 23, 2023) |
| *Rapanos* Guidance | EPA & Corps, Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in *Rapanos v. United States & Carabell v. United States* (Dec. 2, 2008), EPA-HQ-OW-2021-0602-0096 |

RTC                    2023 Rule Response to Comments Document, EPA-HQ-OW-2021-
                       0602-2493

## INTRODUCTION

On January 18, 2023, the Environmental Protection Agency and Army Corps of Engineers ("Agencies") published the *Revised Definition of "Waters of the United States*," 88 Fed. Reg. 3004 ("2023 Rule" or "Rule"), which is due to take effect on March 20, 2023. The Rule affirms, refines, and provides clarity and consistency to a regulatory framework that has been in place for the better part of four decades and carried out by every Administration during that period. The Commonwealth of Kentucky ("Kentucky") and six trade associations ("Business Plaintiffs") have challenged the Rule under the Administrative Procedure Act ("APA"). These Plaintiffs now ask this Court to award them the emergency relief of keeping in place a regime that is almost identical to the one they seek to enjoin in terms of costs to regulated parties and environmental protection, but provides far less clarity to stakeholders. This Court should reject Plaintiffs' request to block the Rule from taking effect.

The motions for preliminary injunction each falter at the outset because they fall far short of demonstrating a likelihood of substantial and irreparable harm to support such extraordinary relief; indeed, Plaintiffs have not even established their standing to bring suit. The declarations that Plaintiffs proffer, while many in number, allege no specific injuries traceable to the 2023 Rule. And it is difficult to see how they could. The declarations have a common defect: Plaintiffs' claims of harm are premised on either a complete disregard for the Rule's similarity to the status quo or overstatements of their slight differences. The status quo is not the *Navigable Waters Protection Rule*, 85 Fed. Reg. 22250 (Apr. 21, 2020) ("2020 Rule"). That rule, as Business Plaintiffs acknowledge (Bus. Mot. 8), is not presently in effect anywhere due to judgments entered by other courts. Instead, the regulatory status quo is the regime that was in place for years prior to 2015, that the Agencies restored in 2019, and that is largely codified in the 2023 Rule, with slight modifications for needed clarity to aid in implementation. *See*

*Definition of "Waters of the United States"—Recodification of Pre-Existing Rules*, 84 Fed. Reg. 56626 (Oct. 22, 2019) ("2019 Rule"); 88 Fed. Reg. at 3007. Throughout the Rule, the Agencies explain in detail how the Rule compares to the status quo, with citations to longstanding guidance and practice. Plaintiffs assert—without a basis or even an attempt to grapple with the Rule's stark similarities with the currently applicable pre-2015 regime—that the Rule is an "expanded definition of jurisdictional waters" (Ky. Mot. 2) or "expansive recasting" (Bus. Mot. 3). However, the differences between the challenged Rule and the status quo are small, and no party has shown any harm arising out of these small differences.

Even assuming Plaintiffs had irreparable injury, or even standing, their motions should still be denied. Plaintiffs are unlikely to succeed on any of their constitutional, statutory, and procedural challenges to the 2023 Rule, which faithfully carries out Congress's intent in the Clean Water Act ("CWA") "to restore and maintain the chemical, physical, and biological integrity," 33 U.S.C. § 1251(a), of all the "waters of the United States," *id.* § 1362(7). Indeed, the Agencies' construction of the CWA in the 2023 Rule reflects the jurisdictional tests outlined by the Supreme Court—a regulatory regime that every Court of Appeals to have considered the matter has upheld, and which Plaintiffs now ask this Court to upend. In updating regulatory text to conform to judicial precedent, clarifying exclusions from federal jurisdiction, and more specifically explicating how the Agencies will apply the jurisdictional tests, the 2023 Rule brings needed clarity and predictability to a longstanding regulatory regime.

Even if Plaintiffs were likely to succeed on one or more of their APA claims, that could unlock the door only to party-specific relief. Kentucky does not and cannot assert that its sovereign, quasi-sovereign, or financial interests could be impaired by an application of the 2023 Rule outside its borders. Further, the balance of equities and public interest clearly disfavor an

injunction against the Rule's application to Business Plaintiffs or their members who have not produced evidence or identified any concrete, specific, and imminent injuries, let alone any beyond the borders of Kentucky.

## BACKGROUND

### A.      The CWA and "waters of the United States"

The CWA is the primary federal law protecting the Nation's waters. Its singular objective is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Congress enacted the Act in 1972, as a "total restructuring" of the previous statutory framework, *City of Milwaukee v. Illinois and Michigan*, 451 U.S. 304, 317 (1981) (citation omitted), which had been "inadequate in every vital aspect," S. Rep. No. 92-414, at 7 (1971). The Act was designed to "establish an all-encompassing program of water pollution regulation." 451 U.S. at 317 (citation omitted). Among other provisions, it prohibits unauthorized discharges "of any pollutant by any person," 33 U.S.C. § 1311(a), to "navigable waters," which are broadly defined as "the waters of the United States, including the territorial seas," *id.* § 1362(7). Waters satisfying that definition are often called "covered" or "jurisdictional" waters.

The scope of key CWA provisions is tied to the definition of "waters of the United States," including permitting programs that regulate discharges of pollutants, *see id.* §§ 1311(a), 1362(12), 1342, 1344; provisions concerning water quality standards and impaired waters, *id.* §§ 1313(a)-(d), 1377(e); the oil spill prevention and response program, *id.* § 1321; and the state certification process for federally-authorized activities, *id.* § 1341.

Two programs are central to implementing the CWA's prohibition on the unauthorized discharge of pollutants to "navigable waters." *Id.* §§ 1311(a), 1362(12). Pursuant to CWA Section 402, EPA or authorized states issue National Pollutant Discharge Elimination System

permits for the discharge of pollutants (other than dredged or fill material) from point sources to "waters of the United States." *Id*. § 1342. For discharges of dredged or fill material into "waters of the United States," the Corps, or authorized states issue CWA Section 404 permits. *Id.* § 1344(a), (d), (g).

Additionally, states and authorized tribes adopt water quality standards for waterbodies or waterbody segments within their boundaries. 33 U.S.C. §§ 1313(a), (b), (c)(1), 1377(e); 40 C.F.R. § 131.8. They then identify, and prioritize, water-quality-limited segments, i.e., segments that do not meet water quality standards. 33 U.S.C. § 1313(d)(1)(A) & (B); 40 C.F.R. §§ 130.2(j) & 130.7(b)(1).

### B.   Prior "waters of the United States" definitions and litigation

#### 1.   The 1986 Regulations and the pre-2015 regime

The Corps and EPA first defined the term "waters of the United States" through regulation in the 1970s. *See* 88 Fed. Reg. at 3011. In 1986 and 1988, the Agencies recodified regulations that (with some minor revisions) remained in effect until 2015. *See* 33 C.F.R. § 328.3 (2014) (Corps) & 40 C.F.R. § 232.2 (2014) (EPA) ("1986 Regulations"); *see also* 88 Fed. Reg. at 3012. The 1986 Regulations defined "waters of the United States" to include seven categories: (1) traditional navigable waters, i.e., waters that are, were, or may be used "in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;" (2) interstate waters; (3) "other waters," i.e., intrastate waters which could affect interstate or foreign commerce; (4) impoundments; (5) tributaries; (6) the territorial seas; and (7) adjacent wetlands. 33 C.F.R. § 328.3(a) (2014), Ex. 1. The 1986 Regulations also provided definitions of key terms (e.g., "wetlands" and "adjacent"), and two exclusions (the prior converted cropland and waste treatment systems exclusions). *Id.*

The Agencies refined their application of the 1986 Regulations as they gained experience and technical expertise over time, and as informed by Supreme Court decisions. In *United States v. Riverside Bayview Homes, Inc.*, the Court upheld the Corps' assertion of CWA jurisdiction over adjacent wetlands. 474 U.S. 121, 135 (1985). In *Solid Waste Agency of Northern Cook County v. USACE* (*SWANCC*), the Court invalidated the Corps' assertion of jurisdiction over isolated ponds based solely on use of the ponds by migratory birds. 531 U.S. 159, 164-65, 168, 171-72 (2001). The *SWANCC* Court characterized *Riverside Bayview* as resting on "the significant nexus between the wetlands and" adjacent waters. *Id.* at 167.

In *Rapanos v. United States*, the Supreme Court assessed the Agencies' assertion of jurisdiction over certain adjacent wetlands and, in a decision fractured in its rationale, remanded for further consideration. 547 U.S. 715, 757 (2006) (Scalia, J., plurality); *id.* at 786-87 (Kennedy, J., concurring). The plurality's "relatively permanent" standard considered CWA coverage to extend to "relatively permanent, standing or continuously flowing bodies of water," *id.* at 739, that are connected to traditional navigable waters, as well as wetlands with a "continuous surface connection" to such waters. *Id.* at 742. The *Rapanos* plurality stated that the term "waters of the United States" does "not necessarily exclude *seasonal* rivers, which contain continuous flow during some months of the year but no flow during dry months." *Id.* at 732 n.5. Concurring in the judgment, Justice Kennedy interpreted the Act as covering wetlands with a "significant nexus" to traditional navigable waters. *Id.* at 759 (Kennedy, J., concurring). Wetlands are covered, he explained, if they "either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity" of traditional navigable waters. *Id.* at 780. The four dissenting Justices would have deferred to the Corps' construction

but agreed that wetlands that satisfy "either the plurality's or Justice Kennedy's test" should be covered. *Id.* at 810 (Stevens, J., dissenting).

After *Rapanos*, the Agencies issued, and later updated, guidance on how certain provisions of the 1986 Regulations applied in light of Supreme Court precedent. "*Rapanos* Guidance," Ex. 2. Generally, the Guidance explained that non-navigable waters are jurisdictional if they met either the relatively permanent or significant nexus standard. All federal circuit courts to decide the question have upheld CWA jurisdiction for waters that meet the significant nexus standard; while some courts have determined that waters that meet either standard are covered, none have held that the plurality's relatively permanent standard is the sole basis that may be used to establish jurisdiction. *See* 88 Fed. Reg. at 3014 (citing cases).[1] The Agencies' application of the 1986 Regulations is referred to as the "pre-2015 regulatory regime," 88 Fed. Reg. at 3006 n.6, "pre-2015 regime," or "status quo regime."

### 2.    "Waters of the United States" rules between 2015 and 2020

In 2015, the Agencies revised the definition of "waters of the United States." *Clean Water Rule*, 80 Fed. Reg. 37054 (June 29, 2015) ("2015 Rule"). Owing to court rulings, the 2015 Rule was only in effect for a limited time in certain states. *See* 88 Fed. Reg. at 3016; "History of the Effects of Litigation," Ex. 3. Where and when the 2015 Rule was not in effect, the pre-2015 regime applied.

In 2019, the Agencies repealed the 2015 Rule and recodified the 1986 Regulations, thereby reinstating the pre-2015 regime nationwide. *See* 2019 Rule, 84 Fed. Reg. at 56626 ("As

---

[1] The Supreme Court has granted a petition for a writ of certiorari to review whether, in applying the significant nexus text to specific wetlands, "the Ninth Circuit set forth the proper test for determining whether wetlands are 'waters of the United States.'" *Sackett v. EPA*, S. Ct. No. 21-454 (argued Oct. 3, 2022). That case is not a challenge to the Agencies' regulations defining "waters of the United States."

of the effective date of this final rule, the agencies will administer the regulations promulgated in 1986 and 1988 . . . and will continue to interpret the statutory term 'waters of the United States' to mean the waters covered by those regulations consistent with Supreme Court decisions and longstanding practice, as informed by applicable agency guidance documents, training, and experience."). The 2019 Rule was in effect nationwide until the Agencies again revised the definition of "waters of the United States" in the 2020 Rule.

