**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
FRANKFORT DIVISION**

| | |
|---|---|
| COMMONWEALTH OF KENTUCKY, )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES ENVIRONMENTAL )<br>PROTECTION AGENCY, *et al.*, )<br><br>Defendants, )<br><br>and )<br><br>KENTUCKY RESOURCES COUNCIL, )<br>INC., *et al.*, )<br><br>Applicant-Intervenor-Defendants. )<br>_____ ) | No. 3:23-cv-00007-GFVT<br>(consolidated with No.<br>3:23-cv-00008-GFVT) |

## CONSERVATION GROUPS' [PROPOSED] CONSOLIDATED RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION

The motions for a preliminary injunction filed by the Kentucky Chamber of Commerce and other organizations (collectively, "the Chamber") and by Kentucky are a long shot. The rule they seek to block from taking effect, Revised Definition of "Waters of the United States," 88 Fed. Reg. 3004 (Jan. 18, 2023) (the "Rule"), retains the same approach to the Clean Water Act's jurisdictional scope as the regulatory framework that is currently in effect. Accordingly, the Rule's economic impacts have been found to be negligible. Indeed, the U.S. Environmental Protection Agency ("EPA") and U.S. Army Corps of Engineers ("Corps") (collectively, the "Agencies") could have done much more to protect the nation's waters, given the scope of their Commerce Clause authority. But instead, the Agencies chose to hew closely to their longstanding practice and to concentrate on providing greater clarity and consistency in the form

of definitions, standards, and examples to guide them and to help the public understand which waters significantly affect the downstream waters that constitute the heart of the Clean Water Act's protections.

Yet despite the Rule's consistency with longstanding practice, Plaintiffs vaguely and speculatively assert that it will somehow impose significant costs and drastically expand the Clean Water Act's jurisdiction. Their assertions regarding the Rule's purported harms and deficiencies lack support, and they fall far short of the strict standards for a preliminary injunction. Plaintiffs' motions must be denied.[1]

## BACKGROUND

In 1972, after decades of ineffective state-led efforts to protect water quality, a bipartisan Congress passed the Clean Water Act (the "Act"), whose single objective is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a); *Cnty. of Maui v. Hawai'i Wildlife Fund*, 140 S. Ct. 1462, 1468 (2020). The Act "incorporate[s] a broad, systemic view of the goal of maintaining and improving water quality," one that "demand[s] broad federal authority to control pollution . . . ." *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 132–33 (1985). The Act's suite of water pollution controls applies to "navigable waters," 33 U.S.C. §§ 1311(a), 1362(12), which "Congress chose to define . . . broadly" as "the waters of the United States." *Riverside Bayview*, 474 U.S. at 133; *see* 33 U.S.C. § 1362(7). Over several decades and multiple decisions, the Supreme Court has reaffirmed the principle that waters that significantly affect downstream water quality are "waters of the United States." *See Riverside Bayview*, 474 U.S. at 135 n.9 (endorsing "significant effects on water quality and the aquatic ecosystem" as a basis for jurisdiction); *Solid Waste*

---

[1] The Conservation Groups request to be heard at a hearing on the motions.

*Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 167 (2001) ("*SWANCC*") (acknowledging that "significant nexus" between waters informed *Riverside Bayview*'s interpretation); *Rapanos v. United States*, 547 U.S. 715, 779–780 (2006) (Kennedy, J., concurring) (concluding that Clean Water Act covers waters with "significant nexus" to traditional navigable waters).[2]

From 1977 to 2015, the Agencies' interpretation of the term "waters of the United States" "remained largely unchanged," as reflected in the Agencies' "1986 regulations." 88 Fed. Reg. at 3005. After the Supreme Court's ruling in *Rapanos*, the Agencies issued guidance for making case-by-case jurisdictional determinations consistent with the two standards codified in the Rule: Justice Kennedy's "significant nexus" standard and the plurality's "relatively permanent" standard. U.S. EPA & U.S. Army Corps of Eng'rs, Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in *Rapanos v. United States & Carabell v. United States* (Dec. 2, 2008) ("*Rapanos* Guidance"), https://perma.cc/X3SF-U987.

The Agencies subsequently finalized three rules revising the definition of "waters of the United States" in 2015, 2019, and 2020. The last of these, the Navigable Waters Protection Rule ("NWPR"), drastically limited the scope of federally protected streams, lakes, and wetlands. 85 Fed. Reg. 22,250 (Apr. 21, 2020). The NWPR was vacated by two federal district courts, reinstating the pre-2015 regulatory framework (i.e., the 1986 regulations implemented consistent with Agency guidance) that is "familiar to the Agencies and industry alike." *Pascua Yaqui Tribe*

---

[2] Although *Rapanos* was a 4–1–4 decision, every Court of Appeals to have considered the question has determined that the government may exercise Clean Water Act jurisdiction over at least those waters that satisfy the significant nexus standard set forth in Justice Kennedy's concurrence. *See* 88 Fed. Reg. at 3014 (collecting cases).

*v. EPA*, 557 F. Supp. 3d 949, 956 (D. Ariz. 2021); *Navajo Nation v. Regan*, 563 F. Supp. 3d 1164, 1169 (D.N.M. 2021).

