UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
FRANKFORT DIVISION
CIVIL ACTION NO. 3:23-cv-00007-GFVT (lead case,
consolidated with No. 3:23-cv-00008-GFVT)

| | |
|---|---|
| COMMONWEALTH OF KENTUCKY; | ) |
| KENTUCKY CHAMBER OF COMMERCE; | ) |
| CHAMBER OF COMMERCE OF THE | ) |
| UNITED STATES OF AMERICA; | ) |
| ASSOCIATED GENERAL CONTRACTORS OF | ) |
| KENTUCKY, INC.; | ) |
| HOME BUILDERS ASSOCIATION OF KENTUCKY; | ) |
| PORTLAND CEMENT ASSOCIATION; and | ) |
| GEORGIA CHAMBER OF COMMERCE, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES ENVIRONMENTAL PROTECTION | ) |
| AGENCY, ET AL., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**PRIVATE-SECTOR PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR A PRELIMINARY INJUNCTION**

## INTRODUCTION

The story that Defendants ("the Agencies") tell is that the Final Rule[1]—which went through twelve months of development, occupies 141 pages in the Federal Register, was rushed out to beat a decision in *Sackett v. EPA*, 142 S. Ct. 896 (certiorari granted Jan. 18, 2022), and is being defended vigorously by the Department of Justice in this Court and two others—does essentially nothing and therefore need not be temporarily paused. But the White House does not take such a modest view of the rule. In "strongly oppos[ing]" a Congressional Review Act resolution that would disapprove the Final Rule, the Administration asserted Monday that the rule "reestablishes critical protections for the nation's vital water resources" and provides "appropriate updates" to prior regulations.[2] And ultimately the Agencies, too, admit to (though grossly understate) the very real changes to the status quo—including more jurisdictional waters and new compliance costs—accomplished by the rule. Despite the rhetoric, there is no serious dispute that Private-Sector Plaintiffs,[3] whose members are subject to the Final Rule, have standing and will suffer irreparable harm if a preliminary injunction is not issued to preserve the status quo.

The main disputed question—as is often true on a motion for preliminary injunction—is whether Private-Sector Plaintiffs have shown the adequate likelihood of success on the merits.

---

[1] Revised Definition of "Waters of the United States," 88 Fed. Reg. 3004 (Jan. 18, 2023).

[2] Executive Office of the President, Office of Management and Budget, Statement of Administration Policy on H.J. Res. 27 – Providing for congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by the Department of the Army, Corps of Engineers, Department of Defense and the Environmental Protection Agency relating to "Revised Definition of 'Waters of the United States'" (Mar. 6, 2023), https://www.whitehouse.gov/wp-content/uploads/2023/03/HJ-Res-27-SAP.pdf ("Statement of Administration Policy").

[3] Private-Sector Plaintiffs are Kentucky Chamber of Commerce, Chamber of Commerce of the United States of America, Associated General Contractors of Kentucky, Inc., Home Builders Association of Kentucky, Portland Cement Association, and Georgia Chamber of Commerce. Their opening memorandum (ECF No. 18) will be cited to herein as "Mem."

They have. The Final Rule is unlawful: It reads the word "navigable" out of the statute, is inconsistent with the outer limits on Clean Water Act (CWA) jurisdiction described in Justice Kennedy's opinion in *Rapanos v. United States*, 547 U.S. 715 (2006), and fails to comply with the notice-and-comment requirements of the Administrative Procedure Act (APA).

Furthermore, the truth is that the Final Rule vastly expands federal jurisdiction beyond the regime currently in place, exceeding the Agencies' statutory authority under each of two relevant clear-statement rules. Among other things, the Final Rule creates a test for asserting jurisdiction over *an entire category of intrastate waters* that the Agencies admit they have not been treating as jurisdictional under the status quo regime. And the Agencies' refusal to acknowledge the Final Rule's real effect is the definition of arbitrary and capricious rulemaking.

This Court should leave the status quo in place while this litigation proceeds.

## ARGUMENT

### I.   Private-Sector Plaintiffs have standing to challenge the Final Rule.

The Agencies turn first to standing, as the government usually does, but it is not the escape hatch they are searching for.

> An association has standing to bring suit on behalf of its members when [1] its members would otherwise have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim requested nor the relief requested requires the participation of individual members in the lawsuit.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 181 (2000). The first requirement—the only one the Agencies challenge—calls for "at least one member with standing." *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555 (1996). Here, Private-Sector Plaintiffs have pointed to several.

Under long-standing precedent, the standing of each identified member is "'self-evident.'" *Bonacci v. Transp. Sec. Admin.*, 909 F.3d 1155, 1159 (D.C. Cir. 2018). "The Supreme

Court has stated that 'there is ordinarily little question' that a regulated individual or entity has standing to challenge an allegedly illegal statute or rule under which it is regulated." *State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 53 (D.C. Cir. 2015) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-62 (1992)). Private-Sector Plaintiffs' members are indisputably regulated under the Final Rule, which defines the scope of jurisdictional waters and wetlands that the declarants cannot dredge, fill, or discharge into without a permit.[4] That is the end of the analysis.