The 2020 Rule did not use the significant nexus standard and substantially narrowed jurisdiction compared to prior rules. 85 Fed. Reg. at 22251, 22273, 22275, 22282-83. Parties challenged the 2020 Rule in several courts, and after the Agencies initiated a new rulemaking to define "waters of the United States," they requested that courts remand without vacating the 2020 Rule. Two district courts vacated the 2020 Rule, *see* 88 Fed. Reg. at 3016, at which point the Agencies returned to implementing the pre-2015 regime nationwide, *id.* at 3007 & n.11. That regime is the current regulatory status quo.

### C.     2023 Rule

The Rule—which followed a detailed proposal, 86 Fed. Reg. 69372 (Dec. 7, 2021), and extensive outreach, notice, and public comment processes, 88 Fed. Reg. at 3018-19—specifies five categories of "waters of the United States," eight exclusions, and six defined terms. 88 Fed. Reg. at 3018-20, 3142 (to be codified at 33 C.F.R. § 328.3 and 40 C.F.R. §§ 120.1 and 120.2). *See* Ex. 4 (Rule's regulatory text for 33 C.F.R. § 328.3). As earlier stated, the Rule largely codifies the status quo regime, which applies until the Rule takes effect on March 20, 2023. Thus, the Rule's regulatory text includes the 1986 Regulations' jurisdictional categories but refines and narrows them, including by establishing limits—the relatively permanent and significant nexus standards—that draw the boundary of waters subject to federal protection. *See*

7

*id.* The Rule itself provides "substantial guidance to assist in implementing" the standards. 88 Fed. Reg. at 3068. The Rule is supported by a robust administrative record. *See* Certified Index, ECF No. 20. The record includes not only the Rule and its proposal, but also responses to public comments, an economic analysis, and a technical support document, as well as syntheses of scientific documents.

### 1.    "Waters of the United States" categories

At the heart of the Rule are three categories of waters that have been jurisdictional for decades—and to which all other covered waters must be connected. 88 Fed. Reg. at 3043. These "(a)(1) waters" are traditional navigable waters, the territorial seas, and interstate waters. *Id.* at 3142. The Rule (like the status quo regime) covers wetlands adjacent to (a)(1) waters, as well as tributaries of (a)(1) waters and wetlands adjacent to such tributaries, provided that those tributaries and their adjacent wetlands meet either the "relatively permanent" or the "significant nexus" standard. *See id.* ("(a)(4) adjacent wetlands" and "(a)(3) tributaries"). The Rule retains longstanding definitions of "wetlands" and "adjacent." *Id.* at 3143; *id.* at 3089, 3116-19.

The Rule also refines two other categories of the 1986 Regulations to more closely align with the status quo regime's approach to limiting CWA jurisdiction. With respect to the "other waters" provision in the 1986 Regulations, the Rule more narrowly covers only intrastate "lakes and ponds, streams, or wetlands" that meet either the relatively permanent or significant nexus standard in relation to (a)(1) waters and eliminates jurisdiction over tributaries and adjacent wetlands based on their connection to these waters. *Id.* at 3098, 3142 ("(a)(5) waters"). And, narrower than the 1986 Regulations' coverage of impoundments, the Rule defines "waters of the United States" to include: "Impoundments of waters otherwise [covered], other than impoundments of [(a)(5) waters]." *Id.* at 3142 ("(a)(2) impoundments"). Tributaries and wetlands

adjacent to such impoundments are also covered, provided that either the relatively permanent or the significant nexus standard is met. *Id.*

### 2. Ditches and other exclusions

Under the 2023 Rule, similar to the *Rapanos* Guidance (Ex. 2 at 12), ditches that meet certain characteristics—along with seven other categories, i.e., more than the two categories under the 1986 Regulations (prior converted cropland and waste treatment systems)—are excluded from "waters of the United States." 88 Fed. Reg. at 3142-43.

### 3. Significant nexus standard

As under the status quo regime, the significant nexus standard, of which the relatively permanent standard is essentially a subset, is central to the Rule's scope and limits of "waters of the United States." *See* 88 Fed. Reg. at 3005 n.2, 3034, 3120. The Rule provides guidance for administering the standard by codifying a definition of "[s]ignificantly affect," which means "a material influence on the chemical, physical, or biological integrity" of (a)(1) waters. *Id.* at 3143.

The Rule lists five "[f]unctions to be assessed" and five "[f]actors to be considered" when determining "whether waters, either alone or in combination with similarly situated waters in the region, have a material influence on the chemical, physical, or biological integrity" of (a)(1) waters. *Id.* Further, the "region" is the "catchment that drains to and includes the tributary of interest." *Id.* at 3088. "A catchment is the area of the land surface that drains to a specific location for a specific hydrologic feature." *Id.* And, the Rule explains that tributaries and their adjacent wetlands within a catchment are "similarly situated." *Id.*

## NATURE AND STAGE OF THE PROCEEDINGS

Kentucky's and Business Plaintiffs' motions, like their complaints, assert a host of facial challenges to the Rule. The Court has since consolidated the cases (ECF No. 16) and scheduled a hearing on the motions for March 10, 2023. Other plaintiffs in the District of North Dakota and

the Southern District of Texas have also moved to preliminarily enjoin the Rule. *See West Virginia v. EPA*, No. 3:23-cv-32 (D.N.D.); *Texas v. EPA*, No. 3:23-cv-17 (S.D. Tex.). A hearing has been scheduled for March 15, 2023, in the Southern District of Texas.

## STANDARD OF DECISION

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Benisek v. Lamone*, 138 S. Ct. 1942, 1943-44 (2018) (quoting *Winter v. NRDC*, 555 U.S. 7, 24 (2008)). In addition to "a plaintiff's showing of a likelihood of success on the merits," a movant must show "that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* (citation omitted). The Sixth Circuit has treated this inquiry as a balancing test. *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 326 (6th Cir. 2019). But "[e]ven with a high likelihood of success on the merits, a preliminary injunction is not warranted unless the plaintiffs are likely to suffer irreparable injury in the absence of interim relief." *Commonwealth v. Biden*, 57 F.4th 545, 555 (6th Cir. 2023); *see also* 5 U.S.C. § 705 (authorizing preliminary relief in APA cases only "to the extent necessary to prevent irreparable injury").

Plaintiffs bear the burden of justifying such an extraordinary remedy, *Kentucky v. U.S. ex rel. Hagel*, 759 F.3d 588, 600 (6th Cir. 2014), and the standard for obtaining a preliminary injunction is more stringent than for surviving summary judgment, *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000). To assess likelihood of success, the APA standard of review applies, *see* 5 U.S.C. §§ 701-706, which affords great deference to agency decisionmaking, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## SUMMARY OF THE ARGUMENT

The motions for preliminary injunction should be denied. First, Plaintiffs cannot show they have been irreparably harmed by the Rule itself, which is substantially similar to the status

quo regime. Nor have they shown standing. Second, Plaintiffs are unlikely to succeed on the merits. The Rule makes only slight changes from the longstanding pre-2015 regime, is a lawful exercise of the Agencies' authority, and is the best interpretation of the CWA. Finally, the balance of equities and public interest factors weigh against a preliminary injunction. To the extent this Court disagrees, any preliminary relief must be limited to the extent necessary to prevent irreparable injury to the parties before the Court.

## ARGUMENT

## I.      Plaintiffs have not adequately demonstrated irreparable harm or standing.

Plaintiffs have not shown that irreparable harm is "certain and imminent" absent the issuance of a preliminary injunction. *D.T.*, 942 F.3d at 326-28. For this reason alone, their request for preliminary injunction should be denied. *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 385 (6th Cir. 2020) ("[E]ven the strongest showing on the other three factors [of the preliminary injunction test] cannot eliminate the irreparable harm requirement.") (internal quotations omitted). In fact, Plaintiffs' claim that they are irreparably harmed by the Rule is so lacking, they also fail to demonstrate standing. *Online Merchants Guild v. Cameron*, 995 F.3d 540, 547 (6th Cir. 2021) ("Where, as here, injunctive relief is sought, 'a plaintiff must show actual present harm or a significant possibility of future harm . . . .'").

Because Plaintiffs have put forth no concrete action applying the regulation in a manner that will affect them, their facial challenges are also unripe. *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003). The Supreme Court has rejected the argument "that mere uncertainty as to the validity of a legal rule constitutes a hardship for purposes of the ripeness analysis." *Id.* at 811.

A.      **Plaintiffs have not shown irreparable harm warranting a preliminary injunction.**

1.      **Plaintiffs' purported compliance costs are not irreparable harms.**

Because the Rule codifies the status quo regime, Plaintiffs cannot show that they will incur unique compliance costs *because of* the Rule. Therefore, they cannot show irreparable harm. Indeed, the Agencies assessed potential compliance costs in their Economic Analysis, which compared the impacts of the 2023 Rule against those of the status quo regime. They ultimately concluded that the Rule "would not change current implementation sufficiently to quantifiably alter overall costs to the regulated public or States and Tribes." Ex. 5 (Econ. Analysis excerpts) Exec. Summary xii. While the Economic Analysis expected "a slight and unquantifiable increase in certain resources being found to be jurisdictional," the increases are expected to be "*de minimis*." *See id.*[2]

Neither Kentucky nor Business Plaintiffs rebut the Economic Analysis or its conclusions. Instead, Plaintiffs proffer unsupported claims that they will have to incur compliance costs because of the Rule. Bus. Mot. 21-24; Ky. Mot. 29. But the costs to which they allude stem not from the Rule, but from the status quo regime.[3] And to the extent the Plaintiffs point to new aspects of the 2023 Rule, their allegations of increased costs are unfounded and speculative.

---

[2] This is in contrast to the 2015 Rule, which was enjoined in *North Dakota v. EPA*, 127 F. Supp. 3d 1047, 1059 (D.N.D. 2015), where the court found irreparable harm when the Agencies acknowledged a quantifiable increase in the scope of jurisdictional waters that would result from the 2015 Rule. *See also infra* Part II.B.2.

[3] For example, Business Plaintiffs complain about the Rule's site-specific nature of jurisdictional determinations, Durbin Decl. ¶¶ 13-14, Heck Decl. ¶ 18, Mitchell Decl. ¶ 17, Perry Decl. ¶ 10, Stout Decl. ¶ 10; the need to obtain permits, Baer Decl. ¶ 10, Durbin Decl. ¶¶ 13-14, Heck Decl. ¶ 18, Mitchell Decl. ¶¶ 17, 19, O'Bryan Decl. ¶ 16, Perry Decl. ¶ 10, Sanford Decl. ¶ 8, Tollison Decl. ¶ 12, Vincent Decl. ¶ 11, Watts Decl. ¶ 12; that sometimes-dry features may be covered, Baer Decl. ¶ 8; Heck Decl. ¶ 13, Mitchell Decl. ¶ 16; and that man-made or altered tributaries, such as ditches, may be covered, Baer Decl. ¶ 8. But Plaintiffs are already subject to these regulatory conditions under the current regulatory regime. *See infra* Part II.A.

12

For example, Plaintiffs believe the new Rule significantly expands CWA jurisdiction and express speculative fears that the Rule will impose more compliance requirements. Ky. Mot. 29 ("the expanded jurisdiction under the Final Rule likely means it will have to seek approval for more projects"); Horne Decl. ¶¶ 6-8 (ECF No. 10-1) (the Rule potentially expands CWA jurisdiction to "any nook or cranny that occasionally becomes moist" in Kentucky); Bus. Mot. 22; Mitchell Decl. ¶ 13; O'Bryan Decl. ¶ 16 (ECF No. 13-1) ("And *if* those features are now jurisdictional, we will have to expend yet additional time and resources). As discussed below, Plaintiffs' fears that the new Rule imposes a regulatory sea change that greatly expands the scope of CWA jurisdiction or the definition of "significant nexus" (Bus. Mot. 3) are baseless. The Rule's definition merely identifies the functions and factors to be evaluated as part of a significant nexus analysis—consistent with the current regulatory regime—and which will not quantifiably expand the scope of jurisdiction but instead will increase clarity and consistency in applying the significant nexus standard. 88 Fed. Reg. 3046-48; *see infra* Part II.A.3. None of these declarations can credibly assert that Plaintiffs will expend more than *de minimis* costs to comply with the 2023 Rule when the Rule is substantially similar to the status quo regime.