In January 2023, after engaging with state, local, and Tribal governments; meeting with stakeholders; seeking independent advice from the Science Advisory Board; and reviewing approximately 114,000 public comments, the Agencies finalized the Rule. 88 Fed. Reg. at 3018–19. The Rule is "founded on the familiar framework of the longstanding 1986 regulations, amended to reflect the agencies' interpretation of appropriate limitations on the geographic scope of the Clean Water Act in light of the law, the science, and agency expertise." *Id.* at 3020. As they were under the 1986 regulations, waters in which the federal interest is "indisputable"—traditional navigable waters, the territorial seas, and interstate waters (collectively, "indisputably federal waters")—are jurisdictional by rule. *Id.* at 3005. Upstream waters—including tributaries, adjacent wetlands, and other waters—that significantly affect the integrity of those indisputably federal waters also come within the Act's coverage, consistent with Supreme Court precedent and longstanding agency practice. *Id.* Critically, such upstream waters are covered only when they can be shown, on a case-by-case basis, to meet either the relatively permanent standard or the significant nexus standard. *Id.* at 3006. In imposing this limitation, the Agencies clarified that they have stopped well short of the outer limits of their Commerce Clause authority. *See id.* at 3050. The Rule thus maintains the Agencies' longstanding approach to implementing the Act, while adding definitions and guidelines to increase clarity and consistency in implementation.

## ARGUMENT

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet*

*v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). The movant carries

the burden on each of the four factors that the Court must consider:

> (1) whether the movant has a "strong" likelihood of success on the merits;
> (2) whether the movant would otherwise suffer irreparable injury;
> (3) whether issuance of a preliminary injunction would cause substantial harm to others; and
> (4) whether the public interest would be served by issuance of a preliminary injunction.

*Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000). Because all four factors weigh against

Plaintiffs, the motions should be denied.

## I.      Plaintiffs Have Not Shown Irreparable Harm.

Irreparable harm is an "indispensable" requirement for a preliminary injunction, and

"even the strongest showing" on the other factors cannot justify a preliminary injunction if there

is no "imminent and irreparable injury." *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 326–27 (6th

Cir. 2019). "To merit a preliminary injunction, an injury 'must be both certain and immediate,'

not 'speculative or theoretical.'" *Id.* at 327 (quoting *Mich. Coal. of Radioactive Material Users,*

*Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991)).

Here, Plaintiffs have made no such showing—and they cannot, because the Rule's

approach to protecting the waters that significantly affect downstream navigable waters is

consistent with the Agencies' approach since the 1970s. *See supra* at 2–3. The Rule's

implementation of this longstanding approach, referred to as the significant nexus standard,

along with the alternate, relatively permanent standard, is no drastic change—it codifies the

Agencies' longstanding practice. Plaintiffs' claims of harm from the Rule are unfounded.

And indeed, for all their talk of the Rule's purportedly drastic effects, neither the

Chamber nor Kentucky identifies any changes that will cause "certain and immediate" harm, as

required by the preliminary injunction standard. The Chamber relies on vague generalizations

about unspecified "delays and changed projects or activities," with no support. Chamber Mem. 24. And Plaintiffs cite no examples of any specific water or other location they claim would be newly covered by the Rule as compared to the pre-2015 framework.

The Chamber's cited declarations (at Chamber Mem. 22–24) and Kentucky's (Horne Decl.) lack any of the requisite specificity to show non-speculative, irreparable harm. They rely on the same two speculative, vague assertions. First, they claim they will "have to" hire consultants to determine the scope of jurisdiction under the Rule. *See* Heck Decl. ¶ 18; Mitchell Decl. ¶¶ 17–18; O'Bryan Decl. ¶ 16; Tollison Decl. ¶ 9; Durbin Decl. ¶ 13; Perry Decl. ¶ 10; Vincent Decl. ¶ 10; Watts Decl. ¶ 12; Horne Decl. ¶¶ 7–8. But in fact the Rule contains no such requirement. Instead, the Agencies offer jurisdictional determinations for free, just as they have done under the pre-2015 framework. *See* 88 Fed. Reg. at 3133–34. Should an entity choose to hire its own consultant, that is voluntary, and a party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted. *See* 11A Charles Allen Wright & Arthur R. Miller, *Fed. Prac. & Proc. Civ.* § 2948.1 (3d ed.).

Second, despite their professions that they do not know what the Rule covers, Plaintiffs' declarations claim without support that the Rule increases the amount of waters covered by the Act. *E.g.*, Heck Decl. ¶ 17; Tollison Decl. ¶ 12; Durbin Decl. ¶ 13; Perry Decl. ¶ 10; Horne Decl. ¶ 8. These assertions of an unspecified impact are far too vague and speculative to support an injunction. Moreover, they purport to compare the Rule to the now-vacated NWPR, rather than the relevant baseline for comparison, the pre-2015 framework currently in effect. Plaintiffs' unfounded speculation and lack of specificity doom their arguments because a preliminary injunction cannot issue for harm that is speculative or theoretical. *Sumner Cnty. Schs.*, 942 F.3d at 327.

Plaintiffs are also wrong about the Rule's impact. The Agencies' Economic Analysis compared the Rule to the pre-2015 regulatory framework and concluded that any jurisdictional change will be "*de minimis*" given the close similarities between the two. *See* 88 Fed. Reg. at 3139. Moreover, even if the Rule were later applied in a way that directly affected someone, such as a jurisdictional determination for a particular water, the affected person could challenge that agency action. *See U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016). But the vague generalizations offered here by Plaintiffs cannot support a preliminary injunction against the Rule.

The Plaintiffs cite compliance costs related to permitting, but that is a thin reed on which to base a claim of irreparable injury; the Sixth Circuit recently stated that compliance costs "maybe" do not qualify as irreparable harm at all, as other Circuits have specified. *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023) (collecting cases). At most, "the peculiarity and size of a harm affects its weight in the equitable balance." *Id*. Here, Plaintiffs make no attempt to quantify the "peculiarity" or "size" of their purported additional costs to comply with the Rule as compared to the pre-2015 framework's status quo.

Kentucky makes much of its concern for state sovereignty (Ky. Mot. 27–28) but makes no attempt to identify any water or land it claims will be newly protected under the Rule or to explain how any such protection would irreparably injure its sovereignty. That is unsurprising: By replacing a broader interstate commerce-based approach with the Supreme Court's relatively permanent and significant nexus standards, the Rule is actually "substantially *narrower* than the 1986 regulations." 88 Fed. Reg. at 3097 (emphasis added); *see also id.* at 3126 (providing examples from across the country of waters that would likely not be jurisdictional under the significant nexus standard).