This case is nothing like *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), on which the Agencies rely. The Court there found the plaintiffs' argument—that as U.S. citizens they would possibly be subject to a law permitting surveillance of non-U.S. citizens—depended on a "highly attenuated chain of possibilities." *Id.* at 410. No such speculation is present here, because Private-Sector Plaintiffs' members are indisputably the object of the Final Rule.

The Agencies also incorrectly argue that Private-Sector Plaintiffs' members lack standing because they "have always faced the prospect of having their property subject to CWA jurisdiction." Opp. 19 (ECF No. 31). "[T]he differences between the challenged Rule and the status quo are small," the Agencies claim, "and no party has shown any harm arising out of these small differences." *Id.* at 2. But courts have explained that "[s]tanding does not work that way," rejecting the notion that "injury-in-fact [must be traced to] a change in the status quo ante." *Rice v. Vill. of Johnstown, Ohio*, 30 F.4th 584, 592 (6th Cir. 2022). Even if the Final Rule simply reaffirmed the previous regulatory regime (which it does not), Private-Sector Plaintiffs' members

---

[4] *See* Mitchell Decl. ¶ 8 (ECF No. 17-1) (member's "multi-year history with the definition of 'waters of the United States'"); Heck Decl. ¶ 8 (ECF No. 17-1) (member has worked on nationwide and individual permits since 1999); O'Bryan Decl. ¶¶ 10–11 (ECF No. 17-1) (Agencies have previously asserted that certain farming activities on declarant's farms were conducted in jurisdictional waters; declarant has had to obtain permits, pay fines, and perform remedial work); Tollison Decl. ¶ 7 (ECF No. 17-1) (significant experience seeking CWA jurisdictional determinations and permits).

still have standing to seek relief from aspects of the rule that they believe are unlawful.[5] The Agencies may argue that the rule is (and has been) lawful. That argument, however, "goes not to standing," but to the merits." *Nat'l Wildlife Fed'n v. Hodel*, 839 F.2d 694, 713 (D.C. Cir. 1988).[6]

In any event, Private-Sector Plaintiffs have identified significant changes from the status quo that harm their members. Key changes include:

- The creation, in paragraph (a)(5), of a test for asserting jurisdiction over *an entire category of intrastate waters* that the Agencies have not been treating as jurisdictional under the status quo regime. As the Agencies themselves explain, paragraph (a)(5)—setting forth a new test for "[i]ntrastate lakes and ponds, streams, or wetlands"—is meant to cover those "water types previously listed in paragraph (a)(3) of the 1986 regulations," 88 Fed. Reg. at 3098, and over which "the [A]gencies *have not in practice asserted jurisdiction* . . . under the pre-2015 regulatory regime" for the last two decades, *id.* at 3102–03 (emphasis added).

- The application of a significant nexus test to this new category of waters, 33 C.F.R. § 328.3(a)(5), whereas a previous significant nexus test was applied only

---

[5] *Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 441 (D.C. Cir. 1998) (en banc) ("The proper comparison for determining causation [for standing] is not between what the agency did and the status quo before the agency acted. Rather, the proper comparison is between what the agency did and what the plaintiffs allege the agency should have done under the statute.").

[6] *National Association of Home Builders v. EPA*, 667 F.3d 6 (D.C. Cir. 2011), cited by the Agencies (Opp. 19), does not say anything different. The problem there was not the absence of any change from the status quo, but rather that the plaintiff had no actual complaint about the challenged action—a site-specific determination that parts of the Santa Cruz River constitute traditional navigable waters. The court found the plaintiff "does not here contest" the "only issue . . . in fact resolved" by the government. *Id.* at 13. The same is true of *New England Power Generators Ass'n, Inc. v. FERC*, 707 F.3d 364 (D.C. Cir. 2013), which the Agencies claim (Opp. 14) is about irreparable harm but in fact addresses Article III standing. The court there found no "injury legitimately traceable to the order" because the plaintiff had achieved "its desired outcome." *Id.* at 369. By contrast, Private-Sector Plaintiffs are challenging numerous legal defects in the Final Rule that harm them and their members.

to non-navigable tributaries and wetlands adjacent thereto, U.S. Envtl. Prot. Agency & U.S. Army Corps of Eng'rs, Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in *Rapanos v. United States* & *Carabell v. United States* (Dec. 2, 2008) (Rapanos Guidance) at 1.[7]

- The expansion of the term "similarly situated" from meaning only "all wetlands adjacent to the same tributary," *id.* at 8, to meaning all "waters . . . within the catchment area of the tributary of interest," 88 Fed. Reg. at 3097.

- The redefinition of the term "significantly affect" to mean "material influence," 33 C.F.R. § 328.3(c)(6), and the changing of the phrase "chemical, physical *and* biological integrity," Rapanos Guidance at 1 (emphasis added), to "chemical, physical, *or* biological integrity," 33 C.F.R. § 328.3(c)(6) (emphasis added).

- The adoption of a novel list of "[f]unctions" and "[f]actors" as part of the Final Rule's significant nexus test, 33 C.F.R. § 328.3(c)(6)(i), (ii).