Plaintiffs next claim that costs incurred to investigate to what extent they will be subject to the new Rule constitute an irreparable harm. Bus. Mot. 22-24 (citing Mitchell Decl. ¶ 17; O'Bryan Decl. ¶ 16; Tollison Decl. ¶ 12); *see also* Horne Decl. ¶¶ 9-10. But these are ordinary compliance costs associated with the introduction of any new regulation. *See Commonwealth*, 57 F.4th at 556 (acknowledging that compliance costs may not qualify as irreparable harms). This also ignores the fact that the Corps offers jurisdictional determinations at no cost.[4] *See* Ex. 7

---

[4] Plaintiffs overstate the costs associated with the case-specific determinations and Section 404 permitting generally. Bus. Mot. 22, n.6 (citing Sunding and Zilberman (2002)). First, these costs

*Cont.*

(Corps, *Regulatory Guidance Letter: No. 16-01*, at 1-2 (Oct. 2016)). And while parties can hire consultants to analyze jurisdiction or prepare permit applications, doing so is certainly not required under the Rule or the Act. In any event, by operation of the statute itself, Plaintiffs' property has always been potentially subject to CWA jurisdiction.

As for the industry-specific allegations, Business Plaintiffs' members aver that the Rule creates regulatory uncertainty that may impact their business decisions or cause them to pause certain operations. Bus. Mot. 22-23; Heck Decl. ¶¶ 10, 13, 16; Mitchell Decl. ¶ 18; Stout Decl. ¶¶ 10-12; Tollison Decl. ¶¶ 9-11. Given that the Rule is largely the same as the status quo regime, any business decisions reflecting speculation as to how the Rule could affect their business activity are effectively self-inflicted and cannot establish irreparable harm. *New England Power Generators Ass'n, Inc. v. FERC*, 707 F.3d 364, 369 (D.C. Cir. 2013) (holding business uncertainty is not an irreparable harm).

Business Plaintiffs also allege that their inability to rely on jurisdictional determinations made under the 2020 Rule constitutes an irreparable harm stemming from the 2023 Rule. Bus. Mot. 21, n.5, 24 (citing Tollison Decl. ¶ 12). But this alleged harm, to the extent it can be considered such, is not attributable to the 2023 Rule. Under the status quo regime, the Corps does not rely on approved jurisdictional determinations made under the 2020 Rule in new permit

---

already exist under the currently regulatory regime. Second, the Corps issues nationwide general permits to streamline the Section 404 authorization process. Total Section 404 permitting cost for a typical project covered by a nationwide general permit requiring advance notice varies from about $4,400 to $14,700, while a standard individual permit ranges from about $17,000 to $35,000, *See* Ex. 8 (Corps, Regulatory Impact Analysis for 2021 Reissuance and Modification of Nationwide Permits 10 (Jan. 3, 2021)) at 25. Third, in the Rule's Economic Analysis, the Agencies point out that the Sunding and Zilberman (2002) study may overstate the costs associated with CWA permitting in that they are based on estimates that "are 14 and 60 times greater than the Corps' high estimates for general and individual permits." Ex. 5-1 (Appendix H of Economic Analysis) at 212.

decisions because the 2020 Rule was vacated by two district courts. 88 Fed. Reg. at 3136 (citing January 2022 press release). The Rule merely explains the Agencies' pre-existing approach to approved jurisdictional determinations in response to judicial vacatur of the 2020 Rule, and that approach is unchanged by the Rule. Any costs already incurred to comply with prior CWA requirements cannot be the basis of irreparable harm. *See D.T.*, 942 F.3d at 328.

Business Plaintiffs next suggest that the threat of civil or criminal penalties that may arise from the Rule weighs toward a finding of irreparable harm. Bus. Mot. 22. Fears of civil or criminal liability, not grounded in actual substantive changes made by the Rule, are far too speculative to constitute an irreparable harm and are not even an injury-in-fact for standing purposes. *See D.T.*, 942 F.3d at 327.

Perhaps to overcome these shortcomings, Plaintiffs suggest that *any* compliance costs are unrecoverable and therefore constitute irreparable harm. Bus. Mot. 24; Ky. Mot. 29 (citing *Commonwealth v. Biden*, 57 F.4th at 556). But *Commonwealth* did not go so far as to hold that incurred compliance costs constitute *per se* irreparable harm. In fact, the Sixth Circuit readily acknowledged, and did not disagree with, other Circuits that have held that injury resulting from attempted compliance with government regulation is not ordinarily irreparable harm. *Commonwealth*, 57 F.4th at 556 (citing *Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980); *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005); *A.O. Smith Corp. v. FTC*, 530 F.2d 515, 527 (3d Cir. 1976)). *Commonwealth* ultimately held that the district court was correct in finding irreparable harm, not necessarily because compliance costs were incurred, but rather that the "peculiarity" and the "size" of the harms at issue constituted the irreparable harm. *See Commonwealth*, 57 F.4th at 556.

15

While this Court has noted that a "regulation later held invalid" imposes "the irreparable harm of nonrecoverable compliance costs," *Kentucky v. Biden*, 571 F. Supp. 3d 715, 734 (E.D. Ky. 2021) (citing *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016)), *aff'd as modified sub nom. Commonwealth v. Biden*, 57 F.4th 545 (6th Cir. 2023), neither is the Rule invalid, *see infra* Part II, nor have Plaintiffs demonstrated certain or imminent nonrecoverable compliance costs. *See Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991) (irreparable harm must be substantiated). And as noted above, given the Rule's similarities with the status quo, compliance with the Rule should not impose any unique costs on Plaintiffs.

### 2. The Rule does not harm Kentucky's sovereignty.

Kentucky alternatively claims irreparable harm to its sovereign interest on the grounds that the Rule expands jurisdiction over intrastate waters by replacing the interstate commerce test with the relatively permanent and the significant nexus standards. Ky. Mot. 27. But again, Kentucky fundamentally misunderstands the nature of this Rule. The codification of these two standards largely codifies the status quo and substantially narrows the 1986 Regulations. *See* 88 Fed. Reg. at 3037-38; *infra* Part II.A.2-3.

Regardless, the Agencies' continued longstanding jurisdiction over covered intrastate waters does not harm Kentucky's sovereignty. Like the CWA itself and the pre-2015 regime, the Rule simply protects certain waters under federal law, regardless of whether those waters are also protected under state law. *See* 33 U.S.C. § 1370 (not precluding state authority to regulate waters more stringently than federal CWA requirements). And the Supreme Court has rejected the idea that federal regulation of water or land for the purpose of pollution control is a cognizable harm to "state sovereignty." *Hodel v. Va. Surface Min. and Reclamation Ass'n, Inc.*, 452 U.S. 264, 284-93 (1981); *see also infra* Part II.B.2 (explaining that the Rule does not violate the Tenth Amendment or disrupt the state-federal balance).

16

Even *if* Kentucky could show harms to its sovereignty (which it cannot), such harms would not qualify as "irreparable." *Conn v. Deskins*, 199 F. Supp. 3d 1172, 1174 (E.D. Ky. 2016) (irreparable injuries are "so irreversible that 'no adequate remedy at law' exists") (quoting *Gilley v. United States*, 649 F.2d 449, 454 (6th Cir.1981)). Kentucky has a remedy for its claim that EPA improperly usurped its authority by issuing the 2023 Rule—that is, if Kentucky is successful on the merits and the Rule is remanded to EPA, then Kentucky's alleged sovereign interest will have been vindicated. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.").

Kentucky insists that injury to state sovereignty *always* causes irreparable harm, *see* Ky. Mot. 28 (citing *Am. Civil Liberties Union of Ky. v. McCreary Cnty.*, 354 F.3d 438 (6th Cir. 2003)), but the First Amendment case it relies on does not support that proposition. In *McCreary*, plaintiffs claimed their Establishment Clause rights were infringed by the display of religious texts in public buildings. *Id.* at 440. The *McCreary* court observed that when a "constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *Id.* at 445. While *McCreary* employs broad language, its conclusions are firmly situated in the First Amendment context. *Id.* (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976) *and Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998)). Moreover, Kentucky's claim that harms to state sovereignty *always* cause irreparable harm is also rebutted by the other case Kentucky cites, *Texas v. EPA*, 829 F.3d 405, 433-34 (5th Cir. 2016). There, the court observed that federalism-related harms "*may* constitute irreparable injury," not that such harms are always irreparable. In sum, Kentucky has not established an injury to its sovereignty, but even if it had, the harm would not be irreparable.

      **3.**      **The *Sackett* case has no bearing on Plaintiffs' alleged harms.**

Both sets of Plaintiffs say that the pending decision in *Sackett v. EPA* creates uncertainty

and that this uncertainty constitutes an irreparable harm. Ky. Mot. 29; Bus. Mot. 25. This is

quintessential conjecture. The question here is whether Plaintiffs have suffered irreparable injury

caused by *the Rule*, not how a forthcoming court decision *may* affect its implementation. *See*

*Platte River Whooping Crane Critical Habitat Maint. Tr. v. FERC*, 962 F.2d 27, 35 (D.C. Cir.

1992) (allegations of injury based on predictions regarding future legal proceedings are too

speculative to invoke the jurisdiction of an Article III Court).

      **B.**      **Plaintiffs fail to demonstrate standing.**

Plaintiffs' claims of irreparable harms are so speculative, hypothetical, or otherwise

lacking, that they fail to even establish standing. Business Plaintiffs consist of various trade

associations that generally profess to have an interest in advocacy on behalf of their members on

issues related to the CWA and "waters of the United States." *E.g.*, Baer Decl. ¶¶ 5-6; Durbin

Decl. ¶ 6; Perry Decl. ¶ 7; Sanford Decl. ¶ 5; Vincent Decl. ¶ 7; Watts Decl. ¶¶ 9, 11. But

professing an interest in an issue alone does not give Business Plaintiffs standing to challenge the

Rule. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 563 (1992). They must show either organizational

standing (from harm to trade associations) or associational standing (from harm to identified

members). *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 332 (6th Cir. 2002); *but see Ass'n*

*of Am. Physicians & Surgeons v. FDA* (*AAPS*), 13 F.4th 531, 537-42 (6th Cir. 2021) (casting

doubt on the legal foundations of associational standing). They fail to do either.

None of the Business Plaintiffs alleges that the Rule causes organizational harms. They

allege only that their *members* will be impacted by the Rule. *See generally*, ECF No. 13-1. In any

event, there is no evidence that the Business Plaintiffs themselves are likely to incur substantial

costs due to a rule that is largely the same as the existing regulatory regime. And while Business

Plaintiffs generally assert an interest in outreach and education on issues surrounding CWA jurisdiction, *see generally id.*, a "mere 'interest in a problem,'" is insufficient "to render the organization 'adversely affected' or 'aggrieved.'" *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972). As to associational standing, Home Builders Association of Kentucky and Portland Cement Association have not identified any specific members that could have standing to sue on their own. Thus, they lack associational standing. *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 255 (6th Cir. 2018) (holding that to demonstrate associational standing, the organization "must show that one of its *named* members" has standing to sue on their own behalf (emphasis added)).