Kentucky also asserts that the Rule will impose injurious costs, but its assertions are entirely generic and speculative. Ky. Mot. 28–29. Kentucky has not shown the Rule's greater clarity will impose any new, irreparably harmful compliance costs on the Commonwealth or attempted to quantify the increase in such purported costs over those of the existing regulatory framework. And if Kentucky is concerned about the purported (and wholly speculative) additional cost of implementing the Rule under the Act's delegated permitting program, it does not "have to" (Ky. Mot. 29)—Kentucky has no obligation to participate in that program. *See* 33 U.S.C. § 1342(c).

## II. The Balance of Harms and the Public Interest Strongly Disfavor an Injunction.

Blocking the Rule from taking effect would deprive Kentucky—and the nation, if the Chamber's motion were granted in full of the additional guidance and clarifying limitations and definitions the Rule provides, after years without a regulation that incorporates the Supreme Court's teachings from *Riverside Bayview*, *SWANCC*, and *Rapanos*. While the Rule largely maintains the status quo when it comes to the scope of jurisdiction, there is a significant benefit to the public in allowing an up-to-date rule implementing scientific consensus and Supreme Court case law to take effect.

The Chamber is misguided in citing the *Sackett* case pending before the Supreme Court (Chamber Mem. 25) as a reason to block the Rule. First, the Supreme Court granted certiorari on the proper test for jurisdiction over wetlands only. *Sackett v. EPA*, No. 21-454 (Jan. 24, 2022). Many of the arguments raised by Plaintiffs fall far outside the scope of that issue. Second, the Rule was adopted in significant part to incorporate Supreme Court precedent into the implementation of the Act, and the approach taken by the Agencies on a bipartisan basis for years—protecting those waters that significantly affect the chemical, physical, or biological

integrity of downstream navigable waters—is the same as that endorsed unanimously by the Supreme Court in *Riverside Bayview*. 474 U.S. at 134 ("the Corps' ecological judgment about the relationship between waters and their adjacent wetlands provides an adequate basis for a legal judgment" of Clean Water Act coverage).

The Chamber also resorts to sophistry by trying to use the fact that the Rule is substantially similar to the pre-2015 framework to claim there can be no harm to the Agencies or the environment from an injunction. Chamber Mem. 26. But of course, if the Rule had no effects, the Chamber could not be entitled to an injunction in the first place. In reality, the benefits of the Rule stem not from any expansion of jurisdiction but from its greater clarity on how the Agencies will assess whether certain waters are jurisdictional, ensuring a more standardized, defensible approach. Without the Rule, those waters will be protected less robustly.

As a result, the public would be worse off. For example, the Kentucky Resources Council's members use and enjoy streams and wetlands placed at risk by these challenges to the Rule, and the organization would have to divert its resources from other important efforts to protect the state's natural resources if the Rule were blocked. Wilmes Decl. (ECF 22-1) ¶¶ 11, 13. Conservation-based businesses that depend on robust Clean Water Act protections, like an ecotourism guide in South Carolina's Lowcountry, Roll Decl. (ECF 22-9) ¶¶ 10–11, and a mitigation fund that restores wetlands and streams, Butler Decl. (ECF 22-6) ¶¶ 14–15, would be placed at risk. For additional public harms, see also Int.-Def. Decls. (ECF 22-1 – ECF 22-15).

As Kentucky itself has told the Supreme Court, "[f]ederal regulation is particularly important because discharges into non-navigable tributaries or their adjacent wetlands in one State often affect the waters of a downstream State." Br. of States of New York et al. as Amici Curiae Supporting Respondents, *Rapanos v. United States*, 547 U.S. 715 (2006) (Nos. 04-1034,

04-1384), 2006 WL 139208, at *3 ("Ky. Amicus Br.") And while Kentucky tries to imply that its waters would "not necessarily lack environmental protections" absent the Rule (Ky. Mot. 30), Kentucky law does not allow the state to go beyond the protections of the Act—it requires state regulations to be "no more stringent than . . . federal law or regulations," Ky. Rev. Stat. Ann. § 13A.120(1)(a), (4); the same is true for its state environmental permits, *id.* § 224.16-050(4).

## III.    Plaintiffs Fail to Establish That They Are Likely to Prevail on the Merits.

Because the Rule respects the Agencies' authority under the Clean Water Act, the Administrative Procedure Act ("APA"), and the Constitution, Plaintiffs have not shown a likelihood of success on the merits of any of their claims—let alone a "strong" likelihood. *Leary*, 228 F.3d at 736.

### A.    The Rule is well within the Agencies' authority under the Clean Water Act.

#### 1.    The Rule's definition of "waters of the United States" is consistent with the text, history, interpretation, and implementation of the Act.

Plaintiffs' claim that the Rule "reads 'navigable' out of the Act" (Ky. Mot. 15; *see also* Chamber Mem. 14) is at odds with the text of the Act and with judicial precedent. It is settled law that "in enacting the Clean Water Act Congress intended to regulate at least some waters that are not navigable in the traditional sense." *Rapanos*, 547 U.S. at 767 (Kennedy, J., concurring); *see id.* at 731 (plurality opinion that "the Act's term 'navigable waters' includes something more than traditional navigable waters"). And it is settled science that achieving the Act's objective to "restore and maintain" the nation's waters requires protecting upstream waters that significantly affect their integrity. *See* 88 Fed. Reg. at 3029–33. Such an interpretation is "[c]onsistent . . . with the need to give the term 'navigable' some meaning." *Rapanos*, 547 U.S. at 779 (Kennedy, J., concurring). The significant nexus standard thus makes possible the protection of traditional navigable waters by preventing upstream pollution or destruction of waters that would degrade

them—while placing limits on how far the Agencies may reach towards that end. Indeed,
contrary to Plaintiffs' suggestions (Ky. Mot. 15; Chamber Mem. 14), the significant nexus
standard by its own terms prevents the assertion of jurisdiction over waters with a "remote" or
"insubstantial" effect on other covered waters. *See* 88 Fed. Reg. at 3120.