All of these changes have harmed Private-Sector Plaintiffs' members, as the members must now seek to comply with them.[8]

Ultimately, the Agencies grudgingly admit that the Final Rule does change the status quo, *see*, *e.g.*, Opp. 20 ("slight differences between the status quo and the new Rule"); *id.* at 21, 32 (same), that there will be an uptick in jurisdictional waters, *id.* at 12 ("slight and unquantifiable increase"), and that these changes will result in compliance costs, *id.* at 13 ("*de minimis* costs"). They merely quarrel (incorrectly) over the magnitude and aggregate effect of the changes.

---

[7] The Rapanos Guidance is available at https://www.epa.gov/sites/default/files/2016-02/documents/cwa_jurisdiction_following_rapanos120208.pdf.

[8] Private Sector Pls.' Compl. (Compl.) ¶¶ 31–42 (ECF No. 1 in consolidated case No. 3:23-cv-00008-GFVT); Baer Decl. ¶ 10; Durbin Decl. ¶ 13; Heck Decl. ¶ 17; Mitchell Decl. ¶¶ 13–18; O'Bryan Decl. ¶ 16; Perry Decl. ¶ 10; Sanford Decl. ¶¶ 8–9; Stout Decl. ¶ 10; Tollison Decl. ¶¶ 10–11; Vincent Decl. ¶¶ 10–11; Watts Decl. ¶ 12 (ECF No. 17-1).

Indeed, even if the Final Rule only "codified" the status quo (which it does not), that would still be a change (and a substantial one) from the regulations currently in effect. As the Agencies explain, the "'status quo regime'" is the 1986 Regulations as interpreted by the Rapanos Guidance. *Id.* at 6. But that Guidance is, and has always been, just that: guidance. By its terms, it "does not impose legally binding requirements on EPA, the Corps, or the regulated community," and "interested persons [have remained] free to raise questions about the appropriateness of the application of th[e] guidance to a particular situation." Rapanos Guidance at 4 n.17. So to the extent the Final Rule "codifies" regulatory concepts and approaches (*e.g.*, application of relatively permanent and significant nexus tests) that previously were described in guidance, the rule now makes them legally binding. *See Sierra Club v. EPA*, 873 F.3d 946, 951 (D.C. Cir. 2017) (guidance differs from legislative rules because it is non-binding). A rule that "sets the bounds for what activities are regulated," Statement of Administration Policy, is far different from agency guidance that, by definition, cannot impose any such bounds.[9]

## II.   Private-Sector Plaintiffs have shown irreparable harm.

For similar reasons, there is little question that Private-Sector Plaintiffs' members will suffer irreparable harm if the Final Rule takes effect on March 20. Those members are currently working on land with potentially jurisdictional water features, or have plans to imminently do so, and thus will need to take immediate steps to comply—either by incurring costs to apply the Final Rule or by suffering the consequences of delaying or changing the scope of their work. Heck Decl. ¶¶ 17–18; Mitchell Decl. ¶¶ 13–18; Stout Decl. ¶ 10; Tollison Decl. ¶¶ 10–

---

[9] Defendants claim that two of the six Private-Sector Plaintiffs lack standing because neither identified a member with standing. But where a group of plaintiffs seek the same relief, only one plaintiff needs to demonstrate standing. *Mays v. LaRose*, 951 F.3d 775, 782 (6th Cir. 2020) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 & n.9 (1977)). Here, several plaintiffs have done so. Moreover, the Commonwealth of Kentucky has shown its own independent standing, as it explains in its reply brief.

11. Indeed, some have pending permit applications or active disputes with regulators. Heck Decl. ¶ 11–13; O'Bryan Decl. ¶ 16. The Agencies concede, as they must, that this Court and the Sixth Circuit have already held that such compliance costs constitute irreparable harm. Opp. 15–16 (acknowledging *Kentucky v. Biden*, 571 F. Supp. 3d 715, 734 (E.D. Ky. 2021), *aff'd as modified sub nom. Commonwealth v. Biden*, 57 F.4th 545 (6th Cir. 2023)).

The Agencies try unsuccessfully to evade this straightforward logic by arguing that the compliance costs of Private-Sector Plaintiffs' members are not due to any changes from the status quo. *See, e.g.*, Opp. 12 (asserting that compliance costs are not "*because of* the Rule" (emphasis in original)); *id.* (costs "stem not from the Rule, but from the status quo regime").[10] The implication appears to be that the compliance costs would be incurred even if the Final Rule is paused. But as discussed above, Private-Sector Plaintiffs have identified changes from the status quo with which their members must newly comply. *See supra* pp. 4–5. And in tension with their own argument, even the Agencies ultimately agree that the Rule extends jurisdiction to more waters than are jurisdictional under the current regime. Opp. 12.