While the remaining Business Plaintiffs proffer declarations from members that purport to be affected by the new Rule, none of the purported impacts rises to the level of injury-in-fact traceable to the Rule that satisfies standing (and by extension, associational standing). Bus. Mot. 22 (noting that if waters are found to be newly jurisdictional, members will only then need to obtain relevant permitting approvals); Bus. Mot. 22-24 (claims that they will incur costs to determine if they will be subject to the new Rule) (citing Mitchell Decl. ¶ 17; O'Bryan Decl. ¶ 16; Tollison Decl. ¶ 12). A fear that land containing features that *may* now be covered by the Rule is not a sufficiently imminent and concrete harm traceable to the Rule to support a finding of injury-in-fact. Given the existence of the CWA, Plaintiffs have always faced the prospect of having their property subject to CWA jurisdiction; this Rule does not change that. *See Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 13 (D.C. Cir. 2011) (association lacked standing to facially challenge CWA Traditional Navigable Waters determination because until the determination can be concretely applied, "[its] members face only the *possibility* of regulation."). And costs incurred to determine if a regulation applies to them is not a sufficient injury-in-fact to

confer standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398,416 (2013). Other purported harms

such as the claim that the Rule creates business uncertainty or increases the risk of civil or

criminal penalties are also too speculative to constitute injury-in-fact for standing purposes. *See,*

*e.g.*, *White v. United States*, 601 F.3d 545, 554 (6th Cir. 2010); *Mylan Pharms. Inc. v. U.S. Food*

*& Drug Admin.*, 789 F. Supp. 2d 1, 10 (D.D.C. 2011) ("standing is not conferred by agency

action that creates uncertainties detrimental to a would-be plaintiff's strategic business planning

abilities").

      Similarly, Kentucky's claim that it has an injury-in-fact traceable to the Rule that

supports standing is deficient. Ky. Mot. 10-13. As an initial matter, as stated above, federal

regulation of water or land for the purpose of pollution control is not a cognizable harm to "state

sovereignty." *Hodel*, 452 U.S. at 284-93. Moreover, Kentucky's single, unsupported declaration

does not establish that Kentucky has incurred any additional compliance costs beyond what is

already required from it under the status quo regime. *See generally* Horne Decl. Indeed,

Kentucky offers even less support for its alleged costs than did Mississippi in *Crane v. Johnson*,

783 F.3d 244, 252 (5th Cir. 2015), which was found to have no standing to challenge a

regulation despite proffering an audit report purporting to show that the State would be forced to

expend additional costs to comply with the regulation. These unsubstantiated, conclusory, and

speculative allegations fail to address, let alone rebut, the Agencies' analysis of the slight

differences between the status quo and the new Rule and thus fail to show injury-in-fact that is

traceable to the Rule. *See Saginaw Cnty., Michigan v. STAT Emergency Med. Servs., Inc*., 946

F.3d 951, 957 (6th Cir. 2020) (holding even if a state's standing analysis deserves "special

solicitude," states still must demonstrate Article III requirements of an "actual or imminent"

invasion of a judicially cognizable interest). In sum, Kentucky has failed to show injury-in-fact

that is traceable to the Rule, but even if it had, such an injury would not be irreparable. *See supra* Part I.A.

**II.     Plaintiffs fail to show that they are likely to succeed on the merits.**

      **A.     The Rule is substantially similar to the status quo regime.**

Plaintiffs' merits arguments—like their failed attempts to demonstrate standing and irreparable harm—are premised on either a complete disregard of the fact that the Rule largely codifies the status quo regime (Kentucky) or overstatements of the slight differences between them (Business Plaintiffs). Under the APA, only the Agencies' reasoned explanation, not Plaintiffs' mischaracterizations, carries a presumption of regularity. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971); *United States v. Martin*, 438 F.3d 621, 634 (6th Cir. 2006).

      **1.     The Rule represents the best (or at least a permissible) interpretation of the Act, "navigable waters," and "waters of the United States."**

The Rule, founded on decades of CWA implementation, is the best reading of the CWA and gives appropriate consideration to the plain language of the CWA in its entirety, the vast scientific record, relevant Supreme Court precedent, and the Agencies' own technical expertise and experience honed during the past 45 years. Kentucky is flatly wrong that the Agencies read "navigable" out of the statute. Ky. Mot. 15; *see also* Bus. Mot. 14. As a preliminary matter, there is no dispute that the scope of "waters of the United States" extends beyond traditional navigable waters. As this Circuit has recognized:

> It would, of course, make a mockery of [Congress's] powers if its authority to control pollution was limited to the bed of the navigable stream itself. The tributaries which join to form the river could then be used as open sewers as far as federal regulation was concerned. The navigable part of the river could become a mere conduit for upstream waste.

*United States v. Ashland Oil & Transp. Co.*, 504 F.2d 1317, 1326 (6th Cir. 1974). "The Supreme Court has repeatedly recognized that, with this definition, Congress 'evidently intended to repudiate limits that had been placed on federal regulation by earlier water pollution control statutes and to exercise its powers under the Commerce Clause to regulate at least some waters that would not be deemed "navigable" under the classical understanding of that term.'" *United States v. Cundiff*, 555 F.3d 200, 206 (6th Cir. 2009) (quoting *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 133 (1985)). All Justices in *Rapanos* agreed that the term "'navigable waters' includes something more than traditional navigable waters." 547 U.S. at 731 (plurality).

Indeed, tributaries have been recognized as jurisdictional under the CWA for decades because they feed into traditional navigable waters and can threaten the degradation of those waters. 88 Fed. Reg. at 3025. The Agencies have similarly interpreted "waters of the United States" to include adjacent wetlands since at least 1975. *Id*. at 3026-27. And the Agencies have included a provision for waters that do not fall within the other categories for more than four decades. *Id*. at 3029.

Even if this Court disagrees that the Agencies' interpretation is the best reading of the statute, it is a reasonable and permissible interpretation of an ambiguous phrase, "navigable waters," and its definition, "waters of the United States." *Chevron* deference extends to an agency's construction in rulemaking of a statute it administers, even if the statute addresses the scope of agency jurisdiction. *City of Arlington v. FCC*, 569 U.S. 290, 301 (2013); *see also Gun Owners of Am., Inc. v. Garland*, 19 F. 4th 890, 899 (6th Cir. 2021) (applying framework of *Chevron, U.S.A. Inc., v. NRDC*, 467 U.S. 837 (1984)), *cert. denied*, 143 S. Ct. 83 (2022).

The *Riverside Bayview* Court deferred to and upheld the Agencies' interpretation of the CWA to cover wetlands adjacent to navigable-in-fact bodies of water, in a unanimous decision:

"[a]n agency's construction of a statute it is charged with enforcing is entitled to deference if it is reasonable and not in conflict with the expressed intent of Congress." 474 U.S. at 131 (citations omitted); *see also* 88 Fed. Reg. at 3021. In *Rapanos*, the Justices again recognized some ambiguity in the terms of the CWA. *E.g.*, 547 U.S. at 752, (Scalia, J., plurality); *id.* at 780 (Kennedy, J., concurring); *id.* at 796 (Stevens, J. dissenting); *id.* at 811-12 (Breyer, J. dissenting). The Chief Justice recognized that the Agencies' interpretations in this regard are "afforded generous leeway by the courts." 547 U.S. at 758.

### a. The Rule advances the CWA's objective.

Recognizing that a statute must be interpreted in light of the purposes Congress sought to achieve, *see Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581 (2004), the Agencies considered the CWA's singular objective in Section 101(a) in interpreting the scope of the Act's jurisdiction. The Agencies also considered the CWA's emphasis on water quality, noting more than 90 such references in the statutory text. The Agencies concluded that any interpretation of "waters of the United States" must consider the substantive effect of the interpretation on the integrity of the nation's waters. 88 Fed. Reg. at 3022-24; *see also Cnty. of Maui, Haw. v. Haw. Wildlife Fund*, 140 S. Ct. 1462, 1476 (2020); *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 624 (2018) (affirming that the definition of "waters of the United States" is fundamental to achieving the objective of the CWA). The Agencies determined that, in interpreting the scope of jurisdiction, they must consider the functions related to the chemical, physical, and biological integrity of water and what factors affect those functions. 88 Fed. Reg. at 3019-20, 3029-30. The Rule reflects that the significant nexus standard best advances the CWA's objective.

### b. The Rule correctly continues to cover interstate waters.

The Rule, through its (a)(1) waters provision, does "not mak[e] changes to the text or substance of the provisions of the 1986 regulations covering traditional navigable waters, the

23

territorial seas, and interstate waters." 88 Fed. Reg. at 3066. Plaintiffs largely ignore this consistency and are wrong that the Rule is unlawful in including interstate waters. *Contra* Ky. Mot. 16; Bus. Mot. 14. The integrity of waters that form and cross state boundaries is necessarily within federal authority, *see* U.S. Const. art. I, § 8, and protecting them aligns with the Act's history, text, and purpose. *See* 88 Fed. Reg. at 3072-75; Ex. 6 (Response to Comments ("RTC")) at 2.3.2.1.

Predecessors of the Act explicitly protected interstate waters independent of their navigability. *See* 33 U.S.C. §§ 466a(d)(1) & 466i(e) (1952); *id.* § 466g(a) (1964); *id.* §§ 1160(c)(1) & 1173(e) (1970). In 1972, Congress explicitly provided that pre-existing water quality standards for "interstate waters" generally remained in effect. *Id.* § 1313(a)(1). Through that plain text, and its significant statutory history, Congress expressed its clear intent to protect the quality of interstate waters without reference to their navigability.

Indeed, the purpose of the 1972 amendments was to expand, not narrow, federal protections. As the Sixth Circuit contemporaneously observed, the CWA was enacted after "two of the important rivers of this circuit, the Rouge River in Dearborn, Michigan, and the Cuyahoga River in Cleveland, Ohio, reached a point of pollution by flammable materials in the last ten years that they repeatedly caught fire." *Ashland Oil*, 504 F.2d at 1326.

Business Plaintiffs inaccurately describe the Rule's coverage of interstate waters irrespective of their navigability as "a departure from pre-2015 agency practice." Bus. Mot. 10. Neither *Rapanos* nor the *Rapanos* Guidance addresses the 1986 Regulations' interstate waters provision or waters connected to non-navigable interstate waters. *See Rapanos*, 547 U.S. at 761 (summarizing provisions) (Kennedy, J., concurring); Ex. 2. Moreover, such coverage is *not* a departure from the Act itself or the 1986 Regulations (as explained above).

### c.     The Rule reasonably continues to cover impoundments.

Under the Rule, impounding waters of the United States "generally does not affect such water's jurisdictional status, consistent with pre-2015 practice." 88 Fed. Reg. at 3077. The Rule's codifying text is narrower than its counterpart in the 1986 Regulations, in that waters that fall within (a)(5) can no longer be jurisdictional as an impoundment under (a)(2). *See id.* at 3075-79, 3098. Kentucky both ignores this narrowing and fails to establish any deficiency in the Agencies' basis for protecting impoundments. Ky. Mot. 16. The Supreme Court has confirmed that impounding covered waters does not make them non-jurisdictional. *See S.D. Warren Co. v. Me. Bd. of Env't Prot.*, 547 U.S. 370, 379 n.5 (2006). Moreover, "impoundments are typically built to maintain some level of hydrologic connection between the water that is being impounded and the downstream tributary network." 88 Fed. Reg. at 3076. It is immaterial that there may be times when such a connection is absent, such as an off-channel impoundment of adjacent wetlands. *See id.* at 3078; *Rapanos*, 547 U.S. at 786 (explaining that "the absence of a hydrologic connection" may actually show a "wetlands' significance for the aquatic system") (Kennedy, J., concurring).

### d.     The Rule's coverage of tributaries that meet a *Rapanos* standard is narrower than Plaintiffs portray and is consistent with the status quo regime.

The Rule's (a)(3) tributaries provision aligns closely with the status quo regime. As under the *Rapanos* Guidance (Ex. 2 at 6-12), tributaries are assessed on a case-specific basis. 88 Fed. Reg. at 3014. Like the 1986 Regulations, the 2023 Rule's regulatory text does not define "tributary." But the Rule states that, consistent with the Agencies' longstanding practice, a tributary "includes rivers, streams, lakes, ponds, and impoundments, regardless of their flow regime, that flow directly or indirectly through another water or waters to" an (a)(1) water or (a)(2) impoundment. *Id.* at 3080 (citing, *inter alia*, 42 Fed. Reg. 37121, 37123 (July 19, 1977)).

The Rule retains the "well-established definition of an ordinary high water mark . . . to assist in identifying tributaries." *Id.* at 3080.