The Rule's coverage of interstate waters—consistent with over four decades of Agency
practice—likewise falls within the authority granted by Congress. The intrinsic federal interest in
waters that cross state boundaries was reflected in the predecessors to the Clean Water Act. As
the Agencies discussed in detail, the Water Pollution Control Act of 1948 made "interstate
waters" subject to abatement, with no requirement of navigability. 33 U.S.C. §§ 466a(d)(1),
466i(e) (1952); *see* 88 Fed. Reg. at 3073; Revised Definition of "Waters of the United States":
Resp. to Comments Doc. ("RTC") § 2, at 33–36, https://perma.cc/9FXJ-Z7BT. Congress's
subsequent amendment of the Water Pollution Control Act in 1961 extended jurisdiction to
"interstate or navigable waters." 33 U.S.C. § 466g(a) (1964). And then the 1972 Clean Water Act
defined "navigable waters" to mean "the waters *of the United States*, including the territorial
seas," 33 U.S.C. § 1362(7) (2018)—with no indication that Congress intended to restrict the
scope of protected waters under existing law. The most straightforward reading of Congress's
chosen language is that "of the United States" encompasses, at the very least, waters that cross
state boundaries—that is, interstate waters. *See* 88 Fed. Reg. at 3072–74.

The Agencies subsequently adopted regulations defining their jurisdiction under the Act
to cover "interstate waters," with no requirement that they be navigable-in-fact. 38 Fed. Reg.
13,528, 13,529 (May 22, 1973) (EPA); 42 Fed. Reg. 37,122, 37,127 (July 19, 1977) (Corps). The
Agencies have implemented that interpretation ever since, with the exception of the now-
invalidated NWPR. None of the Supreme Court's decisions over this period have limited the

Act's applicability to interstate waters based on navigability. *SWANCC*, cited by both Plaintiffs, dealt with wholly *intrastate* wetlands; it did not address interstate waters. *See SWANCC*, 531 U.S. at 170–71.

Protection of interstate waters is critical to controlling water pollution that crosses state boundaries. *See* RTC § 6, at 8, 10, https://perma.cc/6Y4D-QLEA. As states—including Kentucky—have long recognized, "the Clean Water Act's core provisions are the primary bulwark protecting downstream States from upstream water pollution." Ky. Amicus Br., 2006 WL 139208, at *14–15. Excluding from jurisdiction interstate waters not otherwise covered, on the other hand, would leave downstream communities and resources at the mercy of upstream actors, in contravention of the Act.

The Rule's continuation of the longstanding coverage of impoundments of "waters of the United States" is likewise faithful to the Act. Kentucky's suggestion (Ky. Mot. 16) that the Act should not cover impoundments unconnected to tributary networks, or waters separated by dams, would allow an actor to impound an otherwise jurisdictional stream, drying it up or otherwise removing the benefits it provided to indisputably federal waters downstream. That outcome would directly conflict with the Act's objective. *See S.D. Warren Co. v. Maine Bd. of Env't Prot.*, 547 U.S. 370, 379 n.5 (2006) ("[N]or can we agree that one can denationalize national waters by exerting private control over them."). Plaintiffs cannot prevail on this issue.

> **2.** **The Rule's articulation of the significant nexus standard is consistent with the text of the Clean Water Act and with Justice Kennedy's opinion in *Rapanos*.**

Plaintiffs collectively raise five objections to the Rule's interpretation of the significant nexus standard and its consistency with Justice Kennedy's concurring opinion in *Rapanos*. None is likely to succeed.

**First,** Kentucky takes issue with the Rule's adherence to the Agencies' longstanding practice of protecting wetlands that "significantly affect the chemical, physical, *or* biological integrity" of indisputably federal waters. Ky. Mot. 19. Kentucky argues, incorrectly, that Justice Kennedy's standard would have protected only wetlands that "significantly affect the chemical, physical, *and* biological integrity" of such waters. Not so. Failing to protect any of the three listed forms of integrity would contravene Congress's express intent. 88 Fed. Reg. at 3122; *cf. Cnty. of Maui*, 140 S. Ct. at 1477 (rejecting interpretation of Act that would have "consequences that are inconsistent with major congressional objectives"). As a case cited by Plaintiffs explained, "Justice Kennedy's test was quoting the language of the [Clean Water Act] . . . . He was not saying that all three conditions must be present for a significant nexus to exist. Such a reading would lead to absurd results inconsistent with the [Act] . . . ." *Georgia v. Wheeler*, 418 F. Supp. 3d 1336, 1369 (S.D. Ga. 2019). The error of Kentucky's position is further demonstrated by the functions that Justice Kennedy identified that could represent a significant nexus, including pollution trapping and filtering, flood control, and runoff storage—functions that do not necessarily affect all three aspects of integrity. *See Rapanos*, 547 U.S. at 775, 779 (Kennedy, J., concurring). For these reasons, even under the pre-2015 regulatory framework that Plaintiffs' motions aim to revive, the Agencies "appl[ied] the significant nexus standard in a manner that restores and maintains any of these three attributes of traditional navigable waters." *Rapanos* Guidance at 10 n.35.