The Agencies next contend that in the aggregate, they expect only "'a slight and unquantifiable increase'" in water features found to be jurisdictional. *Id.* For the reasons explained below, *infra* Part III.B.1, this assertion fails scrutiny. But even if true, a small projected *overall* increase in jurisdictional waters does not translate to a small increase in compliance costs. From the standpoint of an individual regulated entity, there is no change in what that specific entity actually needs to do to comply. And it still faces the same steep civil and criminal penalties that are imposed for non-compliance.

---

[10] *See also id.* at 12 n.3 ("Plaintiffs are already subject to these regulatory conditions under the current regulatory regime"); *id.* at 14 ("the Rule is largely the same as the status quo"); *id.* at 15 (alleged harms "not grounded in actual substantive changes made by the Rule").

The Agencies further argue that the Corps provides jurisdictional determinations free of charge. Opp. 29. But that is a misleading argument at best. *See, e.g.*, *U.S. Army Corps of Engineers v. Hawkes Co.*, 136 S. Ct. 1807, 1813, 1815-16 (2016) (Corps "demanded" that "if they wished to pursue their application," private parties "would have to submit" analyses estimated to cost "more than $100,000"). The availability of "free" JDs does not eliminate compliance costs. As the Agencies have acknowledged, seeking a JD takes time, unless (and perhaps even if) the applicant is willing to enlist environmental consultants to speed things up. For example, the JD request form for the Corps' Charleston District states repeatedly that "[i]t is . . . recommended that submissions be prepared and submitted by an environmental consultant" and that doing so "will significantly expedite the review process."[11] The Final Rule says: "A landowner may choose to hire an environmental consultant who can assist by providing site evaluation information and data collection, thereby supporting a more efficient process." 88 Fed. Reg. at 3134. In short, an applicant faces a Hobson's choice of costs. It can either suffer the myriad consequences of delaying its project indefinitely until the Corps does all the work, or pay for consultants to try to hurry the lengthy process along.

Finally, were there any remaining doubt about irreparable harm, it should be dispelled by the Final Rule's declaration that the Agencies will not honor approved JDs ("AJDs") made under the 2020 Rule—a significant departure from prior practice that AJDs are five-year safe harbors.[12] If the Final Rule takes effect, Private-Sector Plaintiffs will irrevocably lose any ability to rely on

---

[11] U.S. Army Corps of Engineers, Charleston District, JD Request Form, available at https://www.sac.usace.army.mil/Portals/43/docs/regulatory/JD%20Request%20Form%20Checklist%20FINAL%204-21-22.pdf?ver=t-fE0bxaiNiRIJiucN2KrQ%3D%3D.

[12] *See* Corps Regulatory Guidance Letter 16-01, available at https://usace.contentdm.oclc.org/utils/getfile/collection/p16021coll9/id/1256 , and Corps Regulatory Guidance Letter 05-02, available at https://usace.contentdm.oclc.org/utils/getfile/collection/p16021coll9/id/1246; *see generally Hawkes*, 136 S. Ct. at 1812, 1814-15; *id.* at 1817 (Kagan, J., concurring)..

those AJDs, will have to put on hold ongoing or planned projects that depend on those AJDs, and will need to undertake the costs of obtaining new JDs. The Agencies contend that these harms do not stem from the Final Rule, but rather from a January 2022 press release that announced this policy. Opp. 14–15. But the Agencies ignore, again, the difference between guidance and legislative rules. The press release was not binding on either the Agencies or regulated entities. *See Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 716 (D.C. Cir. 2015) ("Policy statements 'are binding on neither the public nor the agency. . . .'"). The Final Rule is.

III.   **Private-Sector Plaintiffs have shown an adequate likelihood of success on the merits.**

Consistent with their overarching theme, the Agencies' main response on the merits is to rehash their view that the Final Rule "is substantially similar to the status quo regime." Opp. 21. That is wrong, as Private-Sector Plaintiffs explain below. *See infra* Part II.B.1. But it is also irrelevant to several of Private-Sector Plaintiffs' merits arguments, which are addressed first.

A.   **Regardless of how much the Final Rule expands jurisdiction, it is unlawful.**

1.   **The Final Rule reads "navigable" out of the statute by asserting categorical jurisdiction over all interstate waters.**

The Final Rule asserts jurisdiction over all "interstate waters, regardless of their navigability." 88 Fed. Reg. at 3072. This means that there is jurisdiction if waters "flow across, or form a part of, State boundaries." *Id.* The waters need not be navigable, capable of being made navigable, or connected in any way to navigable waters. *Id.* at 3074 ("These waters need not meet the relatively permanent standard or significant nexus standard to be jurisdictional. . . .").

As previously explained, Mem. 14, this aspect of the Final Rule (and by extension, any part of the rule that relies on it) fails the Supreme Court's mandate that the statutory term "navigable" be given some "effect." *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172 (2001) ("*SWANCC*"). Indeed, the Agencies have lost before on these

grounds. In striking down the 2015 Rule, the Southern District of Georgia held that "the inclusion of all interstate waters in the definition of 'waters of the United States,' regardless of navigability, extends the Agencies' jurisdiction beyond the scope of the CWA because it reads the term navigability out of the CWA." *Georgia v. Wheeler*, 418 F. Supp. 3d 1336, 1358 (S.D. Ga. 2019). The court further noted that this overreach contradicts Justice Kennedy's concurrence in *Rapanos* (in which he held that waters must have an "evident connection to navigable-in-fact waters," 547 U.S. at 779 (Kennedy, J., concurring)) and also "would include waters that have little or no connection to navigable-in-fact waters like the ponds in *SWANCC*." *Id.* at 1359.