Similarly, the Agencies explain that the Rule's exclusion for ditches, which can function as tributaries, further limits the scope of tributary coverage and "is consistent with the scope of ditches that were generally non-jurisdictional under the pre-2015 regulatory regime." *Id.* at 3112 (citing, *inter alia*, 51 Fed. Reg. 41217, 41206 (Nov. 13, 1986)). Kentucky, in portraying the Rule's coverage of tributaries as expansive, simply ignores the Rule's limits and continuity with the status quo. *See* Ky. Br. at 24.

### e.    The Rule continues to cover adjacent wetlands consistent with the Act.

The Rule treats adjacent wetlands in substantially the same manner as the status quo regime. Both cover wetlands adjacent to (a)(1) waters and, in the context of wetlands adjacent to tributaries (or other non-(a)(1) waters), both require wetlands-specific application of the significant nexus standard or, as a subset, the relatively permanent standard. *Compare* 88 Fed. Reg. at 3142 *with Rapanos* Guidance, Ex. 2 at 4-12. Moreover, the Rule's approach is consistent with the Act. The Act expressly references "wetlands adjacent," 33 U.S.C. § 1344(g)(1), and *Riverside Bayview* unanimously upheld CWA jurisdiction over wetlands adjacent to traditional navigable waters.

Further, the Rule's definition of "adjacent," which includes the word "neighboring," tracks the 1986 Regulations verbatim. *Compare* Ex. 1 (1986 Regulations) *with* Ex. 4 (Rule's codifying text). Kentucky ignores this fact. Ky. Mot. 24.

### f.    The Rule's coverage of (a)(5) waters is valid.

The Rule's coverage of intrastate lakes, ponds, streams, or wetlands that meet either the relatively permanent or significant nexus standard—(a)(5) waters—*does* represent a difference

from pre-2015 practice, as the Agencies fully explain. *See* 88 Fed. Reg. at 3097-3101. But the difference is modest, not anything like the sea change that Plaintiffs allege. *Contra* Ky. Mot. 17-18; Bus. Mot. 17.

The Agencies have included a similar provision for decades. 88 Fed. Reg. at 3029. Moreover, as the Agencies explain, the Rule replaces "the broad Commerce Clause basis for jurisdiction . . . with the relatively permanent standard and the significant nexus standard." *Id.* at 3097. Because these standards require connections to (a)(1) waters, "and the significant nexus standard further requires that waters significantly affect paragraph (a)(1) waters, [the (a)(5) category] is substantially narrower than the 1986 regulations." *Id.* Further, the Rule eliminates jurisdiction over impoundments, tributaries, and adjacent wetlands based solely on their connections to these waters; and eliminates automatic jurisdiction over impoundments of these waters. *Id.* at 3098.

The record belies Business Plaintiffs' hyperbole that the Rule "sweeps into federal jurisdiction vast numbers of small, isolated, and purely intrastate water features and wetlands." Bus. Mot. 13. Although the Agencies expect the Rule's (a)(5) waters category to generate more significant nexus analyses (because the Agencies, following *SWANCC*, generally did not assess these waters using the significant nexus or relatively permanent standards), they "correspondingly expect[] that the percent of resources [across all categories] found to be jurisdictional under significant nexus analyses will decrease," 88 Fed. Reg. at 3123, and "do not expect a corresponding increase in positive jurisdictional determinations," *id.* at 3047 n.65. *See also* Ex. 5 at Exec. Summary xii (expecting only "a slight and unquantifiable increase in certain resources being found to be jurisdictional"). Neither of the Plaintiffs identify any fact in the

27

Rule's extensive administrative record that supports a different conclusion, much less compels one.

Business Plaintiffs also incorrectly contend that the Rule's application of the significant nexus standard to waters that are not wetlands is inconsistent with Justice Kennedy's concurring opinion in *Rapanos*. *See* Bus. Mot. 15. *Rapanos*, as previously noted, involved only certain provisions of the 1986 Regulations. However, nothing in the text (or logic) of Justice Kennedy's concurring opinion precludes applying the significant nexus standard as Agencies do in paragraph (a)(5). Indeed, Kentucky itself quotes Justice Kennedy's statement that an upstream "*water or wetland* must possess a 'significant nexus.'" Ky. Mot. 15 (quoting *Rapanos*, 547 U.S. at 759 (Kennedy, J., concurring)) (emphasis added).[5]

### 2.     Case-specific determinations continue the status quo regime and are permissible under the CWA.

Plaintiffs criticize the case-specific nature of the significant nexus test, Ky. Mot. 24-25; Bus. Mot. 14, 18-19, but do not acknowledge that case-specific CWA determinations are an element of the status quo regime. With the Rule, the Agencies' approach to implementing both the significant nexus and the relatively permanent standards, which both require inquiry into specific facts, is generally consistent with the status quo regime, and where it differs, the Rule *increases* clarity. *See* 88 Fed. Reg. at 3042, 3046. The Rule, by codifying definitions and incorporating concrete functions and factors, imposes even more appreciable limits than the status quo Plaintiffs seek to restore, which does not contain as much guidance or as many specific definitions.

---

[5] To the extent that Business Plaintiffs contend that paragraph (a)(5) is contrary to *SWANCC*, here again they are wrong. Under the Rule's definition of "significantly affect," "[c]onsideration of biological functions does not constitute an assertion of jurisdiction over a water based solely on its use by migratory birds." 88 Fed. Reg. at 3031.

While case-specific tests cannot provide the same certainty as bright-line categories, they are the norm and well within the Agencies' discretion. *Id*. at 3042. Well-established principles of administrative law permit the Agencies to exercise jurisdiction by rulemaking or adjudication. *NLRB v. Bell Aerospace Co. Div. of Textron, Inc*., 416 U.S. 267, 294 (1974); 88 Fed. Reg. at 3053, 3055, 3091, 3100. Even under the 2020 Rule, the Agencies issued jurisdictional determinations, which are, by their nature, case-specific inquiries into CWA jurisdiction. *Id*. at 3062. Indeed, Justice Kennedy contemplated case-specific determinations when endorsing the significant nexus standard. *Rapanos*, 547 U.S. at 779-80; *see also Maui*, 140 S. Ct. at 1476 (adopting case-specific approach to CWA jurisdiction). Interpreting another CWA provision, the *Maui* Court recognized "that a more absolute position . . . may be easier to administer" but would be "inconsistent with major congressional objectives, as revealed by the statute's language, structure, and purposes." *Id*. at 1477.

Case-specific determinations do not allow for arbitrary enforcement, as Kentucky asserts, Ky. Mot. 26, nor unfettered discretion, as the Business Plaintiffs contend, Bus. Mot. 19. Both the relatively permanent and significant nexus standards involve fact-specific, data-driven determinations conducted by agency staff with significant technical expertise and experience implementing the standards. 88 Fed. Reg. at 3047-48, 3114, 3117, 3121-22, 3130-35. Approved jurisdictional determinations have long been offered by the Corps, free of charge, and are challengeable under the APA standard of review. *USACE v. Hawkes Co*., 136 S. Ct. 1807 (2016).

### 3.    The Rule's significant nexus test is sufficiently limited and is founded on the status quo regime.

The Rule imposes reasonable limits on the scope of jurisdiction. First, the significant nexus standard is limited to consideration of effects on (a)(1) waters. 88 Fed. Reg. at 3097, 3120. Second, the standard is limited to effects only on the three statutorily identified aspects:

chemical, physical, or biological integrity. *Id*. Third, the standard cannot be met by merely speculative or insubstantial effects on (a)(1) waters, but rather requires a "material influence." *Id*. This requires assessing the influence of the water either alone or in combination on the chemical, physical, or biological integrity of an (a)(1) water, providing qualitative and/or quantitative information, and articulating a reasoned basis for determining that the water being assessed significantly affects an (a)(1) water.

  The Agencies have long implemented (and are currently implementing) the significant nexus standard in substantially the same manner as the Rule, *id*. at 3120, which Plaintiffs do not acknowledge. And, even so, the Agencies have "routinely concluded that waters do not meet the significant nexus standard." *Id*. at 3126. Significant nexus determinations comprised only around 12% of jurisdictional determinations historically. *Id*. at 3047, 3123. Under the Rule, it is possible the number of significant nexus analyses may increase, but the number of positive jurisdictional findings is not expected to quantifiably change. *Id*. Because the Rule ties the significant nexus standard to effects on only (a)(1) waters, there are real, appreciable limits to the scope of jurisdiction as compared to the 1986 Regulations that more categorically covered waters and tied jurisdiction to a broad interstate commerce standard. *Id*. at 3097. The Rule in no way "recasts" the significant standard nor "sweeps into jurisdiction" vast numbers of "small, isolated" waters. Bus. Mot. 13. Instead, the Rule provides for a thoughtful, careful approach to implementation and coordination for paragraph (a)(5) waters, Plaintiffs wholly fail to rebut the Agencies' record-based conclusion that any increase in coverage will be *de minimis*. 88 Fed. Reg. at 3098. Further, the rule expressly excludes a number of features that could be characterized as "small, isolated" waters. *Id*. at 3066-67 (excluding, *e.g.*, swales, certain artificial lakes or ponds, certain ditches).

And the Rule's significant nexus standard is narrower than the 1986 Regulations, which tied case-specific jurisdiction for "other waters" to interstate commerce and which had more types of waters that were categorically jurisdictional. Kentucky misunderstands the scope of the 1986 Regulations' standard, which allowed jurisdiction "based solely on whether the use, degradation, or destruction of the water could affect interstate or foreign commerce." *Id.* at 3099. That standard required no connection to paragraph (a)(1) waters. By contrast, the Rule establishes limits that cover upstream waters where they significantly affect the integrity of waters for which the Federal interest is indisputable—(a)(1) waters. Where waters do not, regulation lies exclusively with Kentucky, as well as other States (or tribes). *Id*. at 3005.

Ultimately, Plaintiffs ignore substantial similarities with the status quo regime. For instance, "the phrase 'material influence' . . . reflects the [A]gencies' longstanding position that significant nexus determinations should be supported by the factual record, relevant scientific data and information, and available tools." *Id.* at 3121. In addition, the Rule follows the approach of federal courts of appeals, "which have not held that the term 'significant' . . . requires statistical significance or quantitative measurement." *Id.* (citations omitted). And the Rule's list of functions is "based on the functions identified in the *Rapanos* Guidance," as well as the Agencies' "experience implementing the significant nexus standard, public comments on that list of functions, and consideration of the best available science." *Id.* at 3124.

### 4. The Rule provides a reasoned explanation and is consistent with *Rapanos*.

#### a. The Agencies provide a reasoned explanation for the Rule.

Business Plaintiffs assert that the Rule provides no reasoned explanation for departures from the status quo regime, Bus. Mot. 16-18, but as addressed above, most of the "departures" they identify are actually part of the Agencies' longstanding practice. The Rule is simply not a

31

departure from prior policy *sub silentio* as was the case in *FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009). *See supra* Part II.A. The Rule is substantially similar to the status quo regime and the significant nexus test, as applied. Like the Rule, the status quo regime (i) extends to more than tributaries and wetlands; (ii) considers the effects of similarly situated waters; (iii) analyzes the functions and factors of upstream waters on (a)(1) waters; and (iv) determines that a chemical, physical, or biological connection that significantly affects (a)(1) waters is sufficient to confer jurisdiction. Differences between the Rule and the pre-2015 regime generally serve to clarify and refine that regime. First, the Agencies have interpreted the CWA as extending to more than tributaries and wetlands for over 40 years. *See supra* Part II.A.1.d-e. The Agencies have long considered the effects of similarly situated waters, 88 Fed. Reg. at 3127-28, and Justice Kennedy expressly recognized that wetlands may possess the requisite significant nexus if they "either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Rapanos*, 547 U.S. at 780.[6]

Second, the addition of a new definition for "significantly affect," including the identification of specific functions and factors, are grounded in the Agencies' longstanding position that the significant nexus standard requires a factual record and scientific data. 88 Fed. Reg. at 3121. The definition adds clarity and concreteness to the currently implemented framework. And the Rule explained its basis for identifying specific functions provided by the water that will be assessed, based in part on the *Rapanos* Guidance and Justice Kennedy's *Rapanos* concurrence. The Agencies then provided the requisite reasoned explanation for

---

[6] *Contra* Bus. Mot. 15 n.4 (asserting, incorrectly, that the Rule's aggregation of wetlands adjacent to a tributary within the tributary's "catchment" is inconsistent with Justice Kennedy's aggregation of "similarly situated lands in the region").

identifying specific factors for determining whether the functions have a material influence on

the integrity of (a)(1) waters. *Id.* at 3119-20, 3124. The functions and factors provide regulators

and the public with a clear framework for assessing whether a significant nexus to an (a)(1)

water exists: the functions constitute the "nexus" between the waters being assessed and (a)(1)

waters; and the factors are the practical considerations to assess the strength, or "significance," of

those functions on the integrity of the (a)(1) waters. *Id.* Contrary to Business Plaintiffs' assertion,

the Rule does not conclude that jurisdiction exists if only one function or factor is satisfied. Bus.