**Second,** Kentucky asserts, without support, that the Rule's definition of "significantly affect" as requiring a "material influence" somehow "waters down" Justice Kennedy's standard. Ky. Mot. 19. But the requirement that a water have a "material influence" on the integrity of downstream waters merely adds precision to Justice Kennedy's requirement that an effect on

downstream waters be more than "speculative or insubstantial," *Rapanos*, 547 U.S. at 780 (Kennedy, J., concurring). The Agencies provide that precision by listing a finite set of functions and factors to be considered in determining whether a "material influence" exists and by requiring an explanation be provided as to why the subject water "matters" to the integrity of an indisputably federal water. 88 Fed. Reg. at 3067, 3088, 3119–30.

*Third,* the Chamber contends that allowing the Agencies to find a significant nexus by aggregating "similarly situated" waters in the region is improper. Chamber Mem. 15. But Justice Kennedy expressly directed the Agencies to consider whether the waters in question, "either alone *or in combination with similarly situated lands in the region*, significantly affect" the integrity of other covered waters. *Rapanos*, 579 U.S. at 780 (Kennedy, J., concurring) (emphasis added). Otherwise, downstream waters would suffer "death by a thousand cuts" from the destruction or contamination of wetlands that individually cannot be shown to have a significant nexus but that collectively are critical to downstream water quality. *See Precon Dev. Corp. v. U.S. Army Corps of Eng'rs*, 603 F. App'x 149, 152 (4th Cir. 2015); 88 Fed. Reg. at 3125–27. Accordingly, the Agencies have long considered similarly situated waters in the aggregate— including in the pre-2015 framework that Plaintiffs' motions seek to revive. *See Rapanos* Guidance at 8–10. The Rule's continuation of that practice is entirely consistent with Justice Kennedy's opinion.

*Fourth,* the Chamber erroneously claims that Justice Kennedy's significant nexus standard applies only to wetlands. Chamber Mem. 15–16. The Chamber seemingly ignores that the pre-2015 framework its motion seeks to revive similarly applied the significant nexus standard to waters beyond wetlands. *See Rapanos* Guidance at 8–12 (applying standard to tributaries). While Justice Kennedy's opinion discusses the standard primarily in the context of

wetlands adjacent to tributaries, his opinion addresses Clean Water Act jurisdiction over any "water" with a significant nexus. *Rapanos*, 547 U.S. at 759 (Kennedy, J., concurring) ("to constitute 'navigable waters' under the Act, *a water or* wetland must possess a 'significant nexus' to waters that are or were navigable in fact or that could reasonably be so made." (emphasis added)); *id.* at 767 ("[T]he connection between a nonnavigable *water or* wetland and a navigable water may be so close . . . , that the Corps may deem [it] a 'navigable water.'" (emphasis added)). This Court, like many others, has applied the significant nexus standard to tributaries, not merely to wetlands. *See United States v. Giles*, No. 3:16-cr-0004-GFVT-REW, 2016 WL 5867421, at *3 (E.D. Ky. Oct. 6, 2016) (finding that government provided sufficient evidence of "significant nexus" between tributary creek and navigable-in-fact river); *see also, e.g.*, *United States v. Robison*, 505 F.3d 1208, 1215–24 (11th Cir. 2007); *United States v. Moses*, 496 F.3d 984, 989–91 (9th Cir. 2007).

*Fifth,* the Chamber takes issue with the Rule's definition of the significant nexus standard as involving the consideration of functions and factors that Justice Kennedy did not specifically name in *Rapanos*. Chamber Mem. 16. But Justice Kennedy did not purport to provide an exclusive list; he identified "functions *such as* pollutant trapping, flood control, and runoff storage." *Rapanos*, 547 U.S. at 779–80 (Kennedy, J., concurring) (emphasis added). And the Corps regulation he cited, 33 C.F.R. § 320.4(b)(2) (2004), listed many more "functions important to the public interest" that wetlands provide than the Agencies now enumerate in the Rule. Nothing in Justice Kennedy's opinion precludes the Agencies from using their scientific and technical expertise to identify for regulators and the public alike a finite list of criteria they will consider in assessing whether a significant nexus exists—criteria that are grounded in the unrefuted scientific record and "readily understood." 88 Fed. Reg. at 3120.

3.    **The Rule's articulation of the relatively permanent standard adheres to the *Rapanos* plurality opinion.**

Kentucky's contention that the Rule "warps" the relatively permanent standard "beyond recognition" (Ky. Mot. 18) is without merit. The Rule's definition of "relatively permanent" as "encompass[ing] surface waters that have flowing or standing water year-round or continuously during certain times of the year," 88 Fed. Reg. at 3084, follows from the *Rapanos* plurality's recognition that "relatively permanent" waters do "not necessarily exclude streams, rivers, or lakes that might dry up in extraordinary circumstances, such as drought," or "*seasonal* rivers, which contain continuous flow during some months of the year but no flow during dry months." *Rapanos*, 547 U.S. at 732 n.5 (emphasis in original). The Agencies also clarified that their definition does *not* include waters that flow "for only a short duration in direct response to precipitation," 88 Fed. Reg. at 3084—again, consistent with the *Rapanos* plurality opinion. *See Rapanos*, 547 U.S. at 739 (rejecting application of "waters of the United States" to "channels that periodically provide drainage for rainfall").

While the Agencies' interpretation of the standard largely mirrors the pre-2015 framework, *see Rapanos* Guidance at 6–7, the Agencies explained that they did not retain the *Rapanos* Guidance's interpretation of "relatively permanent" waters to include those that flow "year-round or at least seasonally (e.g., typically three months)," because relying on a uniform minimum flow duration would fail to account for substantial regional variation based upon climate, hydrology, topography, soils, and other conditions. 88 Fed. Reg. at 3085–86; RTC § 13, at 14–17, https://perma.cc/G7YQ-YF42.[3] This determination falls squarely within the Agencies'

---

[3] Contrary to Kentucky's representation, the Rule does not say that "[e]ven tributaries that 'may run dry [for] years' may be jurisdictional." Ky. Mot. 19 n.13 (substitution in original). The Rule says that flow-altered tributaries that typically flow throughout the spring "may run dry *in* years

scientific and technical expertise. *See St. Marys Cement Inc. v. EPA*, 782 F.3d 280, 286 (6th Cir. 2015) ("[W]e are at our 'most deferential' when 'reviewing an agency's scientific determinations' about issues within its expertise") (quoting *Ky. Res. Council, Inc. v. EPA*, 467 F.3d 986, 991 (6th Cir. 2006)). It also adheres to the Supreme Court's rejection of bright-line rules that have consequences that are inconsistent with major congressional objectives. *See Cnty. of Maui*, 140 S. Ct. at 1477.