The Agencies' responses acknowledge neither Supreme Court precedent nor the statutory term "navigable." Opp. 23–24. They argue that "[t]he integrity of waters that form and cross state boundaries is necessarily within federal authority." *Id*. at 24 (citing U.S. Const. art. I, § 8). But that ignores the holdings in *SWANCC* that "navigable" must have meaning and that Congress did not invoke all its constitutional authority in enacting the CWA. 531 U.S. at 172. The Agencies also contend that "[p]redecessors of the [Clean Water] Act explicitly protected interstate waters independent of their navigability." Opp. 24. That proves too much. Congress's decision to remove that "explicit[] protect[ion]" is reason to conclude that Congress intended to narrow, not retain, that broad jurisdiction. *Cf. Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 156 (2013) (different language often shows Congress intended a different meaning).

### 2. The Final Rule is inconsistent with Justice Kennedy's opinion in *Rapanos*.

The Final Rule is also unlawful, irrespective of how much it changes the status quo, because it adopts a significant nexus test that Justice Kennedy would not recognize. Mem. 14–17. The Agencies' responses fail.

10

As an initial matter, the Agencies suggest (Opp. 34) that they are not bound by *Rapanos*, citing *National Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005). Not so. *Brand X* provides that an agency's reasonable interpretation of ambiguous statutory language is entitled to deference even if contrary to a pre-existing court decision with a different take on that same language. *Id.* at 982. But both the plurality and the concurrence in *Rapanos* viewed themselves as doing something different, setting outer limits on the statute's meaning that the Agencies have now ignored. The plurality said its reading is the "only plausible interpretation." 547 U.S. at 739 (plurality op.).[13] And Justice Kennedy made clear that "the need to give the term 'navigable' some meaning" limited "[t]he deference owed to the Corps[]" and required adopting his significant nexus test. 547 U.S. at 778–79 (Kennedy, J., concurring).

Nor have the Agencies succeeded in harmonizing the Final Rule with Justice Kennedy's opinion. *First*, the Agencies do not even attempt to explain how their aggregation of "similarly situated" waters is consistent with Justice Kennedy's test. That is because they cannot. Justice Kennedy expressly rejected the notion that there can be jurisdiction over a wetland whose "effects on water quality are speculative or insubstantial." 547 U.S. at 780 (Kennedy, J., concurring). But such a result would foreseeably and regularly arise under the Agencies' aggregation theory, which would permit gathering up several such "insubstantial" wetlands and streams and finding jurisdiction en masse. In context, it is clear that in referring to "similarly situated" wetlands, Justice Kennedy was simply leaving open that "[w]here an adequate nexus is established for a particular wetland, it may be permissible, as a matter of administrative

---

[13] The Agencies' suggestion that Chief Justice Roberts viewed the Agencies as unrestrained by the *Rapanos* opinions, *see* Opp. 41, is incorrect. Chief Justice Roberts joined the plurality opinion in full, and in his concurrence, he described the CWA as having "broad, *somewhat* ambiguous, but *nonetheless clearly limiting* terms." 547 U.S. at 758 (Roberts, C.J., concurring) (emphasis added). The Chief Justice thus explicitly agreed that the plurality opinion set an outer bound on the Agencies' authority.

convenience or necessity, to presume covered status for other *comparable* wetlands in the region." *Id.* at 782 (emphasis added).

*Second*, the Agencies baldly assert that Justice Kennedy did not limit his water-integrity-based test to adjacent wetlands. Opp. 35. But they ignore that Justice Kennedy's reasoning turned on the functions that wetlands specifically can perform "related to the integrity of other waters." *Rapanos*, 547 U.S. at 779 (Kennedy, J., concurring). And they fail to acknowledge that his holding is stated entirely in terms of wetlands: "Accordingly, *wetlands* possess the requisite nexus, and thus come within the statutory phrase 'navigable waters,' *if the wetlands*, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters. . . ." *Id.* at 780 (emphasis added).

*Finally*, the Agencies argue that while Justice Kennedy's test requires a significant effect on "the chemical, physical, *and* biological integrity of other covered waters more readily understood as 'navigable,'" *id.* (emphasis added), that does not mean the water or wetland must significantly affect "every single aspect" of the water's integrity. Opp. 34. The Agencies argue that the word "and" was not a "holding"—but it was literally a part of Justice Kennedy's holding. Moreover, other parts of his opinion show that he would not accept jurisdiction over wetlands that affect only one aspect of the receiving water's integrity. For example, Justice Kennedy repeatedly rejected the plurality's notion that flow alone—which could undoubtedly affect physical integrity—could establish a requisite significant nexus.[14]

---

[14] *See, e.g., id.* at 769 (Kennedy, J., concurring) (rejecting the plurality's conclusion that "[t]he merest trickle, if continuous, would count as a 'water'"); *id.* at 776 (disagreeing with the plurality that "wetlands (however remote) possessing a surface-connection with a continuously flowing stream (however small)" are jurisdictional).