Mot. 19. Rather, a material influence on (a)(1) waters must exist, and the Rule provides guidance

and identifies examples of certain waters that would likely not be jurisdictional under the Rule.

88 Fed. Reg. at 3126. The Rule expressly recognizes that while certain waters may have some

effect on an (a)(1) water, they would not have a material influence on the chemical, physical, or

biological integrity of the (a)(1) water and would not be jurisdictional under the CWA.

Third, the Agencies have long interpreted Justice Kennedy's opinion consistently with

the CWA's objective. *See, e.g.*, *Cundiff*, 555 F.3d at 211 n.4 (describing the significant nexus test

as "a significant chemical, physical, *or* biological connection between the wetlands and the

nearby navigable-in-fact waters") (emphasis added); *United States v. Osborne*, No. 1:11 CV

1029, 2011 WL 7640985, at *8 n.106 (N.D. Ohio Dec. 15, 2011), report and recommendation

adopted, No. 1:11CV1029, 2012 WL 1095960 (N.D. Ohio Mar. 30, 2012) ("a showing of a

*significant* chemical, physical, or biological connection satisfies Justice Kennedy's test."

(quoting *Benjamin v. Douglas Ridge Rifle Club*, 673 F.Supp.2d 1210, 1217 n. 4 (D. Or. 2009))).

More importantly, Business Plaintiffs are simply incorrect that Justice Kennedy's

significant nexus standard extends jurisdiction to those waters that significantly affect the

chemical, physical, *and* biological integrity of traditional navigable waters, and not to waters that

33

affect the chemical, physical, *or* biological integrity of such waters. Ky. Mot. 19; Bus. Mot. 18. The preamble to the Rule directly addresses this point: While Justice Kennedy used the conjunction "and," this is not a holding by Justice Kennedy that a water must significantly affect every single aspect of an (a)(1) water's integrity to be jurisdictional. 88 Fed. Reg. at 3122. Even if Plaintiffs' interpretation were a reasonable reading of Justice Kennedy's concurrence, Plaintiffs ignore the plain language of the CWA's objective, which is to ensure that all three aspects comprising the integrity of (a)(1) waters are independently restored and maintained. 33 U.S.C. § 1251(a). The Agencies adopted the best reading of the CWA, whereas Plaintiffs' reading contradicts this plain language. It defies reason to believe that Congress intended waters to be covered only if that water could compromise all three aspects of an (a)(1) water's integrity but did not intend jurisdiction if, for example, that water compromised only the physical integrity of an (a)(1) water. 88 Fed. Reg. at 3122.

### b.        The Rule is consistent with *Rapanos*.

Plaintiffs incorrectly argue that the Rule runs afoul of Justice Kennedy's "significant nexus" standard. In particular, Business Plaintiffs appear to contend that Justice Kennedy limited the significant nexus standard to wetlands, as opposed to other waters. Bus. Mot. 14-15.

First, the Rule does not seek to interpret and apply *Rapanos*—it is the Agencies' best interpretation of the scope of "waters of the United States," informed by the text of the relevant provisions of the CWA and the statute as a whole, the scientific record, relevant Supreme Court precedent, and the Agencies' experience and technical expertise after more than 45 years of implementing the CWA 88 Fed. Reg. at 3021-22; *see Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs*, 545 U.S. 967, 982 (2005). Moreover, the Rule is consistent with both opinions in *Rapanos* and cases interpreting *Rapanos*. 88 Fed. Reg. at 3014.

34

Second, it is not surprising that Justice Kennedy addressed wetlands and not other types of waters, as wetlands were directly at issue in *Rapanos*. 547 U.S. at 759. Nothing in Justice Kennedy's opinion expressed any intent to limit the significant nexus standard solely to adjacent wetlands. And Plaintiffs themselves recognize that the pre-2015 regime applied the significant nexus test to tributaries. Bus. Mot. 17.

Third, Plaintiffs do not explain why including a definition for "significantly affect" that includes "material influence" "waters down" Justice Kennedy's test. Ky. Mot. 19. The word "material" ensures that the influence of upstream waters on (a)(1) is more than speculative or insubstantial, and that Agencies will provide qualitative or quantitative information and articulate a reasoned basis for determining that a significant nexus exists, consistent with longstanding practice. 88 Fed. Reg. at 3120-21. The phrase "material influence" thus reflects the Agencies' longstanding position that significant nexus determinations should be supported by facts and data, which is what Justice Kennedy contemplated in *Rapanos*. *Id*.

Plaintiffs also assert that the Rule's relatively permanent standard runs afoul of *Rapanos*, Ky. Mot. 18-19, but the plurality recognized that seasonal waters, which do not constantly flow, could be relatively permanent. *Rapanos*, 547 U.S. at 732 n.5. This is consistent with the plain meaning of relatively, which means "to a relative degree or extent" or "somewhat." *Relatively*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/relatively. Nothing in the definition of "relatively" requires constancy.

**B.      The Rule is constitutional.**

**1.      The Rule is consistent with the Commerce Clause.**

Contrary to Plaintiffs' contentions, *see* Ky. Mot. 17-18; Bus. Mot. 13, the significant nexus and relatively permanent standards in the Rule serve to *narrow* the broad commerce test underlying the 1986 Regulations. *See* 88 Fed. Reg. at 3037. Under the Rule, "a broad interstate

commerce connection is not sufficient to meet the definition of 'waters of the United States.'" *Id.*
at 3140; RTC, Ex. 6 at 2.6.3; *see also Rapanos*, 547 U.S. at 776 (Kennedy, J., concurring) ("In
*SWANCC*, by interpreting the Act to require a significant nexus with navigable waters, the Court
avoided applications—those involving waters without a significant nexus—that appeared likely,
as a category, to raise constitutional difficulties and federalism concerns."); *id.* at 782-83 ("[I]n
most cases regulation of wetlands that are adjacent to tributaries and possess a significant nexus
with navigable waters will raise no serious constitutional or federalism difficulty. . . . [T]he
significant-nexus test itself prevents problematic applications of the statute."); *Riverside
Bayview*, 474 U.S. at 132-33.

The Rule is also narrower than the 1986 Regulations in other respects. The 1986
Regulations' commerce test presumed that the CWA asserted Commerce Clause authority
beyond regulating "the channels of interstate commerce," while the 2023 Rule appropriately
recognizes this limit. 88 Fed. Reg. at 3037, 3045. As the Agencies explained, the power to
regulate channels of interstate commerce "includes the power to adopt 'appropriate and needful
control of activities and agencies which, though intrastate, affect that commerce.'" *Id.* at 3035
(citing *Rapanos*, 547 U.S. at 782-83 (further citations omitted)). And courts have recognized the
power to regulate the channels of interstate commerce as including "the power to regulate waters
to limit pollution, prevent obstructions to navigation, reduce flooding, and control watershed
development." *United States v. Hubenka*, 438 F.3d 1026, 1032 (10th Cir. 2006) (citations
omitted). The Agencies were mindful of *SWANCC*, and the Rule places (a)(1) waters at the
center of CWA jurisdiction while "covering additional waters only where those waters

significantly affect (a)(1) waters." 88 Fed. Reg. at 3037. Thus, Plaintiffs' claims that the Rule is

untethered to traditional navigable waters, *see* Ky. Mot. 17; Bus. Mot. 14, are wrong.[7]

In addition to incorporating the significant nexus and relatively permanent standards, the

Agencies further narrowed the scope of certain covered categories to respect the limits of their

authority. *See* 88 Fed. Reg. at 3037 (noting that unlike the 1986 Regulations, tributaries to (a)(5)

waters and wetlands adjacent to (a)(5) waters are not automatically covered). The Rule also

codifies exclusions that were not in the text of the 1986 Regulations, "and in so doing eliminates

the authority of the agencies to determine in case-specific circumstances that some such waters

are jurisdictional." *Id.* at 3140.

> **2.      The Rule comports with Section 101(b) and maintains the CWA's state-federal balance.**

The Rule gives due consideration to Section 101(b) of the CWA and rights of the states.

88 Fed. Reg. at 3019-20; *see* 33 U.S.C. § 1251(b). Contrary to Kentucky's claims, the Rule does

not violate the Tenth Amendment or disrupt the state-federal balance. Kentucky's reading of

Section 101(b) is inconsistent with Congress's intent to replace an inadequate statutory scheme

that relied on state enforcement of state standards with the CWA, a comprehensive federal

program. *See* 88 Fed. Reg. at 3050-51; *see also Ky. Waterways All. v. Ky. Utils. Co.*, 905 F.3d

925, 928-29 (6th Cir. 2018) (discussing inadequacy of prior statutes and import of CWA Section

101(b)), *abrogated on other grounds by Maui*, 140 S. Ct. 1462. Importantly for states, the

---

[7] As explained above, Part II.A.1.b, the Rule also appropriately provides for jurisdiction over waters that significantly affect interstate waters, regardless of the interstate waters' navigability. This is not contrary to the Agencies' authority, as Congress clearly intended for waters that form state boundaries or that span across multiple states would be federally regulated. *See id.* *Rapanos*, *SWANCC*, and *Riverside Bayview* did not speak to the Agencies' authority to cover interstate waters, but prior Supreme Court cases demonstrate that such coverage is intended. *See* 88 Fed. Reg. at 3073.

CWA—and the Rule—cover interstate waters, which no state alone can adequately regulate. *See supra* Part II.A.1.b; *see also Rapanos*, 547 U.S. at 777 (Kennedy, J., concurring).

The Agencies carefully and appropriately considered Section 101(b). 88 Fed. Reg. at 3044-45. Unlike the Act's foundational objective in Section 101(a), Congress did not establish Section 101(b) as a linchpin of defining the Act's coverage. *Id.*; *see* 33 U.S.C. § 1251(c), (f), (g). The Agencies' interpretation is consistent with Supreme Court opinions, which have described Section 101(b) as creating a partnership in which the states administer programs under federally mandated standards and are allowed to set even more stringent standards. *See, e.g.*, *Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992) (the Act "anticipates a partnership between the States and the Federal Government" to meet the "shared objective" in Section 101(a)); *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 489-90 (1987); *see also Ky. Waterways All.*, 905 F.3d at 929.

Moreover, unlike the 2015 Rule, which the Agencies projected would increase the scope of jurisdiction by a measurable amount, *see North Dakota v. EPA*, 127 F. Supp. 3d 1047, 1059 (D.N.D. 2015) (citing 80 Fed. Reg. at 37101), the 2023 Rule will have only "a slight and unquantifiable increase in certain resources being found to be jurisdictional." Econ. Analysis, Ex. 5, at Exec. Summary xii. Such a slight shift does not impermissibly alter the state-federal balance under the CWA, nor has Kentucky shown that any newly jurisdictional waters would be within its borders. *SWANCC* does not hold otherwise. Kentucky omits the Court's key reasoning in finding that the Agencies' assertion of jurisdiction over "ponds and mudflats *falling within the 'Migratory Bird Rule'* would result in significant impingement of the States' traditional and primary power over land and water use." *SWANCC*, 531 U.S. at 174 (emphasis added); *cf.* Ky. Mot. 22 (quoting *SWANCC* and omitting emphasized text). The Court did not conclude that extending CWA jurisdiction to intrastate waters would impinge State's power, but rather that

basing jurisdiction solely on a waters' use by migratory birds was not permissible. The Rule

expressly does not base jurisdiction on use by migratory birds. *See, e.g.*, 88 Fed. Reg. at 3037.