### 4.     The Rule does not implicate the major questions doctrine.

Plaintiffs contend that the Rule asserts "regulatory power over a 'significant portion of the American economy'" without a "'clear congressional authorization,'" in violation of the major questions doctrine. Ky. Mot. 20; *see also* Chamber Mem. 13–14. But a "major questions case," as described by the Supreme Court, is one in which an agency "'claim[s] to discover in a long-extant statute an unheralded power' representing a 'transformative expansion in [its] regulatory authority.'" *West Virginia v. EPA*, 142 S. Ct. 2587, 2610 (2022). Because the Rule involves neither an "unheralded power" nor a "transformative expansion," the major questions doctrine is not implicated here.

First, the Supreme Court has not merely affirmed the Agencies' authority to issue regulations defining "waters of the United States," but urged the Agencies to do so. *See Riverside Bayview*, 474 U.S. at 134 (noting that Congress delegated a "breadth of federal regulatory authority" and tasked the Agencies with the "inherent difficulties of defining precise bounds of regulable waters"); *accord Rapanos*, 547 U.S. at 758 (Roberts, C.J., concurring). Defining the scope of Clean Water Act jurisdiction draws directly on the Agencies' scientific and

---

following a drought" while storage reservoirs are being refilled, and would not necessarily be excluded on that basis, 88 Fed. Reg. at 3085(emphasis added)—as even the *Rapanos* plurality acknowledged. *See Rapanos*, 547 U.S. at 732 n.5.

technical expertise. Indeed, no court reviewing the Agencies' three prior rules—in 2015, 2019, or 2020—has suggested that the rulemakings were novel exercises of the Agencies' authority.

Further, the Rule issued by the Agencies is no "transformative expansion." As discussed above, *see supra* at 4, the Rule embodies the regulatory framework that the Agencies have implemented for decades, with modest updates to reflect relevant Supreme Court precedent and the Agencies' experience implementing the pre-2015 framework. 88 Fed. Reg. at 3019. Whereas the Supreme Court in *West Virginia* found EPA's adoption of the Clean Power Plan to be a "fundamental revision" of the Clean Air Act, 142 S. Ct. at 2612, the Rule represents nothing of the sort. And because the Rule codifies a regulatory framework with *de minimis* differences from the existing framework, its economic impact is minimal. *See* 88 Fed. Reg. at 3139 (reporting conclusion of Agencies' Economic Analysis). The major questions doctrine does not apply.

**B.    The Rule was adopted in accordance with the Administrative Procedure Act.**

**1.    The Agencies provided ample, reasoned explanation for the modest changes they made to the pre-2015 regulatory framework.**

As the Chamber acknowledges (Chamber Mem. 7), applying the Act to protect waters that significantly affect the integrity of other jurisdictional waters is hardly a novel approach. Yet the Chamber claims that the Rule's articulation of the significant nexus standard "introduces a substantially different regime" for determining Clean Water Act jurisdiction without acknowledging the change or providing a reasoned explanation. *Id.* at 17.

The Chamber is thus left to flyspeck three elements of the Rule's articulation of the significant nexus standard that it contends expand the Agencies' authority. But in reality, each element represents either no change at all or a modest change that *limits* the Agencies' authority as compared to the pre-2015 framework. In any event, each element is supported by the Agencies' extensive and reasoned explanation, satisfying their obligations under *Motor Vehicle*

*Manufacturers Ass'n of the United States, Inc. v. State Farm Mutual Insurance Co.*, 463 U.S. 29 (1983), and leaving the Chamber unlikely to prevail on this issue.

    ***First,*** the Chamber wrongly suggests that the Rule's definition of "significantly affect" as a material influence on the "chemical, physical, *or* biological integrity" of indisputably federal waters is a change from the pre-2015 regulatory framework. Chamber Mem. 18. It is not. *See* 88 Fed. Reg. at 3122; RTC § 12, at 13–14, https://perma.cc/UG6D-JM7U; *see also supra* at 13. The *Rapanos* Guidance made clear that "EPA and the Corps will apply the significant nexus standard in a manner that restores and maintains *any* of these three attributes of traditional navigable waters." *Rapanos* Guidance at 10 n.35 (emphasis added).

    ***Second***, the Chamber argues that the Rule's enumeration of the five functions and five factors that the Agencies will consider in making significant nexus determinations "grant the Agencies significant subjectivity" that the Agencies failed to acknowledge. Chamber Mem. 18. But the Chamber has it exactly backwards. Prior to the Rule, the Agencies publicly identified a non-exclusive list of functions and factors they considered as part of a significant nexus analysis. *See Rapanos* Guidance at 8, 9. In the Chamber's own words, "[t]here has been widespread agreement that the Guidance did not provide stakeholders with sufficient guidance." Chamber Mem. 7. By identifying in the text of the Rule a finite list of functions and factors that Agency personnel will consider going forward, the Agencies have cabined the discretion; Agency personnel previously had in evaluating potential "waters of the United States."