### 3.     The Final Rule violates the APA's notice-and-comment procedures.

The Final Rule is also unlawful under the logical-outgrowth doctrine because the Agencies failed to provide notice that they were considering changes to the definition of "significantly affect." Mem. 20–21. The Agencies claim that they provided sufficient notice because they requested public comment on "all aspects of the proposal." Opp. 45 (quoting 86 Fed. Reg. at 69,372, 69,416 (Dec. 7, 2021)). But they cite no case holding that such a general request is enough. And unsurprisingly so, as such a standard would nullify the logical outgrowth test. To the contrary, cases require more specificity. *See Small Refiner Lead Phase-Down Task Force v. U.S. EPA*, 705 F.2d 506, 549 (D.C. Cir. 1983) (notice of unspecified changes in the relevant definition inadequate). In considering the 2015 WOTUS Rule, the Southern District of Texas explained that "generally requesting comments" on "unspecified geographic limitations" failed to provide notice of a "substantial change" from ecological and hydrologic criteria to a distance-based approach. *Texas v. EPA*, 389 F. Supp. 3d 497, 504–05 (S.D. Tex. 2019).[15]

The Agencies also point to a handful of comments on the proposed rule that suggested alternatives to the proposed definition of "significantly affect." But "notice is the agency's duty," so "notice necessarily must come—if at all—from the Agency.'" *Horsehead Res. Dev. Co. v. Browner*, 16 F.3d 1246, 1268 (D.C. Cir. 1994); *see also Miami-Dade Cty. v. EPA*, 529 F.3d 1049, 1059 (11th Cir. 2008); *Georgia*, 418 F. Supp. 3d at 1374. Thus, the D.C. Circuit has "rejected bootstrap arguments predicating notice on public comments alone." *Horsehead*, 16 F.3d at 1268. *Leyse v. Clear Channel Broadcasting, Inc.*, 545 F. App'x 444 (6th Cir. 2013), cited by the Agencies (Opp. 45–46), is consistent. The Sixth Circuit *first* found that the agency asked for comments on the specific question at issue and *then* noted that comments "provide[d]

---

[15] *See also Georgia*, 418 F. Supp. 3d at 1374 (holding that provisions in 2015 Rule did not satisfy logical outgrowth test); *North Dakota v. EPA*, 127 F. Supp. 3d 1047, 1058 (D.N.D. 2015) (same, in preliminary-injunction posture).

evidence that the notice was adequate." *Id*. at 454. The Agencies did not provide adequate notice here.

    **B.**    **The Final Rule's broad expansion of jurisdiction exceeds the Agencies' statutory authority under each of two clear statement rules and is arbitrary and capricious.**

        **1.**    **Contrary to the Agencies' claims, the Final Rule broadly expands jurisdiction over the status quo regime.**

The Agencies characterize the differences between the Final Rule and the status quo as "slight," "small," "*de minimis*," or mere "refine[ments]." Opp. 1, 2, 8, 11, 12, 20, 21, 32, 40, 47. That is false. The Rule makes many changes, *see supra* pp. 4–5, but two bear highlighting.

*First*, in paragraph (a)(5), the Final Rule creates a test for jurisdiction over *an entire category of intrastate waters* that the Agencies have not been treating as jurisdictional under the current regime. The paragraph provides a new catch-all category asserting jurisdiction over "'intrastate lakes and ponds, streams, or wetlands not identified in paragraphs (a)(1) through (4)' that meet either the relatively permanent standard or the significant nexus standard." 88 Fed. Reg. at 3097; *see* 33 C.F.R. § 328.3(a)(5). As the Agencies candidly admit, this paragraph is meant to cover those "water types previously listed in paragraph (a)(3) of the 1986 regulations," 88 Fed. Reg. at 3098—waters over which "the [A]gencies have not in practice asserted jurisdiction . . . under the pre-2015 regulatory regime," *id.* at 3102–03.

*Second*, the Final Rule expands the definition of "similarly situated" from just "all wetlands adjacent to the same tributary" under the current regime, Rapanos Guidance at 8, to all "waters . . . within the catchment area of the tributary of interest," 88 Fed. Reg. at 3097. This is a substantial broadening of the waters capable of being "similarly situated." *Id.* at 3128 ("all tributaries in a catchment and their adjacent wetlands" are similarly situated); *id.* at 3127 (indicating that all ephemeral streams draining a watershed could be aggregated). And it also

broadens the area over which those many types of waters may be aggregated. The Final Rule explains that a "catchment" is "the area of the land surface that drains to a specific location for a specific hydrologic feature, in this case the tributary." *Id.* at 3128. In plain English, the term "similarly situated" now appears to refer to everything in an area that drains to a common point.