### 3. The Rule does not run afoul of the major questions doctrine and is a valid exercise of Congress's delegated authority.

Plaintiffs argue that the major questions doctrine requires the conclusion that the

Agencies lack delegated authority to interpret the relevant language in the CWA, or, if Congress

did delegate authority, such a broad delegation is unlawful. Neither is true.[8]

The major questions doctrine, reserved for "extraordinary" cases, is inapplicable here.

*West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). In *West Virginia*, the Court considered

EPA's novel interpretation of "vague language" of an "ancillary" statutory provision in the Clean

Air Act that "had rarely been used" to grant what the Court described as "unheralded power"

representing a "transformative expansion" of EPA's regulatory authority. *Id.* at 2610 (applying

doctrine to EPA rule requiring shift in electricity production from fossil-fuel sources to

renewables to address greenhouse gases). Here, the Rule is consistent with "longstanding

practice . . . implementing the relevant statutory authorities." *Biden v. Missouri*, 142 S. Ct. 647,

652 (2022). The Agencies have exercised their authority to construe the meaning of "waters of

the United States" for half a century. *Cf. West Virginia*, 142 S. Ct. at 2607-08. Significantly, both

Congress and courts, including the Supreme Court, have affirmed the Agencies' authority to do

so. Both houses of Congress rejected a narrower definition of "navigable waters." 88 Fed. Reg.

at 3020-21 (intending the term be given broad meaning (House Committee); noting that "[w]ater

---

[8] Notably, although the Agencies received about 114,000 comments, *see id.* at 3019, no
commenter asserted that the Rule would violate the major questions doctrine. It is a well-
established tenet of administrative law that issues not raised in administrative proceedings
normally are not properly the subject of judicial review. *See, e.g.*, *LeBlanc v. EPA*, 310 F. App'x
770, 776 (6th Cir. 2009). Thus, this issue cannot be the basis of a finding that Plaintiffs are likely
to succeed on the merits.

moves in hydrologic cycles and it is essential that discharge of pollutants be controlled at the source" (S. Rep. No. 92-414, at 77)). And Congress has been aware of the Agencies' interpretation of the phrase and has not limited the Agencies' authority when amending the CWA. *Id.* at 3027-28 (describing amendments). Unlike the rule in *West Virginia* which was projected to have billions of dollars in costs, as shown by the Agencies' Economic Analysis, the Rule will have *de minimis* costs when compared to the status quo regime. 88 Fed. Reg. at 3007; *see* Ex. 5 at Exec. Summary xii. Its projected increase in covered waters is "slight and unquantifiable." Ex. 5, at Exec. Summary xii. The Rule is far from the "immense expansion of federal jurisdiction," Bus. Mot. 13; *see* Ky. Mot. 20, that Plaintiffs claim.

Congress's delegation of authority to define the scope of "waters of the United States," while broad, was lawful. *See* 88 Fed. Reg. at 3020. The CWA authorizes the Agencies "to prescribe such regulations as are necessary to carry out [their] functions under" the Act. 33 U.S.C. § 1361. Congress knew that construing the scope of "waters of the United States" is necessary because the phrase defines the geographic scope of many of the Act's key provisions through which the Act's singular objective may be achieved. *See* Background Part A; *Maui*, 140 S. Ct. at 1468-69 (stating that the Act uses "specific definitional language to achieve" its purpose, including the phrase "navigable waters."); *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 475-76 (2001) (upholding Clean Air Act provision requiring EPA to set air standards at a level "requisite" to protect public health). Congress' delegation of authority is clear, and contrary to Plaintiffs' argument, *see* Bus. Mot. 14, Congress did not need to speak in more precise terms, *see Gun Owners*, 19 F.4th at 899 ("[T]he Supreme Court has made clear that *Chevron* deference is not eliminated simply because the rulemaking authority conferred . . . was not specified with exactitude." (citing *Mayo Found. for Med. Educ. & Rsch. v. United States*, 562 U.S. 44, 56-57

(2011)), *cert. denied*, 143 S. Ct. 83 (2022). The CWA's text, statutory scheme, and legislative history all demonstrate that Congress intended this delegation.

The Supreme Court has affirmed that Congress delegated a "breadth of federal regulatory authority" to the Agencies to address the "inherent difficulties of defining precise bounds to regulable waters." *Riverside Bayview*, 474 U.S. at 134. In *Rapanos*, the Chief Justice stated that "Agencies delegated rulemaking authority under a statute such as the Clean Water Act are afforded generous leeway by the courts in interpreting the statute they are entrusted to administer," and that the Agencies "would have enjoyed plenty of room to operate in developing some notion of an outer bound to the reach of their authority." 547 U.S. at 758 (Roberts, C.J., concurring). These statements would be inexplicable if the Court had any question about the Agencies' authority to issue such regulations. *See also Arlington*, 569 U.S. at 301 (deferring to agency's interpretation of the scope of its jurisdiction).

In sum, accepting Plaintiffs' argument would result in a dramatic departure from a longstanding understanding of the CWA, shared by the Agencies, Congress, and courts.

### 4.      The Rule is not impermissibly vague.

Contrary to Plaintiffs' claims, the Rule's definitions are not unduly vague. *See* RTC, Ex. 6 at 2.7.3. Nor should the Court consider Plaintiffs' facial challenges. *See Maynard v. Cartwright*, 486 U.S. 356, 361 (1988) ("Vagueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand; the statute is judged on an as-applied basis."); *United States v. Midwest Fireworks Mfg. Co.*, 248 F.3d 563, 567-68 (6th Cir. 2001) (noting that in a due process challenge claimants "must show that the regulation is 'unconstitutionally vague as applied to the specific facts of the case, not whether it is unconstitutional on its face'" (citation omitted)). The Agencies' approach in the Rule—to largely codify the status quo regime while providing additional explanation and guidance on key

41

provisions—provides *more* clarity and predictability for regulators and the regulated community. *See* 88 Fed. Reg. at 3055. Kentucky complains that the Rule's terms are vague. *See* Ky. Mot. 24. But the ditch exclusion, while currently being implemented as part of the pre-2015 regime, is absent from the text of the 1986 Regulations; and the term "adjacent" is defined *identically* in the 1986 Regulations. Moreover, the Rule's significant nexus standard including the terms "similarly situated" and "in the region" is not new. The Agencies have been implementing the standard since *Rapanos*, in which Justice Kennedy used the terms that Plaintiffs complain about. *See Rapanos*, 547 U.S. at 780. The Agencies have provided a regulatory definition of "significantly affect" as "a material influence," and identified the only factors and functions to be assessed in determining whether a water has a significant nexus to an (a)(1) water. 88 Fed. Reg. at 3119-21. But that provides more guidance and certainty than the longstanding pre-2015 regime.

The Agencies' discretion in determining whether a water is covered is sufficiently limited by the definitions and factors in the Rule. *See United States v. Lucero*, 989 F.3d 1088, 1103 (9th Cir. 2021) (finding, in rejecting vagueness challenge to status quo regime, that the phrases "similarly situated" and "significant nexus" "provide an ascertainable, qualitative standard akin to others found in the law"). The Rule appropriately provides flexibility for regulators across the country to assess a variety of waters, while providing ample guidance and fair warning to comport with due process. *See Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972). The Rule is not unduly vague even if "difficulty is found in determining whether certain marginal offenses fall within" it. *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963); *see Lucero*, 989 F.3d at 1101.

Notably, both *Rapanos* standards required case-specific determinations. *See* 88 Fed. Reg. at 3042-43. In a recent case concerning what discharges require a CWA permit, the Supreme

Court declined to adopt a bright-line test, *Maui*, 140 S. Ct. at 1476-77, even though violators are subject to criminal penalties, *see* 88 Fed. Reg. at 3042. And, the Sixth Circuit has affirmed criminal convictions under the CWA during the status quo regime. *See, e.g.*, *United States v. Long*, 450 F. App'x 457, 463 (6th Cir. 2011) (rejecting vagueness challenge); *Boylen v. United States*, No. 19-3597, 2019 WL 13127547, at *2 (6th Cir. Sept. 27, 2019) (rejecting due process claim). Likewise, the Fifth Circuit rejected arguments that the Act as applied was unconstitutionally vague and that jurisdiction was determined on an ad hoc basis. *United States v. Lucas*, 516 F.3d 316, 327-28 (5th Cir. 2008). Thus, because the Rule provides even more clarity and regulatory certainty than the current status quo regime, which was in effect at the time of *Long*, *Lucas*, and *Lucero*, it cannot be impermissibly vague or violate due process and fair notice.[9]

The presence of "waters of the United States" does not by itself violate the CWA or subject a person to criminal liability. *See* 33 U.S.C. § 1319(c); *Maui*, 140 S. Ct. at 1468; *Cundiff*, 555 F.3d at 213 ("To establish liability under the Act, the government must prove that (1) a person (2) discharged a pollutant (3) from a point source (4) into waters of the United States (5) without a permit."). And, although the CWA's definition of "navigable waters" as "waters of the United States" may be ambiguous, the Rule represents the best interpretation of that phrase. *See* Part II.A.1. Moreover, the Supreme Court, having considered the phrase on multiple occasions, has never indicated that it is grievously ambiguous. *See generally Rapanos*, 547 U.S. 715; *SWANCC*, 531 U.S. 159; *Riverside Bayview*, 474 U.S. 121. Nor has the Sixth Circuit.

---

[9] Indeed, Plaintiffs apparently do not dispute that the Rule is more specific than the status quo regime.

Further, contrary to Kentucky's argument, the ability of property owners to obtain a jurisdictional determination from the Corps does not demonstrate that the Rule is impermissibly vague. The Corps has offered jurisdictional determinations—for free—for decades, including under the 2020 Rule that Plaintiffs preferred. *See* Ex. 7 (Corps, *Regulatory Guidance Letter: No. 16-01*, at 1-2 (Oct. 2016)). Property owners wishing to protect themselves from liability could obtain a determination of the covered waters on their property. *Lucas*, 516 F.3d at 328. While parties can hire consultants to analyze jurisdiction or prepare permit applications, the expense of doing so is not required to avoid criminal or civil penalties for violating the Act's prohibition on the unauthorized discharge of pollutants. *See supra* Note 4.

## C.   The Rule complied with procedural requirements.

Under the APA, a "[g]eneral notice" of proposed rulemaking must include "either the terms or substance of the proposed rule or a description of the subjects and issues involved" and provide the public with an opportunity to comment. 5 U.S.C. § 553(b)(3), (c). The purposes of these procedures are "to get public input so as to get the wisest rules," to "ensure fair treatment for persons to be affected by regulations," and "to ensure that affected parties have an opportunity to participate in and influence agency decision making at an early stage." *Dismas Charities, Inc. v. U.S. Dep't of Justice*, 401 F.3d 666, 678, 680 (6th Cir. 2005) (internal quotation marks and citation omitted).

An agency may promulgate a rule that differs from a proposed rule. *Chrysler Corp. v. Dep't of Transp.*, 515 F.2d 1053, 1061 (6th Cir. 1975). If that were not the case, one of the key purposes of notice and comment—to allow an agency to reconsider, and perhaps revise, a proposed rule based on the comments submitted—would be undermined. *Ass'n of Battery Recyclers, Inc. v. EPA*, 208 F.3d 1047, 1058 (D.C. Cir. 2000). Agencies could be "forced into

perpetual cycles of new notice and comment periods" or "refuse to make changes in response to comments." *Id.* Thus, even substantial changes to a proposal may be made, provided the final rule is a "logical outgrowth" of the proposed rule. *Leyse v. Clear Channel Broadcasting, Inc.*, 545 F. App'x 444, 453 (6th Cir. 2013) (citing *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007)).