    In any event, the Agencies openly acknowledged that it was newly including these functions and factors in the regulatory definition of "waters of the United States," and provided a reasoned explanation for doing so: to "provide[] regulators and the public with a clear framework for the significant nexus analysis that will be done on a case-specific basis under the rule." 88

Fed. Reg. at 3119; *see also id.* at 3124 (stating such a list "would promote clarity and implementation consistency"). The Agencies proceeded to explain the basis for the particular functions and factors they selected, *id.* at 3119–20, 3123–25; provided additional detail as to how each factor would be considered and then applied that detail to the list of functions, *id.* at 3120; and identified the two factors (distance from the indisputably federal water and hydrology) that would be given the greatest weight, *id.* As a further limit on their discretion, the Agencies even specified the important functions provided by waters that the Agencies will *not* consider when making jurisdictional decisions under the Rule, including carbon sequestration, provision of habitat for non-aquatic species such as migratory birds, soil fertility, and recreational value. *Id.* at 3125. The Agencies' identification of factors and functions they will consider in implementing the significant nexus standard does not violate the APA.

**Third,** the Agencies expressly acknowledged a change in their definition of "intrastate lakes and ponds, streams, or wetlands" not otherwise covered by the Rule, which the Agencies refer to as "paragraph (a)(5) waters." *Id.* at 3020. The pre-2015 regulations gave the Agencies "broad" authority over such waters where their use, degradation, or destruction could affect interstate or foreign commerce—including, for example, waters from which fish could be taken and sold in interstate commerce. 88 Fed. Reg. at 3097; 33 C.F.R. § 328.3(a)(3) (2014). The Rule, in contrast, is "substantially narrower," removing the broad interstate commerce basis for jurisdiction and instead asserting authority over only those waters that meet either the relatively permanent standard or significant nexus standard for protecting downstream water quality. 88 Fed. Reg. at 3097.[4]

---

[4] Further narrowing the Agencies' authority in this area, the Rule eliminates jurisdiction over tributaries and adjacent wetlands based on their connection to paragraph (a)(5) waters, and

In sum, because the Chamber has not shown that the Agencies changed their interpretation of the significant nexus standard without providing a reasoned explanation, the Chamber cannot prevail on this APA claim.

### 2. The Rule's definition of "significantly affect" as having a "material influence" is a logical outgrowth of the Agencies' proposal.

The Chamber's objection that the Agencies failed to provide adequate notice that they were considering changes to the proposed definition of "significantly affect" (Chamber Mem. 20–21) is also unlikely to succeed. One of the central purposes of the APA's required notice-and-comment period is to allow an agency to reconsider and, if necessary, revise the proposed rule based on the comments it receives. *Ass'n of Battery Recyclers, Inc. v. EPA*, 208 F.3d 1047, 1058–59 (D.C. Cir. 2000). For an agency to satisfy the APA, the final rule must merely be a "logical outgrowth" of the proposed rule. *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007). A final rule is a logical outgrowth of a proposed rule if "interested parties should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period." *Clean Air Council v. Pruitt*, 862 F.3d 1, 10 (D.C. Cir. 2017).

Here, the Agencies provided notice not only that they proposed to define "significantly affect" to mean "more than speculative or insubstantial effects," 86 Fed. Reg. 69,372, 69,449 (Dec. 7, 2021), but also that they were considering changes to their proposed definition, such that interested parties should reasonably have anticipated a possible change. In the preamble to the proposed rule, the Agencies specifically solicited comment on the definition's list of factors to be considered, *id.* at 69,430, 69,431, 69,438; on whether the definition should also include a list of

---

eliminates jurisdiction by rule over impoundments of paragraph (a)(5) waters—two features of the regulations underlying the pre-2015 framework. 88 Fed. Reg. at 3098.

functions of upstream waters to be assessed, *id.* at 69,431, 69,438; and on whether the agencies should consider other approaches to implementing the significant nexus standard, including whether any regulatory clarifications were needed to improve implementation, *id.* at 69,438.

And, in fact, many commenters—including Plaintiff U.S. Chamber of Commerce itself—responded by weighing in on this precise topic. *See* Comments of U.S. Chamber of Commerce at 7 (Feb. 7, 2022), https://perma.cc/EN9V-EZ9K; 88 Fed. Reg. at 3121–22 (summarizing comments on proposed definition of "significantly affect"). Such comments that address a specific issue provide evidence that an agency's notice was adequate, by demonstrating that interested parties understood that the issue was under consideration. *See Miami-Dade Cnty. v. EPA*, 529 F.3d 1049, 1059 (11th Cir. 2008).

Finally, the Agencies responded to the comments it received on this issue by incorporating a more precise definition of "significantly affect" into the final rule that requires the demonstration of a "material influence." 88 Fed. Reg. at 3119–21. The Sixth Circuit has declined to set aside an agency regulation where the agency notified interested parties of the substance of the proposal and the final regulation "did not embrace any major subjects that were not described" in the proposal. *See Chrysler Corp. v. Dep't of Transp.*, 515 F.2d 1053, 1061 (6th Cir. 1975). The Agencies have similarly met their notice-and-comment obligations here.

### C.  The Rule Is Constitutional.

The Chamber does not contend that the Rule violates the Constitution; Kentucky does. Ky. Mot. 17–18, 22–26. But Kentucky is wrong: the Rule stops far short of the outer limits of the Agencies' Commerce Clause authority, it is consistent with the Tenth Amendment, and it provides fair notice to affected parties as required by the Due Process Clause.