Those two changes together would seem to any ordinary person to potentially sweep in extraordinary amounts of newly jurisdictional waters. The first brings under consideration a category of intrastate waters ("lakes and ponds, streams, or wetlands") that were not previously considered. And the second allows jurisdiction to be established by aggregating all such waters within a "drainage area"—whether they belong to a single property owner or hundreds.

The Agencies acknowledge that this change amounts to "a difference from pre-2015 practice," but label the change as "modest" based solely on their asserted "expect[ations]." Opp. 26–27. They admit, as they must, that they "expect the Rule's (a)(5) waters category to generate more significant nexus analyses." *Id.* at 27. They then inconsistently claim, however, that they "'do not expect a corresponding increase in positive jurisdictional determinations.'" *Id.* (quoting 88 Fed. Reg. at 3047 n.65).

What are these expectations based on? In short, "the agencies' experience."[16] More specifically, the estimates are extrapolated from a review of JDs carried out under the Rapanos Guidance. *See* Ex. 1, U.S. EPA and Department of the Army, *Economic Analysis for the Final "Revised Definition of 'Waters of the United States'" Rule* at I.B.3.6.2 (Dec. 2022). But that past experience did not concern "intrastate lakes and ponds, streams, and wetlands" or "catchment areas"—so it provides no evidence as to what will happen once the Agencies start evaluating

---

[16] 88 Fed. Reg. at 3126 ("Based on the agencies' experience, many waters assessed under this rule will not have a significant nexus to paragraph (a)(1) waters, and thus will not be jurisdictional under the Clean Water Act under this rule.").

these features and areas. While the Agencies dress their predictions up as "record-based" judgments, Opp. 30, it is clear on closer examination that there is little actually there.

The Agencies claim that the multi-function, multi-factor analysis under the Final Rule's significant nexus test imposes "appreciable limits" on their authority. *Id.* at 28. But without any guidance (much less binding instructions) on how to weigh those factors, nothing stops JDs from varying wildly based on the agency staff evaluating them. The Agencies ask regulated entities simply to trust that the multitude of "fact-specific, data-driven determinations conducted by agency staff with significant technical expertise and experience implementing the standards" will turn out the way they expect. *Id.* at 29. But based on what is actually written in the rule, there is simply no way to tell how the analysis will go.

### 2. The expansive new regime fails under two clear statement rules.

This expansive new regime risks the federal government's asserting jurisdiction over exactly the small, isolated, and purely intrastate water features for which the Supreme Court in *SWANCC* required clear congressional approval. Mem. 13. The Agencies respond by trying to limit the case to its facts, contending that they have not transgressed *SWANCC* because they are not relying on waters providing habitat for migratory birds. Opp. 28 n.5, 38-39.

But *SWANCC* was no minor decision. *See* 531 U.S. at 172 (holding that "what Congress had in mind as its authority for enacting the CWA" was "its traditional jurisdiction over waters that were or had been navigable in fact or which could reasonably be so made").[17] The rationale was not limited to the Agencies' reliance on migratory birds for jurisdiction; instead, the Court reasoned that asserting jurisdiction over "nonnavigable, isolated, intrastate waters" "invoke[d]

---

[17] *See also id.* at 168 (rejecting proposition that "the jurisdiction of the Corps extends to ponds that are *not* adjacent to open water" because "the text of the statute will not allow this"); *id.* at 176-77 (Stevens, J., dissenting) ("[T]he Court draws a new jurisdictional line, one that invalidates the 1986 migratory bird regulation as well as the Corps' assertion of jurisdiction over all waters except for actually navigable waters, their tributaries, and wetlands adjacent to each").

the outer limits of Congress's power." *Id.* at 172. Because no clear statutory statement supported doing so, the Court rejected that theory of jurisdiction. *Id.* at 174. So too should this Court.

The Final Rule's expansive new regime also triggers the major questions doctrine under *West Virginia v. EPA*, 142 S. Ct. 2587 (2022), because it asserts extraordinary authority with significant economic and political significance. Mem. 13. The Agencies respond that the increase in covered waters is "'slight and unquantifiable.'" Opp. 40. But as shown above, that claim does not hold up. The Agencies also point to their history of interpreting "waters of the United States." *Id.* The major questions doctrine, however, concerns not whether Congress granted the agency authority to regulate at all, but whether Congress granted the authority to regulate in the "*manner*" desired by the agency. *West Virginia*, 142 U.S. at 2613 (emphasis added).[18]

### 3.  The Final Rule is arbitrary and capricious because it fails to provide a reasoned explanation for its broad expansion of the status quo.

Finally, the Agencies' refusal to acknowledge the Final Rule's real effect is the definition of arbitrary and capricious rulemaking. An agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Likewise, agencies may change their policies so long as they provide a reasoned explanation for the change. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). The Agencies fail these standards by claiming that the Final Rule does something different from what it really does.

## IV.  The balance of equities and public interest support a preliminary injunction.

The public has no interest in maintaining an unlawful rule. *See* Mem. 25–26; *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). And there is no public

---

[18] The Agencies note that this argument was not presented in comments. Opp. 39 n.8. But the major questions doctrine is a tool of statutory interpretation, and a party cannot waive a tool of statutory construction. Moreover, *West Virginia* was decided after the comment period closed.

interest in allowing the Final Rule to take effect while *Sackett* is likely to address key elements of the rule. The Agencies argue that waiting on *Sackett* would "rais[e] grave separation of powers concerns," Opp. 48, but it is they who created those concerns by rushing out their rule.