Here, contrary to Business Plaintiffs' claim (Bus. Mot. 20-21), the Agencies complied with this procedural requirement of the APA. The proposed rule defined "significantly affect" to mean "more than speculative or insubstantial effects on the chemical, physical, or biological integrity" of traditional navigable waters, the territorial seas, or interstate waters. 86 Fed. Reg. at 69449; *see also id.* at 69430-33. The final definition that followed is similar but more refined, reflecting not only that the influence must be more than speculative or insubstantial, but also that qualitative and/or quantitative information and a reasoned basis must support any significant nexus determination: "significantly affect" means "a material influence on the chemical, physical, or biological integrity" of (a)(1) waters. 88 Fed. Reg. at 3143; *see also id.* at 3119-21. It is plainly evident that the Rule is a logical outgrowth of the proposal.

Moreover, it is simply incorrect that the proposal provided "no notice whatsoever that [the Agencies] were considering changing" this definition, or that "the public was denied a meaningful opportunity to comment." Bus. Mot. 21. In fact, the Agencies expressly invited public comment on "all aspects of the proposal." 86 Fed. Reg. at 69416. Further, the Agencies received "numerous" comments on the subject, 88 Fed. Reg. at 3121, including from Business Plaintiffs. Business Plaintiffs proposed a narrower definition. For instance, the U.S. Chamber of Commerce asserted that "significant" means "full of import," "important," or "weighty." Ex. 9 at 7 (citation omitted). Similarly, the National Stone, Sand & Gravel Association contended that

"significant" means "important or influential." Ex. 10 at 7 (citation omitted). As the Sixth Circuit has recognized, comments that address an issue resolved in the final rule "provide evidence that the notice was adequate." *Leyse*, 545 F. App'x at 454; *cf. Am. Trucking Ass'ns, Inc. v. FMCSA*, 724 F.3d 243, 253 (D.C. Cir. 2013). That rule is particularly applicable where, as here, the Agencies ultimately adopted a definition that merely refines what they had proposed (in part due to public comments).[10]

Even if Business Plaintiffs could somehow identify a logical outgrowth problem, however, they ignore "the rule of prejudicial error." 5 U.S.C. § 706. Courts generally apply a harmless-error rule in the APA review context when any procedural deficiency does not defeat the purpose of the bypassed requirements. *See United States v. Utesch*, 596 F.3d 302, 312 (6th Cir. 2010) (citing examples). Here, the arguments made by Business Plaintiffs in this case were advanced during the rulemaking by numerous commenters, including Plaintiffs themselves,[11] and there is no harm as a result of any deficiency in notice. What matters is that, in developing the Rule, the Agencies had an opportunity to consider all relevant views.

## III. The balance of equities and public interest weigh against an injunction.

The balance of equities and public interest strongly disfavor an injunction here. Plaintiffs ask this Court to award them the emergency relief of keeping in place a regime that is almost

---

[10] *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 549 (D.C. Cir. 1983), supports the Agencies, not Business Plaintiffs. That court found a change in the regulatory definition of "small" to be a logical outgrowth; although "the proposal did not list specific 'loopholes' that EPA might try to close," regulated entities were "aware generally" what EPA was trying to do. *Id.* at 548. The only provision the court found was not adequately noticed was the new ownership requirement that arose from a single comment. *Id.* at 548-49. Here, Business Plaintiffs were at least "aware generally" that the Agencies could sharpen the definition during the rulemaking. *See also Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1107 (D.C. Cir. 2014).

[11] The U.S. Chamber of Commerce not only submitted the comment noted above, but also joined in the Water Advocacy Coalition's detailed comments that left no stone unturned. *See* Ex. 11.

identical to the one they seek to enjoin in terms of costs to regulated parties and environmental protection, but provides far less clarity to stakeholders. The Agencies acknowledge that the overall costs and benefits of the Rule are slight, but that does not mean that the Rule does not provide benefits to the public, nor that Plaintiffs are entitled to disrupt the regular course of administrative rulemaking based on speculative statements about compliance costs.

Regulated parties as well as regulators (including Kentucky) will benefit from the added clarity that the Rule provides. No version of the C.F.R. reflects the operative definition of "waters of the United States." The text of the vacated 2020 Rule is in the current version, while the 1986 Regulations (recodified by the 2019 Rule) are broader than the status quo regime and the Rule. Thus, to understand the current scope of jurisdiction (the pre-2015 regime), a person cannot rely on the C.F.R., but must consult multiple sources. *See* 84 Fed. Reg. at 56626. But once the Rule takes effect, its regulatory text will be codified in a single section of each Agency's regulations—providing for easier understanding of covered and excluded waters— resulting in greater efficiency and clarity. *See* 88 Fed. Reg. at 3007; *id.* at 3046-47. Also, the Rule provides guidance and identifies tools and best available science for making determinations, promoting more timely and consistent determinations. *See* 88 Fed. Reg. at 3007.

When the party opposing a stay is the United States, the public interest element "merge[s]" with the United States' interest. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). The Rule is the product of a year-long extensive rulemaking process in which the Agencies considered about 114,000 comments from a broad array of stakeholders, the great majority of whom are not before the Court but who would be adversely affected if the Rule is enjoined. *See* 88 Fed. Reg. at 3019.

47

In sum, preliminarily enjoining the Rule threatens more harm to the combined interests of the government and public, *see Nken*, 556 U.S. at 435, than Plaintiffs even argue they will suffer. Plaintiffs have not met their burden to show that the Rule should be enjoined—and have provided no compelling basis for relief to be issued now, rather than after the parties present their arguments in the normal course of proceedings.[12]

Additionally, the Supreme Court's future disposition of *Sackett* provides no basis for staying the Rule. Whether and how *Sackett* might affect the Rule is entirely speculative. Congress directed the Agencies "to prescribe such regulations as are necessary to carry out [their] functions under" the CWA. 33 U.S.C. § 1361(a). That is exactly what this Rule is. Implementation of the Agencies' lawful Rule, resulting from robust public engagement, should not be delayed. To prohibit the Rule to take effect based on the prospect that the Supreme Court might decide a case (taken prior to issuance of the Rule) in a way that *could* have implications for the Rule's legality would elevate a speculation on a future judicial decision over the will of Congress and the Executive Branch, raising grave separation of powers concerns.

IV.    **Any injunction should be limited to the Rule's application to waters in Kentucky.**

Assuming, *arguendo*, that the Court finds that any relief is appropriate in this case, such relief would be subject to traditional equitable principles, including the principle of party-specific relief.[13] The APA confirms this, as it expressly limits judicial review to a person

---

[12] Because review in these cases is under the APA, based on the administrative record, *see* 5 U.S.C. § 706, the litigation may be fully resolved on summary judgment briefing.

[13] *See, e.g.*, *California v. Texas*, 141 S. Ct. 2104, 2115 (2021) (stating that remedies "ordinarily operate with respect to specific parties") (cleaned up); *DHS v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring) ("Equitable remedies . . . are meant to redress the injuries sustained by a particular plaintiff in a particular lawsuit."); *Commonwealth*, 57 F.4th 545, 546-47 ("federal courts should not issue relief that extends further than necessary to remedy the plaintiff's injury") (6th Cir. 2023); *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en

*Cont.*

"adversely affected or aggrieved by agency action," 5 U.S.C. § 702, and preserves "the power or duty of the court to . . . deny relief on any . . . equitable ground." *Id.* With specific reference to the stay pending review sought here, while the APA authorizes courts to issue "writs of prohibitory or mandatory injunction," 5 U.S.C. § 703, and "to preserve status or rights pending conclusion of the review proceedings," *id.* § 705, it also specifies that any such interim relief should only be granted "to the extent necessary to prevent irreparable injury," *id.*

Although neither Kentucky nor Business Plaintiffs discuss the scope of their requested injunctive relief in their motions, both make clear in their proposed orders that they are *not* seeking nationwide relief. Specifically, Kentucky's proposed Order seeks an injunction barring application of the Rule "inside the Commonwealth or against the parties to this action" and in the case of Business Plaintiffs, the proposed order seeks to enjoin enforcement of the Rule "against Plaintiffs and their members." Based on the record presented in this action, as well as the principles discussed above, there is no justification for the Court to grant equitable relief extending beyond the Commonwealth of Kentucky.

Kentucky's allegations of generalized programmatic impacts from the Rule, as well as its requested relief, are indisputably limited to the Rule's application to waters in Kentucky. Most of the individual Business Plaintiffs are Kentucky organizations and companies. Only one Business Plaintiff, the Georgia Chamber of Commerce, identifies a member outside Kentucky. *See* Tollison Decl. ¶ 6. That member's alleged harms rest on misperceptions about the Rule's import and its relationship to the status quo, *see supra* Part I.A.1, but in any case, harm to one Georgia

---

banc) ("It is well-established that a plaintiff's remedy must be tailored to redress the plaintiff's particular injury.") (cleaned up); *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) ("courts generally grant relief in a party-specific and injury-focused manner") (Sutton, C.J., concurring) (cleaned up); *see also Trump v. Hawaii*, 138 S. Ct. 2392, 2425-29 (2019) (arguing that broad injunctions conflict with foundations of courts' equitable authority) (Thomas, J., concurring).

Chamber of Commerce member does not support an award of extraordinary relief in favor of all its members, *cf. AAPS*, 13 F.4th at 541, much less members of *other* Business Plaintiffs.

Simply put, the mere fact that some of the Business Plaintiffs have unidentified members in other states who may be affected in some way by the new Rule does not in itself demonstrate that those members will suffer irreparable injury from the Rule that is concrete, imminent and important enough to outweigh countervailing interests, and to warrant injunctive relief extending into other states. This is particularly true since any such broader injunction would inevitably impair the interests of other states, individuals, and organizations who are not before the Court and that support the challenged Rule—and whose interests in the Rule's implementation are no less weighty than Plaintiffs' interests in its delay.[14]

## CONCLUSION

The Court should deny the motions for preliminary injunction.

Respectfully submitted,

TODD KIM
Assistant Attorney General
ENVIRONMENT AND NATURAL
RESOURCES DIVISION

*Of Counsel:*
Karyn I. Wendelowski
Elise O'Dea
Environmental Protection Agency

Daniel Inkelas
Erica Zilioli
U.S. Army Corps of Engineers

*/s/ Hubert T. Lee*
HUBERT T. LEE, NY Bar No. 4992145
ANDREW J. DOYLE, FL Bar No. 84948
SONYA J. SHEA, CA Bar No. 305917
SARAH IZFAR, DC Bar No. 1017796
ELLIOT HIGGINS, NY Bar No. 5737903

---

[14] Plaintiffs also bear the burden of showing harm from each aspect of the Rule they seek to enjoin, so any injunctive relief granted by the Court should be tailored to just those portions of the Rule on which the Court finds a sufficient showing has been made. *See* 88 Fed. Reg. at 3135 (discussing severability of any portions of the Rule "determined by judicial review or operation of law to be invalid"). And at a minimum, plaintiffs should not be afforded relief broader than requested in their proposed order.

United States Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044
Tel: (202) 514-1806 (Lee)
Tel: (415) 744-6469 (Doyle)
Tel: (303) 844-7231 (Shea)
Tel: (202) 305-0490 (Izfar)
Tel: (202) 514-3144 (Higgins)
Fax: (202) 514-8865
hubert.lee@usdoj.gov
andrew.doyle@usdoj.gov
sonya.shea@usdoj.gov
sarah.izfar@usdoj.gov
elliot.higgins@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on March 3, 2023, I filed the foregoing using the Court's CM/ECF system, which will electronically serve all counsel of record registered to use the CM/ECF system.

 */s/ Hubert T. Lee*

HUBERT T. LEE