**1.      The Rule is authorized by the Commerce Clause.**

Kentucky claims that the Rule cannot constitutionally protect intrastate, non-navigable waters. Ky. Mot. 17–18. But water pollution is "a direct threat to navigation." *United States v. Ashland Oil & Transp. Co.*, 504 F.2d 1317, 1325 (6th Cir. 1974). And courts have long affirmed that Congress has "the authority to regulate nonnavigable waters when that regulation is necessary to achieve Congressional goals in protecting navigable waters." *United States v. Deaton*, 332 F.3d 698, 707 (4th Cir. 2003) (collecting cases); *see also Oklahoma ex rel. Phillips v. Guy F. Atkinson Co.*, 313 U.S. 508, 525 (1941) ("There is no constitutional reason why Congress cannot under the commerce power treat the watersheds as a key to flood control on navigable streams and their tributaries."). Federal authority over interstate waters, without regard to navigability, is equally well-established. *See, e.g.*, *Illinois v. City of Milwaukee*, 406 U.S. 91, 105 (1972) ("Rights in interstate streams, like questions of boundaries, 'have been recognized as presenting federal questions.'"). Congress may regulate waters that significantly affect navigable and interstate waters, lest those channels of commerce become "a mere conduit for upstream waste" that "is an obvious hazard to navigation which Congress has every right to seek to abate under its interstate commerce powers." *Ashland Oil*, 504 F.2d at 1326.

Kentucky's suggestion that the Rule unlawfully covers an isolated "small farm pond" (Ky. Mot. 18) is incorrect. The only ponds covered by the Rule are those that meet the relatively permanent or significant nexus standard, meaning there is an adequate Commerce Clause basis for jurisdiction over them. As for farm ponds, the Rule specifically excludes artificial ponds created in dry land and used for agricultural purposes. 88 Fed. Reg. at 3103. And discharges "for the purpose of construction or maintenance of farm or stock ponds" are excluded from the Act's Section 404 requirements. 33 U.S.C. § 1344(f)(1)(C).

## 2.     The Rule is consistent with the Tenth Amendment.

Kentucky's Tenth Amendment claim (Ky. Mot. at 22–23) falls along with its Commerce Clause claim. *See United States v. Mussari*, 95 F.3d 787, 791 (9th Cir. 1996) ("If . . . Congress acts under one of its enumerated powers—here, its power under the Commerce Clause—there can be no violation of the Tenth Amendment."). Moreover, the Clean Water Act preserves a state's authority to regulate pollution within its borders, rather than eliminating it. *See, e.g.*, 33 U.S.C. § 1370(1).

Rather than acknowledge the weight of this authority, Kentucky alters a quote from *SWANCC* to make it seem as if federal jurisdiction over any "pond" would violate the Tenth Amendment. Ky. Mot. 22–23. But the Supreme Court actually said that "federal jurisdiction over ponds . . . *falling within the 'Migratory Bird Rule'*" would impinge upon state powers. *SWANCC*, 531 U.S. at 174 (emphasis added). The Court did not reject the Act's application to waters based on their effects on the integrity of downstream waters; indeed, it has never done so.

## 3.     The Rule provides fair notice under the Due Process Clause.

The Rule provides the public with more clarity, guidance, and definitions than does the pre-2015 framework it replaces. Yet Kentucky claims the Rule is too vague to provide the fair notice required by the Due Process Clause. The vagueness doctrine allows "flexibility and reasonable breadth, rather than meticulous specificity." *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972). The test is whether a person of common intelligence has a reasonable opportunity to know what is prohibited and need not guess. *Kolender v. Lawson,* 461 U.S. 352, 357 (1983). "[A] regulation is not vague because it may at times be difficult to prove an incriminating fact but rather because it is unclear as to what fact must be proved." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). That is not the case here. The Rule puts the

regulated public on reasonable notice of the relevant factors and types of waters covered by the Act, based on scientifically supported, objective measures present on the landscape. The Rule provides more than "minimal guidelines" that constrain agency staff in exercising their discretion. *Kolender,* 461 U.S. at 358.

Kentucky misleadingly complains that the Rule "does not define 'similarly situated' or 'in the region,'" and that the term "material influence" is supposedly "nebulous" (Ky. Mot. 25), when in fact the Rule amply discusses these terms, clarifying what constitutes "material influence" (including examples of situations that do not meet this standard, 88 Fed. Reg. at 3121) and explaining "similarly situated" waters "in the region" (providing illustrative examples taken from the scientific record, *id.* at 3125–27).

Kentucky likewise charges that the Rule's protection of adjacent wetlands "neighboring" other jurisdictional waters is too broad. Ky. Mot. 24. But for decades the Clean Water Act has been applied to protect more than just wetlands directly touching other jurisdictional waters. The regulation examined in *Riverside Bayview* protected wetlands "in reasonable proximity" to other jurisdictional waters, and the Corps' approach was endorsed unanimously by the Supreme Court. *Riverside Bayview*, 474 U.S. at 134 (quoting 42 Fed. Reg. at 37,128). The Rule lays out the longstanding criteria for assessing adjacent wetlands, which are grounded in science and the law. 88 Fed. Reg. at 3117–19. Its approach is nothing new, and it provides adequate notice.

## CONCLUSION

For the reasons set forth herein, Plaintiffs' Motions for Preliminary Injunction should be denied.

Respectfully submitted this 3rd day of March 2023.

/s/ Mark Sabath
Mark Sabath*
Southern Environmental Law Center
122 C Street NW, Suite 325
Washington, DC 20001
(434) 977-4090
msabath@selcva.org

Nicholas S. Torrey*
Kelly F. Moser*
Southern Environmental Law Center
601 West Rosemary Street, Suite 220
Chapel Hill, NC 27516
(919) 967-1450
kmoser@selcnc.org
ntorrey@selcnc.org

Megan Hinkle Huynh*
Southern Environmental Law Center
Ten 10th Street NW, Suite 1050
Atlanta, GA 30309
(404) 521-9900
mhuynh@selcga.org

*Counsel for the Conservation Groups*
*Pro hac vice applications pending*

/s/ Ashley Wilmes
Ashley Wilmes
Tom FitzGerald
Kentucky Resources Council, Inc.
PO Box 1070
Frankfort, Kentucky 40602
(502) 875-2428
ashley@kyrc.org
fitzkrc@aol.com

*Counsel for Kentucky Resources Council, Inc.*