The Agencies turn again to the argument that Private-Sector Plaintiffs will not be harmed because the Final Rule is "almost identical" to the status quo. And they argue that the Final Rule will benefit regulated parties because it provides clarity by codifying the pre-2015 regime. These premises are false. The Final Rule is not a codification of the pre-2015 regime, but rather changes the status quo. *See supra* pp. 4–5. And it does not provide clarity. Mem. 14. Finally, the Agencies note that Congress granted them authority to implement the CWA. Opp. 48. But that is a non-sequitur. That the Agencies can regulate does not mean they may do so however they choose.

The Agencies struggle mightily, and unsuccessfully, to articulate some harm to them in the face of their claims that the Final Rule does little to nothing. If they mean what they say, a temporary pause would do little to harm them. That does not mean Private-Sector Plaintiffs would not benefit. As explained, while the Agencies represent that they do not presently intend to exercise their authority broadly, nothing in the rule stops them from doing so.

## V.   This Court should issue the requested injunctive relief.

Private-Sector Plaintiffs' proposed preliminary injunction—to stop the Agencies from "enforcing the Final Rule … against [Private-Sector] Plaintiffs and their members," Proposed Order Granting Mot. for Prelim. Inj. at 2 (ECF No. 17-3)—is exactly the "party-specific relief," Opp. 48, that the Agencies say they want. As discussed above, associational standing allows associations to stand in as "representative[s]" of their members who could "make out a case or controversy had the members themselves brought suit." *Warth v. Seldin*, 422 U.S. 490, 516 (1975). There is no obligation to identify every injured member. *Id.* at 515. And when

associations with standing seek injunctive relief, that relief "inure[s] to the benefit of all members of the association actually injured." *Neighborhood Action Coal. v. City of Canton*, 882 F.2d 1012, 1017 (6th Cir. 1989). Here, for the reasons explained above, that includes all members subject to the Final Rule.

Indeed, it is the Agencies' proposal that fails to offer party-specific relief. The Agencies suggest an injunction "limited to the Rule's application to waters in Kentucky." Opp. 48 (boldface omitted). But as the Agencies acknowledge, Private-Sector Plaintiffs do not represent the interests of members (or, for that matter, of their members' operations) located only in the Commonwealth. *Id.* at 49; Compl. ¶¶ 21, 25. And the Agencies present no legal basis for treating differently those members that reside, or have operations, elsewhere when Private-Sector Plaintiffs have established standing to seek relief for all members subject to the Final Rule.

This Court should also decline the Agencies' passing suggestion that the Court enjoin only parts of the Final Rule. Opp. 50 n.14. To begin with, the merits arguments presented by Private-Sector Plaintiffs and the Commonwealth would require invalidating the entire rule. In any event, the public interest militates against a partial injunction that would only foster confusion in an already uncertain area with strict civil and criminal penalties for non-compliance.

## CONCLUSION

The motion for a preliminary injunction should be granted.

Dated:  March 8, 2023                          /s/ Elbert Lin
                                                     Charles E. English, Jr. ("Buzz")
Sarah P. Jarboe
LaJuana S. Wilcher
English, Lucas, Priest & Owsley, LLP
1101 College Street; P.O. Box 770
Bowling Green, KY 42102-0770
(270) 781-6500
benglish@elpolaw.com
sjarboe@elpolaw.com
lwilcher@elpolaw.com

Elbert Lin (*pro hac vice*)
Hunton Andrews Kurth LLP
951 East Byrd Street, East Tower
Richmond, VA 23219
(804) 788-8200
elin@HuntonAK.com

Matthew Z. Leopold (*pro hac vice*)
Kerry L. McGrath (*pro hac vice*)
Erica N. Peterson (*pro hac vice*)
Hunton Andrews Kurth LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 955-1500
mleopold@HuntonAK.com
kmcgrath@HuntonAK.com
epeterson@HuntonAK.com

*Counsel for Plaintiffs Kentucky Chamber of*
*Commerce, Chamber of Commerce of the United*
*States of America, Associated General Contractors*
*of Kentucky, Inc., Home Builders Association of*
*Kentucky, Portland Cement Association, and*
*Georgia Chamber of Commerce*

Andrew R. Varcoe (*pro hac vice*)
Stephanie A. Maloney (*pro hac vice*)
U.S. Chamber Litigation Center
1615 H Street, NW
Washington, DC 20062
(202) 463-5337
avarcoe@USChamber.com
smaloney@USChamber.com

*Counsel for Plaintiff Chamber of Commerce of the
United States of America*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 8th day of March 2023, I filed a copy of this Private-Sector Plaintiffs' Reply In Support of Motion For A Preliminary Injunction with the Court's electronic-filing system, which will send an electronic copy to all counsel.

/s/ Elbert Lin _____